*Fee Paid*

FAY ARFA, ATTORNEY AT LAW - SBN 100143
NAME

10100 SANTA MONICA BLVD., #300
PRISON IDENTIFICATION/BOOKING NO.

LOS ANGELES, CA 90067
ADDRESS OR PLACE OF CONFINEMENT

TEL: (310) 841-6805 FAX: (310) 841-0817

Note: · It is your responsibility to notify the Clerk of Court in writing of any
change of address. If represented by an attorney, provide his name,
address, telephone and facsimile numbers, and e-mail address.

```
            FILED
CLERK, U.S. DISTRICT COURT

      DEC 1 1 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY
```

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

WILLIAM SADOWSKI

CASE NUMBER:

CV 2:12CV 10623 PSG ( RZ )

To be supplied by the Clerk of the United States District Court

FULL NAME (Include name under which you were convicted )
                                                    Petitioner (30)

v.

RANDY GROUNDS, WARDEN

☐ _____ **AMENDED**

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254

NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER ·
                                                    Respondent.

PLACE/COUNTY OF CONVICTION _____
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number )
CV _____
CV _____

## INSTRUCTIONS - PLEASE READ CAREFULLY

1.   To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.   In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge the judgment entered by a difference California state court, you must file a separate petition.

3.   Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.   Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum. the grounds for relief from the conviction and/or sentence that you challenge.

5.   You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6.   You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the fee.

7.   When you have completed the form, send the original and two copies to the following address:



> Clerk of the United States District Court for the Central District of California
> United States Courthouse
> ATTN: Intake/Docket Section
> 312 North Spring Street
> Los Angeles, California 90012

PLEASE COMPLETE THE FOLLOWING: (*Check appropriate number*)

This petition concerns:
1. ☑ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention <u>Salinas Valley State Prison, Soledad, CA</u>
   b. Place of conviction and sentence <u>Los Angeles, CA</u>

2. Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked)*.
   a. Nature of offenses involved *(include all counts)* : <u>Felony murder, carjacking (2 cts), attempted carjacking (1 ct),</u>
      <u>special circumstance - murder during a carjacking</u>

   b. Penal or other code section or sections: <u>PC 187, 215, 664/187, 190.2(a)(17)</u>

   c. Case number: <u>SA041780</u>
   d. Date of conviction: <u>11/16/09 (guilt) 11/25/09 (sanity)</u>
   e. Date of sentence: <u>1/15/10</u>
   f. Length of sentence on each count: <u>LWOP (Ct. 1)</u>

   g. Plea *(check one)* :
      ☑ Not guilty
      ☐ Guilty
      ☐ Nolo contendere
   h. Kind of trial *(check one)* :
      ☑ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?      ☑ Yes   ☐ No
   If so, give the following information for your appeal *(and attach a copy of the Court of Appeal decision if available)*:
   a. Case number: <u>B221859</u>
   b. Grounds raised *(list each)* :
      (1) <u>Presence of Uniformed police officers during trial - denial dp & fair trial (US Const. Amends. V, XIV)</u>
      (2) <u>Prosecutorial Misconduct (US Const. Amends. V, VI, XIV)</u>

    (3) <u>Insufficient Evidence Sanity (US Const. Amends. V, VI) (Jackson v. Virginia)</u>

    (4) <u>LWOP is Cruel and Unusual Punishment (US Const. Amends. VIII)</u>

    (5) _____

    (6) _____

c.  Date of decision: <u>5/31/2011</u>

d.  Result <u>Affirmed</u>

4. If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision? ☑ Yes ☐ No

If so give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)* :

a.  Case number: <u>S194212</u>

b.  Grounds raised *(list each)* :

    (1) <u>Same as in the court of appeal (See #3 above)</u>

    (2) _____

    (3) _____

    (4) _____

    (5) _____

    (6) _____

c.  Date of decision: <u>September 14, 2011</u>

d.  Result <u>Denied</u>

5. If you did not appeal:

a.  State your reasons

b.  Did you seek permission to file a late appeal?  ☐ Yes ☐ No

6. Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☑ Yes ☐ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court: <u>Los Angeles Superior Court</u>

    (2) Case number: <u>SA 041780</u>

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: <u>12/7/12</u>

(4) Grounds raised *(list each)*:

    (a)   Presence of Uniformed Officers - Denial of DP and Fair Trial US Const. Amends. V, VI, XIV

    (b)   IAC - Failure to prepare and present defense.  US Const. Amends. V, VI, XIV

    (c)   Prosecutorial misconduct - Golden Rule & Vouching. US Const. Amends. V, VI, XIV

    (d)   Imcomplete Instructions at Sanity Phase; IAC US Const. Amends. V, VI, XIV

    (e)   Sentence Violates Cruel and Unusual Punishment US Const. Amends. VII

    (f)

(5) Date of decision: Pending

(6) Result

(7) Was an evidentiary hearing held?    ☐ Yes  ☐ No

b.  (1) Name of court:

    (2) Case number:

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)* :

    (4) Grounds raised *(list each)*:

        (a)

        (b)

        (c)

        (d)

        (e)

        (f)

    (5) Date of decision:

    (6) Result

    (7) Was an evidentiary hearing held?    ☐ Yes  ☐ No

c.  (1) Name of court:

    (2) Case number:

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*:

    (4) Grounds raised *(list each)*:

        (a)

        (b)

        (c)

        (d)

        (e)

        (f)

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?       ☐ Yes  ☐ No

7.  Did you file a petition for certiorari in the United States Supreme Court?       ☐ Yes   ☑ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

8.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the <u>facts</u> supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:**   *Exhaustion Requirement*:  In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court.  This means that, prior to seeking relief from the federal court, you first must present <u>all</u> of your grounds to the California Supreme Court.

a.  Ground one: Trial for killing a police officer in Overwhelming Presence of Uniformed Officers Violated Rights to Due Process and Fair Trial (US Const. Amends. V, VI, XIV)

(1) Supporting FACTS: Uniformed officers filled courtroom, courtroom corridors, and sat with victim' family during trial for death of police officer.  Opened doors for jurors.  Stood when jury entered and exited courtroom.  Stared down defendant's family.  (Only overwhelming presence raised on appeal)

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?       ☑ Yes   ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?       ☐ Yes   ☑ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?       ☐ Yes   ☐ No

b.  Ground two: IAC - Failure to prepare and present defense.  Failure to call treating psychiatrist and failure to present evidence about disability payments. (US Const. Amends. V, VI, XIV)

(1) Supporting FACTS: Defense counsel failed to present treating psychiatrist Dr. Zetin to testify that Sadowski suffered a psychotic break at the time of the incident;  Failure to present evidence that

disability had maximum benefit period of two years.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☐ Yes  ☑ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☐ Yes  ☑ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☐ Yes  ☑ No

c.  Ground three: Prosecutorial Misconduct - Guilt and Sanity Phases; IAC (US Const. Amends.V,VI, XIV)

(1) Supporting FACTS: Prosecutor committed misconduct by violating "Golden Rule"; Misstating Law and Facts; Disparaging Defense Counsel;  Improper Vouching; IAC failure to object & raise on appeal) (Golden Rule and some vouching not raised on direct appeal)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☑ Yes  ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☑ Yes  ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☐ Yes  ☑ No

d.  Ground four: Trial Court Failed to Issue Complete Instructions During Sanity Phase;  IAC - Failure to Object and Raise on Appeal (US Const.  Amends. V, VI, XIV)

(1) Supporting FACTS: Trial court issued only 7 instructions, none of which dealt with judging witness credibility, judging expert witness and evidence.  IAC for failure to raise issue at trial and on appeal

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☐ Yes  ☑ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☐ Yes  ☑ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☐ Yes  ☑ No

e.  Ground five: Overwhelming Evidence Proved Sadowski's Insanity at time of Carjacking (US Const.  Amends. V, VI, XIV) Failure to Adequately raise on appeal

(1) Supporting FACTS: Jury's sanity verdict lacked substantial evidence because  lay and expert witnesses presented by the defense proved Sadowski's sanity by preponderance of evidence. (Similar, but not exact issue raised on appeal)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☑ Yes  ☐ No

ADDITIONAL PAGES OF GROUNDS FOR RELIEF

Question 8 continued

F.   **Ground six: SENTENCE OF LWOP CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT**
(1) Supporting FACTS: Sadowski's LWOP sentence should be considered disproportionate to his culpability in light of the severity of his illness, his lack of substantial criminal history, and the jury's finding that he lacked the intent to kill. Sadowski's LWOP sentence ". . . in the circumstances of this case . . . violated the Federal constitutional prohibition against cruel or unusual punishment." U.S. Const. amend. VIII.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    Yes.
(3) Did you raise this claim in a Petition for Review to the CA Supreme Court?    Yes.
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    No.

G.   **Ground seven: THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL**
(1) Supporting FACTS: Trial counsel failed to investigate & present a defense. The prosecutor committed misconduct. The trial court committed evidentiary errors. Appellate counsel failed to raise issues. Sadowski was denied several constitutional rights including due process, a fair trial, & effective counsel. The case was close. *Donnelley v. DeChristoforo,* 416 U.S. 637, 642-643 (1974); *Brecht v. Abrahamson,* 507 U.S. at 623
(2) Did you raise this claim on direct appeal to the California Court of Appeal?    No
(3) Did you raise this claim in a Petition for Review to the CA Supreme Court?    No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    No

    (3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☑Yes   ☐No

    (4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☐Yes   ☑No

9.  If any of the grounds listed in paragraph 7 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: <u>Ineffective assistance of appellate counsel;</u> <u>ineffective assistance of trial counsel.</u>

10. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

    ☐Yes  ☑No

    If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.   (1) Name of court: _____

     (2) Case number: _____

     (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

     (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

     (5) Date of decision: _____

     (6) Result _____

     (7) Was an evidentiary hearing held?    ☐Yes ☐No

b.   (1) Name of court: _____

     (2) Case number: _____

     (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

     (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

     (5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?      ☐ Yes ☐ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?      ☐ Yes   ☐ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?      ☑ Yes ☐ No

If so, provide name, address and telephone number: Fay Arfa, 10100 Santa Monica Blvd., #300

LA, CA  90067 Tel:  (310) 841-6805 _____

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding,

/s Fay Arfa

*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _____

*Date*                                    *Signature of Petitioner*

WILLIAM SADOWSKI

_____
Petitioner

RANDY GROUNDS, WARDEN

_____
Respondent(s)

**ELECTION REGARDING
CONSENT TO PROCEED BEFORE
A UNITED STATES MAGISTRATE JUDGE**

- A magistrate judge is available under 28 U.S.C. § 636 ( c) to conduct all proceedings in this case, including dispositive matters, and entry of final judgment. However, a magistrate judge may be assigned to rule on dispositive matters only if all parties voluntarily consent.

- Parties are free to withhold consent to magistrate judge jurisdiction without adverse substantive consequences.

- If both parties consent to have a magistrate judge decide the case, any appeal would be made directly to the Ninth Circuit Court of Appeals, as if a district judge had decided the matter.

- Unless both parties consent to have a magistrate judge decide the case, the assigned magistrate judge will continue to decide only non-dispositive matters, and will issue a Report and Recommendation to the district judge as to all dispositive matters.

*Please check the "yes" or "no" box regarding your decision to consent to a United States Magistrate Judge, and sign below.*

☐ Yes, I voluntarily consent to have a United States Magistrate Judge conduct all further proceedings in this case, decide all dispositive and non-dispositive matters, and order the entry of final judgment.

☑ No, I do not consent to have a United States Magistrate Judge conduct all further proceedings in this case.

Executed on 12/11/12                    /s Fay Arfa
_____        _____
Date                                                Signature of Petitioner/Counsel for Petitioner

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA, )
                                    )
        Plaintiff and Respondent,   )        Supreme Court
                                    )        No. _____
                                    )
                                    )        Court of Appeal
    v.                              )        No. B221859
                                    )
                                    )        Superior Court
WILLIAM SADOWSKI,                   )        No.  SA054153
                                    )
        Defendant and Appellant     )
                                    ).
_____)

Appeal from the Superior Court of Los Angeles County

Honorable Lance A. Ito, Judge

---

## PETITION FOR REVIEW

---

Deborah L. Hawkins
State Bar No. 127133
13446 Poway Road PMB 225
Poway, California 92064
(858) 530-8032

Attorney for Defendant and
Appellant

Certified Specialist, Appellate Law
The State Bar of California Board
of Legal Specialization

By appointment of the Court of
Appeal

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . iii

ISSUES PRESENTED FOR REVIEW AND NECESSITY FOR REVIEW
. . . . . . . . . . . . . . . . . . . . . . . 3

     I.    WHETHER TRIAL FOR THE DEATH OF A POLICE
     OFFICER IN A COURTROOM FILLED WITH UNIFORMED
     OFFICERS AS A SUBSTANTIAL SPECTATOR PRESENCE
     VIOLATED APPELLANT'S STATED AND FEDERAL DUE
     PROCESS RIGHT TO A FAIR TRIAL (U.S. CONST.
     AMEND. V AND AMEND. XIV; CAL. CONST.    ART. I § 7
     AND § 15) . . . . . . . . . . . . . . . . . 3

     II.   WHETHER APPELLANT SHOULD BE GRANTED A NEW
         TRIAL BASED ON PROSECUTORIAL MISCONDUCT (U.S.
         CONST. AMEND. V AMEND VI, AND AMEND. XIV) . 4

     III. WHETHER THE EVIDENCE IS SUFFICIENT TO PROVE
         BEYOND A REASONABLE DOUBT THAT APPELLANT WAS
         SANE AT THE TIME OF THE CARJACKING (U.S.
         CONST. AMEND V. AND AMEND. VI)
         . . . . . . . . . . . . . . . . . . . . . 5

     IV.  WHETHER APPELLANT'S LWOP SENTENCE IS CRUEL
         AND UNUSUAL PUNISHMENT UNDER THE CALIFORNIA
         CONSTITUTION (CAL. CONST. ART. I § 17)
         . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF THE CASE . . . . . . . . . . . . . . . 9

STATEMENT OF FACTS . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . 11

     I.    TRIAL FOR THE DEATH OF A POLICE OFFICER IN A
     COURTROOM FILLED WITH UNIFORMED OFFICERS AS A
     SUBSTANTIAL SPECTATOR PRESENCE VIOLATED
     APPELLANT'S STATED AND FEDERAL DUE PROCESS RIGHT
     TO A FAIR TRIAL (U.S. CONST. AMEND. V AND AMEND.
     XIV; CAL. CONST. ART. I § 7 AND § 15) . . . . 10

A.   CLEARLY ESTABLISHED UNITED STATES SUPREME
     COURT PRECEDENT   . . . . . . . . . 10

B.   THE TRIAL COURT AND THE COURT OF APPEAL'S
     FAILURE TO APPLY CLEARLY ESTABLISHED UNITED
     STATES SUPREME COURT PRECEDENT  . . . . . 14

II.   APPELLANT SHOULD BE GRANTED A NEW TRIAL BASED ON
      PROSECUTORIAL MISCONDUCT (U.S. CONST. AMEND. V
      AMEND VI, AND AMEND. XIV) . . . . . . . . . 18

A.   THE CLAIM OF PROSECUTORIAL MISCONDUCT
     DISPARAGING DEFENSE COUNSEL IS NOT FORFEITED
     . . . . . . . . . . . . . . . . . . . 18

B.   THE NINETEEN MISSTATEMENTS OF FACT   . . . 20

C.   MISSTATEMENTS OF LAW AND APPEAL TO SYMPATHY
     . . . . . . . . . . . . . . . . . . 33

D.   IN THE AGGREGATE, THE PROSECUTOR'S MISCONDUCT
     RENDERED APPELLANT'S TRIAL FUNDAMENTALLY
     UNFAIR  . . . . . . . . . . . . . . . . 34

III.  THE EVIDENCE IS INSUFFICIENT TO PROVE BEYOND A
      REASONABLE DOUBT THAT APPELLANT WAS SANE AT THE
      TIME OF THE CARJACKING (U.S. CONST.
      AMEND V. AND AMEND. VI) . . . . . . . . . . 37

IV.   APPELLANT'S LWOP SENTENCE IS CRUEL AND UNUSUAL
      PUNISHMENT UNDER THE CALIFORNIA CONSTITUTION (CAL.
      CONST. ART. I § 17) . . . . . . . . . . . . 43

A.   NATURE OF THE OFFENSE . . . . . . . . . 44

B.   THE NATURE OF THE OFFENDER  . . . . . . 45

CONCLUSION  . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF WORD COUNT

"EXHIBIT A"

TABLE OF AUTHORITIES

**CASES**

Chapman v. California (1967) 386 U.S. 18 [87 S.Ct. 824,
      17 L.Ed.2d 705] . . . . . . . . . . . . . . . 35

Donnelly v. DeChristoforo (1974) 416 U.S. 637 [94 S.Ct.
      1868, 40 L.Ed.2d 431] . . . . . . . . 4, 5, 18, 37

Estelle v. McGuire (1991) 502 U.S. 62 [112 S.Ct. 475,
      116  L.Ed.2d 385] . . . . . . . . . 4, 5, 18, 37

Estelle v. Williams (1976) 425 U.S. 501 [96 S.Ct. 1691,
      48 L.Ed.2d 126] . . . . . . . . . . . . 4, 12, 18

Holbrook v. Flynn (1986) 475 U.S. 560 [106 S.Ct. 1340;
      89 L.Ed.2d 525] . . . . . . . . . . . 3, 11, 18

In re Lynch (1972) 8 Cal.3d 410 . . . . . . . . 7, 44

In re Winship (1970) 397 U.S. 358 [90 S.Ct. 1068, 5
L.Ed.2d 368] . . . . . . . . . . . . . . . 6, 38, 44

Leland v. Oregon (1952) 343 U.S. 790 [72 S.Ct. 1002,
      96 L.Ed.2d 1302] . . . . . . . . . . . 6, 38, 44

People v Holt (1997) 15 Cal.4th 619 . . . 4, 5, 19, 38

People v. Bacigalupo (1991) 1 Cal.4th 103 . . . . . 51

People v. Dillon (1983) 34 Cal.3d 441 . . . . . . 7, 44

People v. Espinoza (1992) 3 Cal.4th 806 . . . . . . 37

People v. Gionis (1995) 9 Cal.4th 1196 . . . . . . 37

People v. Hill (1998) 17 Cal.4th 800 . 20, 21, 35, 37

People v. Love (1961) 56 Cal.3d 720 . . . . . . . 21

People v. Mora (1995) 39 Cal.App.4th 605 . . . . . 45

iii

People v. Redd (2010) 48 Cal.4th 691 . . . . . . . 21

People v. Simington (1993) 19 Cal.App.4th 1374 . . 36

People v. Skinner (1985) 39 Cal.3d 765 . . . 6, 38, 44

People v. Smith (1986) 187 Cal.App.3d 666 . . . . . 50

People v. Valdez (2004) 32 Cal.4th 73 . . . . . . . 34

Strickland v. Washington (1984) 466 U.S. 668 [104 S.Ct. 2052,
    80 L.Ed.2d 674] . . . . . . . . . . . . . . . . 20

Washington v. Glucksberg (1997) 521 U.S. 702 [117 S.Ct. 2258,
    117 S.Ct. 2302, 138 L.Ed.2d 772] . . . . . 42, 43

Woods v. Dugger (11th Cir. 1991) 923 F.2d 1454 . . . .
    . . . . . . . . . . . . . . . . . . 3, 12,18, 19

**STATUTES**

Penal Code
                                                    1
    section 187, subd. (a) . . . . . . . . . . 2

    section 215, subd. (a) . . . . . . . . . . 2

    section 190.2, subd. (a)(17) . . . . . 2, 7

    section 664/215 . . . . . . . . . . . . . 2

    section 12022, subd. (b)(1) . . . . . . . 2

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amend. V . . . . 4-6, 18, 37, 38, 44

U.S. Const. Amend. VI . . . . . . . . . . . 20

U.S. Const. Amend. XIV . . . . 4-6, 18, 37, 38, 44

Cal. Const. Art. I, § 17 . . . . . . . . 7, 44, 51

Cal. Const. Art. I, § 7 and § 15 . . . 4, 5, 19, 37

**RULES OF COURT**

California Rules of Court

rule 8.500(b)(1) . . . . . . . . . . . . . . . 4-7

rule 8.508 . . . . . . . . . . . . . . . . . 4-7

**OTHER AUTHORITIES**

Hinshaw, <u>The Mark of Shame: Stigma of Mental Illness and Agenda for Change</u> (Oxford University Press, 2007)
. . . . . . . . . . . . . . . . . . . . . . . 36, 46

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA


PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )       Supreme Court
        Plaintiff and Respondent,  )       No. _____
                                   )
                                   )       Court of Appeal
v.                                 )       No.   B221859
                                   )
                                   )       Superior Court
WILLIAM SADOWSKI,                  )       No.   SA054153
                                   )
        Defendant and Appellant    )
_____)


Appeal from the Superior Court of Los Angeles County

Honorable Lance A. Ito, Judge


PETITION FOR REVIEW


TO THE HONORABLE CHIEF JUSTICE AND THE ASSOCIATE

JUSTICES OF THE SUPREME COURT OF CALIFORNIA:

William Sadowski, appellant, respectfully

petitions for review of the unpublished decision of the

Court of Appeal, Second Appellate District Division

Eight, filed May 31, 2011.  A jury found appellant

guilty of one count of first degree felony murder with

1

a carjacking special circumstance and deadly weapon enhancement; two counts of carjacking; and one count of attempted carjacking. (Pen. Code § 187, subd. (a); §190.2, subd. (a)(17); § 12022, subd. (b)(1); § 215, subd. (a); § 664/215.) (2 C.T. pp. 441-445.) A copy of the court of appeal's opinion is attached as "Exhibit A," hereinafter "Slip opn."

ISSUES PRESENTED FOR REVIEW AND NECESSITY FOR REVIEW

I.  WHETHER TRIAL FOR THE DEATH OF A POLICE OFFICER IN
    A COURTROOM FILLED WITH UNIFORMED OFFICERS AS A
    SUBSTANTIAL SPECTATOR PRESENCE VIOLATED
    APPELLANT'S STATED AND FEDERAL DUE PROCESS RIGHT
    TO A FAIR TRIAL (U.S. CONST. AMEND. V AND AMEND.
    XIV; CAL. CONST. ART. I § 7 AND § 15)

The trial court denied appellant's motion for a

new trial because he was tried for the death of a

police officer in a courtroom filled with uniformed

officers, sending a message to the jury of the verdict

the officers desired. (14 R.T. p. 2526.) Prior to

trial in denying appellant's motion to have officers

attend in civilian dress, the trial court stated there

was no authority for asking the officers to appear out

of uniform. (2 R.T. p. 63.) However, ample federal

authority supported granting appellant's request to

have the spectators in civilian clothes. (Holbrook v.

Flynn (1986) 475 U.S. 560, 570-575 [106 S.Ct. 1340; 89

L.Ed.2d 525]; Woods v. Dugger (11th Cir. 1991) 923 F.2d

1454, 1459.) The trial court erred. The presence of

many uniformed police officers at defendant's trial for

the death of an officer undermined appellant's federal

and state due process rights to a fair trial. (U.S.

3

Const. Amend. V and Amend. XIV; <u>Estelle v. McGuire</u>

(1991) 502 U.S. 62, 73 [112 S.Ct. 475, 116   L.Ed.2d

385]; <u>Donnelly v. DeChristoforo</u> (1974) 416 U.S. 637,

643 [94 S.Ct. 1868, 40 L.Ed.2d 431]; <u>Estelle v.</u>

<u>Williams</u> (1976) 425 U.S. 501, 505 [96 S.Ct. 1691, 48

L.Ed.2d 126]; Cal. Const. Art. I, § 7 and § 15; <u>People</u>

<u>v Holt</u> (1997) 15 Cal.4th 619, 667-668

.) Review is necessary to settle an important question

of law and to exhaust appellant's state law remedies.

(California Rules of Court, rule 8.500(b)(1); 8.508.)

## II.   WHETHER APPELLANT SHOULD BE GRANTED A NEW TRIAL BASED ON PROSECUTORIAL MISCONDUCT (U.S. CONST. AMEND. V AMEND VI, AND AMEND. XIV)

Prior to sentencing, trial counsel moved for a new

trial on, among other grounds, the prosecutorial

misconduct of Ms. Loftfield. (2 C.T. p. 530.) During

the guilt phase, she asked for sympathy for Officer

Scott's family.  (2 C.T. p. 530; 9 R.T. p. 1418.)

During the sanity phase, she misstated the applicable

law during closing argument and attacked the integrity

of defense counsel.  (2 C.T. p. 530; 14 R.T. pp.  2471,

2492.)  She also mischaracterized the evidence numerous

4

times, referred to facts not in evidence, and vouched

for her interpretation of the evidence by testifying

based on her personal experience.  (14 R.T. pp. 2447-

2477.)    The trial court found no prosecutorial

misconduct, and the court of appeal agreed.  (14 R.T.

pp. 2526-2537.) (Slip opn. at pp. 7-13.)  Both are in

error.   Prosecutorial misconduct undermined

appellant's state and federal due process right to a

fundamentally fair trial.  (U.S. Const. Amend. V,  and

Amend. XIV; Estelle v. McGuire, supra, 502 U.S. at p.

73 [112 S.Ct. 475, 116  L.Ed.2d 385]; Donnelly v.

DeChristoforo, supra, 416 U.S. at p. 643; Cal. Const.

Art. I, § 7 and § 15; People v Holt, supra, 15 Cal.4th

at pp. 667-668.)  Review is necessary to settle an

important question of law and to exhaust appellant's

state law remedies.  (California Rules of Court, rule

8.500(b)(1); 8.508.)

III. WHETHER THE EVIDENCE IS SUFFICIENT TO PROVE BEYOND
     A REASONABLE DOUBT THAT APPELLANT WAS SANE AT THE
     TIME OF THE CARJACKING(U.S. CONST. AMEND V. AND
     AMEND. VI)

The jury found that appellant was sane at the time

of the carjacking.  (2 C.T. p. 522.)  However, there

5

was overwhelming evidence that appellant had been
mentally ill for many years leading up the death of
Officer Scott. The jury's verdict was against the
weight of the evidence; it was not supported by proof
beyond a reasonable doubt.  The finding of sanity
violates appellant's state and federal due process
rights.  (U.S. Const. Amend. V and Amend. XIV; In re
Winship (1970) 397 U.S. 358, 364 [90 S.Ct. 1068, 5
L.Ed.2d 368]; Leland v. Oregon (1952) 343 U.S. 790, 801
[72 S.Ct. 1002, 96 L.Ed.2d 1302]; People v. Skinner
(1985) 39 Cal.3d 765, 744 [punishment by death or
imprisonment of one who's mental illness results in the
inability to appreciate an act is wrongful raises
serious questions of constitutional dimension under the
due process and cruel and unusual punishment provisions
of the Constitution].)  Review is necessary to settle
an important question of law and to exhaust appellant's
state law remedies.  (California Rules of Court, rule
8.500(b)(1); 8.508.)

IV.  WHETHER APPELLANT'S LWOP SENTENCE IS CRUEL AND
     UNUSUAL PUNISHMENT UNDER THE CALIFORNIA
     CONSTITUTION (CAL. CONST. ART. I § 17)

     Based upon the jury's true finding on the Penal

6

Code section 190.2, subdivision (a)(17) special circumstance [murder during a carjacking], the court sentenced appellant to confinement in state prison for life without the possibility of parole (LWOP). (14 R.T. p. 2562; 2 C.T. p. 442.)  Trial counsel moved the court to strike the special circumstance finding because the LWOP sentence was cruel and unusual punishment under the California Constitution in light of appellant's severe mental illness and his decline based on that illness. (2 C.T. p. 532-533; 14 R.T. pp. 2556-2557; Cal. Const. Art. I, § 17; In re Lynch (1972) 8 Cal.3d 410, 424; People v. Dillon (1983) 34 Cal.3d 441.)  The trial court's refusal to do was in error. Appellant's LWOP sentence is disproportionate to his culpability, given the severity of his illness, his lack of substantial criminal history, the inadequate medical and legal protocols that failed to recognize his need for hospitalization and treatment, and the jury's finding that he lacked the intent to kill. Review is necessary to settle an important question of law and to exhaust appellant's state law remedies. (California Rules of Court, rule 8.500(b)(1); 8.508.)

7

## STATEMENT OF THE CASE

Appellant incorporates by reference the procedural

history found at Slip opn. p. 2-4.

## STATEMENT OF FACTS

Appellant incorporates by reference the statement of facts found at Slip opn. pp. 2-4.

ARGUMENT

I.    TRIAL FOR THE DEATH OF A POLICE OFFICER IN A
      COURTROOM FILLED WITH UNIFORMED OFFICERS AS A
      SUBSTANTIAL SPECTATOR PRESENCE VIOLATED
      APPELLANT'S STATED AND FEDERAL DUE PROCESS RIGHT
      TO A FAIR TRIAL (U.S. CONST. AMEND. V AND AMEND.
      XIV; CAL. CONST. ART. I § 7 AND § 15)

      A.    CLEARLY ESTABLISHED UNITED STATES SUPREME
            COURT PRECEDENT

      In Holbrook v. Flynn, supra, 475 U.S. at pp. 571-

572 [106 S.Ct. 1340, 89 L.Ed.2d 525], the Supreme

Court had held that four uniformed state troopers

sitting in the spectator row directly behind the

defendant throughout his trial for security purposes

did not create such inherent prejudice that it denied

the defendant a fair trial.  In reaching this holding,

the Court stated that the test must be "whether an

unacceptable risk is presented of impermissible factors

coming into play."  (Id at. p. 570 [106 S.Ct. 1340, 89

L.Ed.2d 525].   The Supreme Court, did note, however,

that " [w]e do not minimize the threat that a roomful

of uniformed and armed policemen might pose to a

defendant's chances of receiving a fair trial."  (Id.

at p. 570-571 [106 S.Ct. 1340, 89 L.Ed.2d 525].)   In

Holbrook, the United States Supreme Court held that

10

"some practices are so inherently prejudicial that they must be justified by an "essential state" policy or interest.  (Holbrook v. Flynn, 475 U.S. supra, 568-569 [106 S.Ct. 1340, 89 L.Ed.2d 525]; see also Estelle v. Williams, supra, 425 U.S. at p. 505 [96 S.Ct. 1691, 48 L.Ed.2d 126].)  Thus, where state action is concerned, established federal constitutional precedent requires the state to justify a practice that is inherently prejudicial, including the presence of uniformed officers at trial.

The Eleventh Circuit Court of Appeals addressed an issue almost identical to the instant question·in Woods v. Dugger, supra, 923 F.2d at p. 1459.  Applying clearly established federal constitutional law developed in Estelle v. Williams and Holbrook v. Flynn, the Eleventh Circuit found that a large number of non-witness, off-duty, uniformed prison guards sitting as spectators at the defendant's high profile trial for the death of a prison guard created inherent prejudice that the state could not.justify.

In Dugger, co-defendants Woods and Bean, inmates at Union Correctional Institution in Union County,

11

Florida, attacked a number of correctional officers.
(Id. at p. 1455.)    Eighteen-year-old Woods killed
correctional officer John Dennard.    (Ibid.)

The trial was held in the geographic area of the
prison where the correctional facility represented a
substantial portion of the local economy and job
opportunities. (Ibid.)    There was extensive pre-trial
publicity about the death of the guard.    (Ibid.)

In addition to these facts, the gallery of the
courtroom, which accommodated about forty spectators,
was half-filled by off-duty uniformed prison guards.
(Id. at p. 1458.)    Defense counsel objected to their
presence. (Id. at p. 1458.)

The Eleventh Circuit found the presence of the
spectator guards in uniform along with the pretrial
publicity to be presumptively prejudicial.    (Id. at p.
1459.)    "The prejudice arises from the presence of the
uniformed corrections officers in the context of a
trial being held in the midst of an angry community."
(Ibid.)    The Court of Appeal noted that the guards were
present during voir dire, closing argument, and
throughout the sentencing phase of the trial.    (Ibid.)

> "The officers were there for one reason: they
> hoped to show solidarity with the killed
> correctional officer.  In part, it appears
> they wanted to communicate a message to the
> jury.  The message of the officers is clear
> in light of the extensive pretrial publicity.
> The officers wanted a conviction followed by
> imposition of the death penalty.

(<u>Id</u>. at pp. 1459-1460.)

Applying <u>Holbrook v. Flynn, supra</u>, the Eleventh
Circuit found that the state could rebut the
presumption of prejudice by a showing that the officers
were present to further an essential state interest as
the four troopers had been in <u>Holbrook</u>.  (<u>Id</u>. at p.
1460.) However, because the uniformed officers in
<u>Dugger</u> were there as spectators only, the state could
not justify their presence.  (<u>Ibid</u>.)  Further, the
Eleventh Circuit noted that officers, as part of
department policy, were not to wear uniforms during
off-duty hours or when not acting in an official
capacity.  (<u>Ibid</u>.)  The Eleven Circuit noted that
"presumed prejudice rarely occurs" and "is reserved for
extreme situations."  (<u>Id</u>. at p. 1459.)  However, the
presence of the uniformed guards in such substantial
numbers was an instance of "extreme prejudice." (<u>Ibid</u>.)

13

B.    THE TRIAL COURT AND THE COURT OF APPEAL'S
      FAILURE TO APPLY CLEARLY ESTABLISHED UNITED
      STATES SUPREME COURT PRECEDENT

Here the trial court and the court of appeal have

failed to apply clearly established United States

Supreme Court precedent.  The trial court was entirely

unaware that the state had the duty to rebut the

prejudice a courtroom full of uniformed officers

presented.  (2 R.T. p. 63; 14 R.T. p. 2526.)  The court

of appeal does not state any furtherance of an

essential state interest to rebut the presumption of

prejudice.  (Slip opn. at pp. 6-7.)  Rather, the court

of appeal quibbles about the number of uniforms that

appeared before the jury during trial.  (Slip opn. at

pp. 6-7.)

However, defense counsel stated at the outset of

these proceedings that the already established practice

in this case of the spectacle of two rows of officers

lined up in their uniforms would send a message to the

jury.  (2 R.T. p. 63.)   LAX officers were not only an

official, uniformed presence, but by their positioning

in the courtroom they attempted to evoke sympathy from

the jury for themselves and the Scott family.  Thus,

14

when the prosecutor asked for sympathy for the Scott
family during guilt phase closing, she turned to the
family who were surrounded by numerous uniformed LAX
officers.  (2 C.T. p. 530.)  At an earlier point in the
trial, Ms. Nunez noticed that one of these LAX officers
who sat by the Scott family was holding the door for
the jurors.  (8 R.T. p. 1185.)  He touched the juror
who walked with a cane as if to escort her.  (8 R.T. p.
1185.)  The court acknowledged the gesture to be good
manners but inappropriate under the circumstances.  (8
R.T. p. 1185.)  The jurors were aware of the uniformed
presence.  Arguing over the exact number of uniforms
present is a red herring; clearly there was a
substantial police presence during this trial.

As in Dugger, the state in this case can make no
justification for the presence of the officers in
uniform in as a substantial presence at appellant's
trial.  As in Dugger, the officers were attending as
spectators and not as witnesses or court functionaries.
(Ibid.; 14 R.T. p. 2526.)  Further, as in Dugger, the
officers were

"there for one reason: they hoped to show

15

> solidarity with the killed . . . officer. In
> part, it appears that they wanted to
> communicate a message to the jury. The
> message of the officers is clear in light of
> the extensive pretrial publicity."

(Id. at pp. 1459-1460.)

The record contains substantial evidence that the police were not disinterested or neutral observers. First, as Ms. Nunez stated in her motion to exclude uniforms from the courtroom, uniformed officer spectators had been highly visible pretrial, a fact that she believed would create an oppressive presence in the courtroom. (2 R.T. pp. 63-64.)

Second, the police found appellant guilty from the outset and marked this case for special treatment. Dr. Ebrahim testified on cross-examination that when he first came in contact with appellant's jail records he had been designated as having "done serious crime" because it involved the death of the police officer. (8 R.T. p. 1068.)

The uniforms represented visually the overall message of contempt and bitterness that police expressed orally at the victim impact statement stage of the proceedings. Their statements were heavily

16

biased and full of contempt, hatred, and bitterness for appellant, whom overwhelming evidence showed had been seriously mentally ill for decades. (14 R.T. p. 2536, 2540, 2543.) Officers took great pains to deny his substantial history of delusions and suicide that even the state's own expert had had to acknowledge.   The police officers assumed that people have a choice about becoming seriously mentally ill.

The state has failed to justify the presence of a substantial number of uniformed officers in the courtroom during appellant's trial. (Woods v. Dugger, supra, 923 F.2d at p. 1460; Holbrook v. Flynn, supra, 475 U.S. p. 569 [106 S.Ct. 1340, 89 L.Ed2d 525] [test applied on a case by case basis].)

Allowing a uniformed law enforcement presence in the courtroom undermined appellant's due process right to a fair trial. (U.S. Const. Amend. V and Amend. XIV; Estelle v. McGuire, supra, 502 U.S. at p. 73 [112 S.Ct. 475, 116  L.Ed.2d 385]; Donnelly v. DeChristoforo, supra, 416 U.S. at p. 643 [94 S.Ct. 1868, 40 L.Ed.2d 431]; Estelle v. Williams, supra,  425 U.S. at p.  505 [96 S.Ct. 1691, 48 L.Ed.2d 126]; Holbrook v. Flynn,

17

supra, 475 U.S. at pp. 570-572 [106 S.Ct. 1340; 89
L.Ed.2d 525]; Cal. Const. Art. I, § 7 and § 15; People
v Holt, supra, 15 Cal.4th at pp. 667-668.)  The
instant case is the example found in Dugger of the
"extreme situation." (People v. Dugger, supra, 923
F.2d at p. 1459.)  Under existing federal precedent
articulated by the United States Supreme Court, the
trial court erred when it permitted a substantial,
uniformed presence of law enforcement at appellant's
trial.

II.  **APPELLANT SHOULD BE GRANTED A NEW TRIAL BASED ON
     PROSECUTORIAL MISCONDUCT (U.S. CONST. AMEND. V
     AMEND VI, AND AMEND. XIV)**

     A.  **THE CLAIM OF PROSECUTORIAL MISCONDUCT
         DISPARAGING DEFENSE COUNSEL IS NOT FORFEITED**

     The court of appeal is mistaken when it finds that
appellant's claim of prosecutorial misconduct based
upon disparaging trial counsel is waived.  (Slip opn.
at pp. 8-9.) Ms. Loftfield called Ms. Nunez "desperate,
she really had nothing to work with, she is desperate."
(14 R.T. p. 2471.)  Here, Ms. Nunez did not interrupt
Ms. Loftfield's diatribe against herself to object but
endeavored to address the misstatements in her

18

rebuttal. (14 R.T. p. 2472.)  However, attacking

defense counsel's credibility immediately after making

materially false claims about the evidence, placed Ms.

Nunez in a very poor position to undo the damage in

rebuttal that Ms. Loftfield had done.  Moreover, Ms.

Loftfield's misstatements in her closing were so

pervasive, it would have been impossible to undo or

object to all of them.  (People v. Hill (1998) 17

Cal.4th 800, 821-822.)

In the alternative, if Ms. Nunez waived the attack

upon herself and the material misstatements by Ms.

Loftfield by failure to object, appellant has then

received ineffective assistance of counsel for failure

to preserve the claim.  Ms. Nunez would have no

tactical reason to forego a substantial and important

constitutional claim on appellant's behalf. (U.S.

Const. Amend. VI; Strickland v. Washington (1984) 466

U.S. 668, 687-688 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

Similarly, the 19 errors of fact in the

prosecutor's closing are not forfeited by failure to

object as the court of appeal states.  (Slip opn. at p.

10.)  Again, this misconduct was so pervasive that it

would have been impossible to cure all of the errors
through objection. (<u>People v. Hill</u>, <u>supra</u>, 17 Cal.4th
at pp. 821-822.)

### B.    THE NINETEEN MISSTATEMENTS OF FACT

Ms. Loftfield made nineteen misstatements of
material facts to the jury in her closing argument
during the sanity phase about the nature and duration
of appellant's mental illness, argued facts not in
evidence and vouched for the credibility of her
contention that appellant was not insane.  (14 R.T. pp.
2447-2478.) (<u>People v. Love</u> (1961) 56 Cal.3d 720, 731
[misconduct to use arguments calculated to mislead a
jury]; <u>People v. Hill</u>, <u>supra</u>, 17 Cal.4th at p. 823-824,
827-828; <u>People v. Redd</u> (2010) 48 Cal.4th 691, 740-
741.)  Her misconduct consisted of the following:

> (1)  Ms Loftfield stated, "He has been under
> the care of a psychiatrist from at least
> 2001 and has never been hospitalized
> either for depression or mania.  (14
> R.T. p. 2449.)

This statement is false.

In fact, appellant had been under psychiatric care

and hospitalized long before 2001. (10 R.T. pp. 1552-1554, 1589, 1592.) After 2001, appellant was hospitalized on April 7, 2005, after he was found naked in the middle of the street at Sunset and Cherokee. (2 C.T. pp. 481-480; 12 R.T. pp. 1911-1932.) Immediately after the incident on April 29, 2005, he was transported to UCLA Medical Center where, among other things, he was given antipsychotic medication and placed in four-point restraints. (7 R.T. p. 946.)

> (2) Ms. Loftfield stated, "But this man has never had such a severe case of bipolar that he has ever been hospitalized for it.
>
> (14 R.t. p. 2449.)
>
> This statement is false.

In fact, appellant was hospitalized twice between 1985 and 1987. (10 R.T. pp. 1553-1554; 11 R.T. p. 1632, 1686.) He was hospitalized on April 7, 2005. (12 R.T. pp. 1911-1932.) In jail, he was suicidal and placed in restraints and a bolted bed and was placed on the seventh floor, reserved for the sickest patients. (8 R.T. pp. 1067, 1077; 13 R.T. p. 2006.)

> (3) Ms. Loftfield misrepresented Dr. Zetin's

21

opinion about appellant's condition, implying

that Dr. Zetin's statement on April 5

that appellant was in remission was his

final word on the subject. (14 R.T.

pp. 2451-2452.) She implied that

Ms. Nunez did not call Dr. Zetin

as a witness because his testimony

would have favored the state. (14

R.T. p. 2495.)

These statements are false.

After April 29, 2005, Dr. Zetin acknowledged that

his professional judgment on April 5, 2005, was in

error. (14 R.T. pp. 2345-2346.) Ms. Loftfield had

been the one who planned to call Dr. Zetin and then had

decided not to. (14 R.T. pp. 2522-2523.) She left the

jury with the impression that Dr. Zetin's professional

judgment supported her case when she, in fact, knew it

did not.

(4)   Ms. Loftfield stated that appellant was in

remission on April 5 because of Dr. Zetin's

skill as a psychiatrist. (14 R.T. p. 2452.)

That statement was false.

22

No expert, including her own, testified that the skill of a psychiatrist could cure bipolar disorder or cause it to go into remission. No evidence in the record established that Dr. Zetin's care influenced appellant's condition. The evidence did show that Dr. Zetin misjudged appellant's condition. In March 2004, he refused the Kentros' request to hospitalize appellant even though appellant showed symptoms of mania and psychosis. (10 R.T. p. 1579.) Dr. Zetin misjudged the seriousness of appellant's condition on April 5 and April 7, 2005, leading to Officer Scott's death on April 29, 2005. (14 R.T. pp. 2345-2346.)

    (5)  Ms. Loftfield misrepresented the nature of Dr. Zetin's 2003-2004 notes to the jury, implying that he had found appellant was not bipolar but "nonconformist." (13 R.T. pp. 2454-2455.) Of these notes, she claimed "What part of this is bipolar?" (14 R.T. p. 2455.)

    Her claim is false.

The evidence never showed that Dr. Zetin's was documenting anything other the symptoms of bipolar

disorder for which appellant was being treated. Dr. Zetin neither testified nor wrote anywhere that appellant was exhibiting symptoms of being a "nonconformist" rather than a "bipolar." Further, the nature of bipolar illness renders patients "non-conformists" in that they exhibit symptoms that do not conform to social norms. (11 R.T. pp. 1630, 1650, 1634, 6646, 1647, 1651-1652.)

    (6)  Ms. Loftfield said, "He is getting the best care that you can get in the country for his bipolar disorder." (14 R.T. p. 2457.)

This statement is false.

Ms. Loftfield put on no evidence of the levels of care available in the United States for a bipolar patient, nor did she establish through evidence that Dr. Zetin provided the best care in the country. In fact, Dr. Zetin's misjudgment of appellant's condition in March 2004 and April 2005 directly contributed to Officer Scott's death. (10 R.T. p. 1579; 14 R.T. pp. 2345-2346.)

    (7)  Ms. Loftfield said, "He is bipolar, which is a scammer . . . ." (14 R.T. p. 2458.)

24

This statement is false.

Ms. Loftfield never established through any expert testimony or other evidence that all bipolar patients are dishonest or "scammers."

> (8)  Ms. Loftfield said, "No matter how many times Ms. Nunez tries to tell you that his religious themes were crazy themes, nobody said that."

(14 R.T. p. 2460.)

This statement was false.

Steve Gates said appellant quoted the words of Christ in the Gospels and twisted them into a crazy version of what love should be. (12 R.T. p. 1892.) He said that appellant's statements were completely different from standard Christian doctrine. (12 R.T. p. 1892.) Appellant told Mr. Gates that appellant was Jesus and wanted to save the world if he could. (12 R.T. p. 1891.)

Robert Wutts said appellant would say that Satan was speaking through Mr. Wutts. (12 R.T. p. 1872.) He said that after the March 2005 visit, Mr. Wutts would have requested a psychiatric evaluation of appellant if

25

he had been asked to give him a security clearance like the ones appellant had had in the past (12 R.T. p. 1864.)

Selima Mahamdi said appellant regarded himself as the savior of the world.  (12 R.T. p. 1972.)

    (9)  Listening to Ms. Nunez, it almost sounds delusional to believe in God, to read the teachings of Jesus Christ.  (14 R.T. p. 2461.)

This statement was false.

Ms. Nunez presented numerous witnesses, as outlined above, who testified that appellant spoke to them about religion in obviously crazy ways. Dr. Zetin's notes indicated that appellant talked about delusional religious themes involving God and love. (11 R.T. p. 1764; 14 R.T. p. 2384.)

    (10) Ms. Loftfield said, "Then you get to the April 7 incident that Dr. Hirsch found very suspect.  And I will suggest to you Dr. Zetin would have found it extremely suspect, also."  (14 R.T. p. 2466.)

This statement was false.

26

Ms. Loftfield knew this statement to be false. Dr. Zetin acknowledged that his April 5 diagnosis of remission was incorrect.  (14 R.T. pp. 2345-2346.)

    (11) Ms. Loftfield said, "Apparently nobody has consulted  with Dr. Zetin."  (14 R.T. p. 2466.)

    This statement was false.

Appellant's trial attorneys had consulted with Dr. Zetin, and Ms. Loftfield knew that.  (14 R.T. pp. 2345-2346.)

    (12) Ms. Loftfield said, . . . "But I think you would feel bad if I never had given you the evidence that on April 5 his treating psychiatrist who has seen him for three years found him to be completely in remission."  (14 R.T. p. 2467.)

    This statement was false.

After the April 29, 2005, incident, Mrs. Loftis knew that Dr. Zetin had changed his mind about his April 5 opinion.  (14 R.T. pp. 2345-2346.)  Moreover, Dr. Zetin did not say appellant was "completely in remission."  He checked the box "recovered, April 5" on

27

insurance disability forms which Dr. Plotkin, a

psychiatrist, said would not even meet the American

Psychiatric Association minimum requirements for record

keeping.  (11 R.T. p. 1749.)  No evidence established

that a bipolar patient can be "completely in

remission."

      (13)  Ms. Loftfield said that Karen Courtney

           testified that appellant was furious on the

           morning of April 29, 2005, because his car

           had been towed.  (14 R.T. p. 2470.)

           This was a half truth.

      Ms. Courtney testified that appellant was in

the middle of the street, ranting.  (3 R.T. p. 351.)

He was incoherent, as if he had blinders on and

couldn't see Ms. Courtney.  (4 R.T. p. 370.)  She was

screaming at him to get out of the street.  (4 R.T. p.

370.)

      (14)  Of appellant's journey to LAX on foot,

           Ms. Loftfield said, "He is angry and he is

           trying to get to Russia.  He was trying to

           get there earlier than on May 4th.  So he

           walks up the hill.  He walks and I heard

her tell you it would only be a crazy man
that would walk, you have to be insane
to walk.  Well, I am insane.  I walk
an hour and a half every day and I am
insane I guess. . . . Is it that true
that to walk up a hill from Marina del
Rey to the airport, you have to be insane.
. . . . What is crazy about walking?
It's healthy, trying to stay in shape
for those young girls. Trying to look
good." (14 R.T. p. 2471.)

These statements were false, and Ms. Loftfield was
vouching with her personal experience.  (People v.
Redd, supra, 48 Cal.4th pp. 740-741.)

No witness testified that appellant appeared to be
approaching LAX on foot for recreational exercise.  (9
R.T. 1192-1196, 1206, 1209; 8 R.T. pp. 1131-1134.)
Pedestrians in this area are uncommon.  (8 R.T. p.
1131.)

(15) Ms. Loftfield said,"Does it matter if the
reason he was killing himself to go to hell
to fight the devil to be with Olga?  It's

29

garbage. It's hard for me to say it with a straight face because it's garbage. You can look at all these records. He never talked like that to Dr. Zetin. He never talked like that to anybody at any time."

(14 R.T. p. 2473.)

These statements were false.

Dr. Plotkin [on the notes of Dr. Zetin]: "There are probably a hundred different records that diagnose and document his manic symptoms, his delusions, his lack of sleep, his pressured thoughts, his pressured speech. Those are well documented, we see that going back to the early 80's on this individual." (11 R.T. p. 1762.)

Dr. Plotkin [on the notes of Dr. Zetin]: "Dr. Zetin's note from March 5th, he talked about the delusional religious themes involving God and love. He talked about the joy to children website, the grandiose ideas, believing the world was breaking down, and also mentioned that he's wearing two watches for whatever reason at their last appointment. (11 R.T. p. 1764.)

Dr. Plotkin [on the notes of Dr. Zetin]: "There

30

were reported behaviors by the wife . . . that he was
influenced by the devil and Satan.   That seemed to be
the common theme she saw." (11 R.T. p. 1764.)

    Dr. Plotkin [on the notes of Dr. Zetin]: " . . .
[C]oworkers had him . . . being hyperreligious and
writing hyperreligious rants in e-mails."  (11 R.T. p.
1764.)

    Dr. Plotkin [re evil for evil for good]: "I don't
remember if that exact quote is in there, but there are
plenty of notations of very similar delusions."
(11 R.T. p. 1765.)

        (16) Ms. Loftfield said, "Everybody came to court
            and said he knew what he was doing when he
            was doing it.   (11 R.T. pp. 2474-2475.)

    That statement is false.

    The only witness who testified that appellant was
sane and only mildly bipolar was Dr. Hirsch.

        (17) Ms. Loftfield said, "He doesn't pull up the
            name Olga until three days later when he is
            talking with Detective Ito."  (14 R.T.
            P. 2480.)

            This statement was false.

                            31

Numerous witnesses testified about appellant's involvement and preoccupation with Olga and Zhanna. In particular, Selma Mahamdi testified that appellant talked about them as angels, and the embodiment of purity. (11 R.T. p. 2480.) She said his trip to Russia seemed to be a form of salvation for him. (11 R.T. p. 2480.) These conversations took place before April 29, 2005. (12 R.T. p. 1972.)

(18) Ms. Loftfield said, "Some of you may have believed he had an intent to kill." (14 R.T. p. 2483.)

This statement was false.

In the guilt phase, the jury did not find appellant had the intent to kill. (2 C.T. p. 441.)

(19) Ms. Loftfield told the jury appellant had some sort of highly sophisticated airline reservation expertise - reserving and cancelling tickets to increase chances of flying standby ticketless, passportless, and luggageless on April 29, 2005. (14 R.T. pp. 2469-2470.)

32

This claim was false.

Appellant had no ticket to fly on April 29, 2005. (12 R.T. pp. 1979-1980.)  Ms. Loftfield never established that appellant had the same, specialized, esoteric, airline reservation expertise as the Lufthansa manager that she put on as a witness. (5 R.T. p. 568.)

Ms. Loftfield made multiple misrepresentations in her closing argument. While a prosecutor is accorded `great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (<u>People v. Valdez</u> (2004) 32 Cal.4th 73, 133-134.)

C.  **MISSTATEMENTS OF LAW AND APPEAL TO SYMPATHY**

The court of appeal agrees that Ms. Loftfield misstated the law in her closing argument in the sanity phase when she told the jury that sanity meant "a reasonable person with reasonable moral standards" and when she said that the jury must adopt the reasonable interpretation against appellant who bore the burden of

33

establishing his insanity.  (14 R.T. pp. 2492; 2496.)

(Slip opn. at pp. 12-13.)   The court also acknowledges

that she improperly asked the jurors for sympathy for

Officer Scott's family and that, as she did so, she

turned to the family which was surrounded by numerous

LAX police officers.  (2 C.T. p. 530; 9 R.T. p. 1418.)

However, the court of appeal, as it has minimized the

other significant prosecutorial misconduct in this

case, continues to minimize, stating the misconduct is

not prejudicial.  (Slip opn. at pp. 11-13.)   The court

is in error.

D.   IN THE AGGREGATE, THE PROSECUTOR'S MISCONDUCT
     RENDERED APPELLANT'S TRIAL FUNDAMENTALLY
     UNFAIR

The prosecutor's conduct rendered appellant's

fundamentally unfair in violation of the federal

constitution and the errors are not the harmless beyond

a reasonable doubt. (Chapman v. California (1967) 386

U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].)    Here

prosecutorial misconduct be considered in its

individual instances but also cumulatively.  (People v.

Hill, supra, 17 Cal.4th at p. 818-819.)  Ms. Loftfield

made errors that black letter law has established as

34

misconduct: she appealed to passion and prejudice, she misstated the law, and she attacked defense counsel.

It is well-settled that "it is improper for the prosecutor to appeal to the passion and prejudice of the jury in closing argument . . ." (<u>People</u> <u>v.</u> <u>Simington</u> (1993) 19 Cal.App.4th 1374, 1378.) The instant case was a minefield for passion and prejudice. Any observer could see the competing, strong emotions the instant facts created. A police officer had suffered a horrific death, the courtroom was loaded with angry officers in uniform. The defendant had a long and substantial history of mental illness, a condition that even in the present day is the subject of ignorance and prejudice. (Hinshaw, <u>The</u> <u>Mark</u> <u>of</u> <u>Shame: Stigma</u> <u>of</u> <u>Mental</u> <u>Illness</u> <u>and</u> <u>Agenda</u> <u>for</u> <u>Change</u> (Oxford University Press, 2007), pp. 73-93.) Appellant's sister and brother-in-law, who had tried without success to have his condition managed competently, were also present. (7 R.T. p. 937; 10 R.T. p. 1550.) Juror objectively was essential to a fair outcome.

The cumulative effect of the prosecutor's

35

misconduct required reversal.    (People v. Hill, supra,
17 Cal.4th at pp. 845-856.)    Ms. Loftfield seriously
mischaracterized the evidence of appellant's bipolar
illness.    She attempted to minimize it by saying he had
not been hospitalized.    She made fun of it by calling
him a "scammer" and by calling his well-documented
delusions "garbage."    She misrepresented the level of
care he received, and Dr. Zetin's opinions.    She
misrepresented the witnesses' testimony about their
observations of his abnormal behavior.    She testified
that walking to LAX is normal, recreational activity.

Prosecutorial so "infect[ed] the trial with such
unfairness as to make the conviction a denial of due
process."  (People v. Gionis (1995) 9 Cal.4th 1196,
1214.)   The prosecutor used "deception or reprehensible
methods to attempt the persuade . . . the jury."
(People v. Espinoza (1992) 3 Cal.4th 806, 820.)
Appellant should be given a new trial.   (U.S. Const.
Amend. V and Amend. XIV; Estelle v. McGuire, supra, 502
U.S. at p. 73 [112 S.Ct. 475, 116  L.Ed.2d 385];
Donnelly v. DeChristoforo, supra, 416 U.S. at p. 643
[94 S.Ct. 1868, 40 L.Ed.2d 431] Cal. Const. Art. I, § 7

36

and § 15; <u>People</u> <u>v</u> <u>Holt</u>, <u>supra</u>,   15 Cal.4th at pp. 667-668.)

### III. THE EVIDENCE IS INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT WAS SANE AT THE TIME OF THE CARJACKING (U.S. CONST. AMEND V. AND AMEND. VI)

The jury found that appellant was sane at the time of the carjacking.  (2 C.T. p. 522.)  The jury's verdict was against the weight of the evidence; it was not supported by proof beyond a reasonable doubt.  The finding of sanity violates appellant's state and federal due process rights.  (U.S. Const. Amend. V and Amend. XIV; <u>In</u> <u>re</u> <u>Winship</u>, <u>supra</u>, 397 U.S. at p. 364 [90 S.Ct. 1068, 5 L.Ed.2d 368]; <u>Leland</u> <u>v.</u> <u>Oregon</u>, <u>supra</u>,  343 U.S. at p. 801 [72 S.Ct. 1002, 96 L.Ed.2d 1302; <u>People</u> <u>v.</u> <u>Skinner</u>, <u>supra</u>, 39 Cal.3d at p. 744 [punishment by death or imprisonment of one who's mental illness results in the inability to appreciate an act is wrongful raises serious questions of constitutional dimension under the due process and cruel and unusual punishment provisions of the Constitution].)

The prosecution's claim that years and years of

37

increasingly severe bipolar disorder was not a serious
illness and that appellant feigned symptoms to cover up
criminal conduct is not supported by the evidence or
science. (14 R.T. pp. 2465-2467.)  Mental illness is
not a voluntary condition, under the control of an
individual. (14 R.T. pp. 2465-2467.) Psychologist Barry
Hirsch's opinion to the contrary notwithstanding.(13
R.T. pp. 2082, 2156.)

The evidence in this case was overwhelming that
appellant manifested the symptoms of a typical bipolar
patient, and these grew increasingly severe as he aged.
(11 R.T. p. 1633.)  Appellant made three documented
suicide attempts in the 1980's. (10 R.T. pp. 1552-
1592.)  He evidenced a marked decline in the 1990's. By
2000 and 2001, he no longer appeared to be a normal,
family man and engineer.  (12 R.T. p. 1889.)  His
marriage ended.  (12 R.T. p. 1843, 1851.)  He lived in
his car outside of the family residence.  (12 R.T. p.
1093.)  588.) In March 2004, appellant's sister and
brother-in-law in Rhode Island received a call from him
that was so disturbing  they tried, unsuccessfully, to
persuade the police and Dr. Zetin, his treating

38

certainly do not call themselves Jesus Christ and the savior of the world.  (12 R.T. p. 1872, 1972.)

The medical treating professionals who saw appellant on April 7, 2005, did not indicate in any way that appellant was faking a "psychotic break," under the influence of Dr. Zetin's remission finding on April 5, 2005.  (14 R.T. p. 2467-2469.)  Dr. Hirsch's contention that sane, normal people appear on beaches and in front of churches naked speaks for itself.  (13 R.T. p. 2083.)  Dr. Hirsch's contention that appellant could safely and sanely run into the traffic lanes on Lincoln to "test out" committing suicide just before his encounter with Officer Scott is beyond absurd. (13 R.T. pp. 2162-2163.)  The drivers who observed appellant that day did not find his behavior normal.(8 R.T. pp. 1134, 1196, 1209.) Do sane people "test out" suicide"?  (13 R.T. p. 2157.)

Dr. Hirsch's fundamental, underling premise that multiple suicide attempts and preoccupations with suicide are not indicative of severe mental illness is entirely contrary to common sense and contrary to generally accepted standards of what is morally right

40

and morally wrong. (13 R.T. p. 2078.)    The United

States Supreme Court has recognized that historically

society considers suicide to be a grave public wrong,

not de minimis activity. (<u>Washington</u> <u>v.</u> <u>Glucksberg</u>

(1997) 521 U.S. 702, 723 [117 S.Ct. 2258, 117 S.Ct.

2302, 138 L.Ed.2d 772].)

The overwhelming weight of the evidence

demonstrates that, after decades of mental illness,

appellant was engaged in a suicide attempt at the time

he carjacked Officer Scott's vehicle.  His intent was

to take his life.  He had lost his moral compass.  He

was mentally ill.  By engaging in acts to take his

life, he did not know what is morally right and wrong;

he was engaging in conduct that our society regards as

morally wrong. Killing yourself is morally wrong.

(<u>Ibid</u>. [117 S.Ct. 2258, 117 S.Ct. 2302, 138 L.Ed.2d

772].)

The court of appeal also made much of appellant's

statement to a paramedic while he was in the Explorer

that he knew had "done wrong." (5 R.T. p. 640.) (Slip

opn. at p. 15.)  However, as Dr. Plotkin and Dr.

Rothberg opined, at the time appellant took the car,

41

the evidence was overwhelming that he was under the influence of the mental illness and delusions. (11 R.T. p. 1678; 13 R.T. p. 2015.) While he might have known the legal wrongfulness of refusing to obey the officer, he could not appreciate the morality of it because he was focused on committing the morally wrong act of suicide. (11 R.T. p. 1678; 13 R.T. p. 2015.) [Washington v. Glucksberg, supra, 521 U.S. at p. 723 [117 S.Ct. 2258, 117 S.Ct. 2302, 138 L.Ed.2d 772].

The evidence in this case does not support a verdict of sanity. No medical professional who ever examined appellant reached Dr. Hirsch's conclusions. Dr. Hirsch was not a psychiatrist and had never treated a bipolar patient. (13 R.T. p. 2064, 2187.) Dr. Zetin candidly admitted that he had been wrong about his April 5, 2005, conclusion that appellant was in remission. (13 R.T. pp. 2345-2346.) Dr. Zetin stated that appellant had been extremely psychotic with a clearly stated intention to kill himself and no intent to harm Officer Scott. (14 R.T. p. 2345.)

The instant case is the extremely rare case in which the verdict is not supported by the evidence.

42

Appellant's entire intent was to bring about his own death, and he was incapable of realizing that it was morally wrong to do that and morally wrong not to submit to Officer Scott. The sanity verdict violates appellant's federal due process right to proof beyond a reasonable doubt. (U.S. Const. Amend. V and Amend. XIV; In re Winship, supra, 397 U.S. at p. 364 [90 S.Ct. 1068, 5 L.Ed.2d 368]; Leland v. Oregon, supra, 343 U.S. at p. 801 [72 S.Ct. 1002, 96 L.Ed.2d 1302; People v. Skinner, supra, 39 Cal.3d at p. 744.)

## IV. APPELLANT'S LWOP SENTENCE IS CRUEL AND UNUSUAL PUNISHMENT UNDER THE CALIFORNIA CONSTITUTION (CAL. CONST. ART. I § 17)

Appellant's LWOP sentence is cruel and unusual punishment under the California Constitution because it is disproportionate to his culpability based upon his severe mental illness. (2 C.T. p. 532-533; 14 R.T. pp. 2556-2557; Cal. Const. Art. I, § 17; In re Lynch, supra, 8 Cal.3d at p. 424; People v. Dillon, supra, at p. 34 Cal.3d 441.) The court of appeal rejects this contention because of the nature of the victim. (Slip opn. at pp. 16-17.) Deciding that a punishment is cruel or unusual under Dillon presents a question of

43

law subject to independent review; it is "not a
discretionary decision to which the appellate court
must defer." (<u>People</u> v. <u>Mora</u> (1995) 39 Cal.App.4th
605, 615.)

A.    NATURE OF THE OFFENSE

A thread running throughout this case, illustrated
with the decision to allow uniformed officers into the
courtroom, is that because appellant killed a police
officer, he deserved adverse treatment from the justice
system beginning with the moment of his arrest (8 R.T.
p. 1068), throughout his trial, at sentencing where
appellant was vilified by officers (14 R.T. p. 2536,
2540, 2543), and into the appellate process where the
court of appeal dismisses any mitigation because of his
mental illness because "Sadowski murdered a police
officer who was performing his duty." (Slip opn. at p.
16.)    However, appellant had no intent to murder a
police officer "who was performing his duty." He was
convicted upon a felony murder theory which does not
require intent to kill. (2 C.T. pp. 441-442.) He never
deliberately targeted Officer Scott.

**B.   THE NATURE OF THE OFFENDER**

In 1981, when appellant began his career as a
defense industry engineer, he would never have expected
to be in Judge Ito's courtroom, being sentenced for the
death of Officer Scott on January 15, 2010. However, in
the 1980's, appellant began a long and painful decline
into delusions, mania, and depression.

Appellant did not chose to become mentally ill.
(14 R.T. p. 2557.)  His descent into psychosis was
well-documented.  Further, despite the state's
assertions here, no human being ever born elects mental
illness as a way of life.  That claim spreads
misinformation against the mentally ill and encourages
discrimination in a society that already discriminates
against mental illness. Public policy should not favor
a claim by a representative of the people that mental
illness as voluntary. (Hinshaw, The Mark of Shame:
Stigma of Mental Illness and Agenda for Change (Oxford
University Press, 2007), pp. 73-93.) Other, fairer
tactics exist to convict.  Mental illness is not, as
Ms. Loftfield and Dr. Hirsch claimed repeatedly, a
scam.

45

At the heart of this case is the inadequacy of the
protections that medicine and society have in place for
the mentally ill and the public.  Stripped of
prosecutorial hyperbole, this case is simply about
psychiatric malpractice, accompanied by inadequate
legal means to commit severely ill individuals.  Dr.
Plotkin said it best on the medical side: bipolar
disorder is hard to treat.  (11 R.T. p. 1646.)  Dr.
Zetin failed to see what is now so clearly and
painfully obvious: appellant's frantic travels and
emptying bank account, teenage girl fixations, and
Satanic dogma were not self-indulgent binges.  They
were the work of undiagnosed mania.

After the fact, when it was too late to save
Officer Scott and appellant, Dr. Zetin admitted that
appellant had not been in remission on April 5, 2005.
(14 R.T. pp. 2345-2346.)  And appellant was psychotic
and delusional when he killed Officer Scott.  (14 R.T.
pp. 2345-2346.)  Clearly Dr. Zetin's medical and
psychiatric judgement had been flawed. The medical care
that should have in place to protect both appellant and
Officer Scott and the public was not in place on April

46

29, 2005.

But consider, too, what society does to protect itself and the severely mentally ill. As the Kentroses learned from Dr. Zetin back in March 2004, the criteria for a Welfare and Institutions Code section 5150 hold is too narrow to be truly useful in many, many circumstances. (10 R.T. pp. 1557.) As Dr. Plotkin explained, the homeless mentally ill who can scrounge food on the streets cannot be held under section 5150. (11 R.T. pp. 1639-1640.) And police officers have to deal with them, whether they are dangerous or not. More protective commitment criteria would protect the police, the mentally ill, and the public.

Consider that in March 2004, Dr. Zetin admitted that appellant was psychotic, yet he would not order appellant into a hospital at Mr. Kentros' begging. (10 R.T. p. 1557.) And consider that the Kentroses could not get LAPD to help either. (10 R.t. pp. 10 R.T. p. 1596.) And consider that while appellant was traveling the world, in the throes of undiagnosed mania, the Kentroses were trying unsuccessfully to prevail upon Dr. Zetin to hospitalize him. (10 R.T. pp. 1577-1579.)

Can we say, honestly, that the medical and legal
resources available in this case to protect the public
and the mentally ill were adequate?  No.

Then come forward in the analysis and look at the
way section 5150 operated on April 7, 2005. On that
day, despite Ms. Loftfield's repeated and distasteful
claims at trial, appellant was genuinely psychotic as
the medical personnel at Hollywood Presbyterian
Hospital recognized.  (12 r.T. pp. 1911-1914.)  Yet he
was released to a tow truck company because he could
live in his car. (11 R.T. p. 1643.)   And his
psychiatric care, rather than being addressed
substantively, was punted back to Dr. Zetin, whom we
already know had refused the Kentroses' plea to
hospitalize appellant. (10 R.T. pp. 1577-1579; 11 R.T.
p. 1753.)

What this case stands for, along with the tragic
loss of Officer Scott, is the inadequacy of the
existing medical and legal protocols to respond when
presented with increasingly severe mental illness.
Appellant and his family relied on Dr. Zetin, and Dr.
Zetin let them down.  Appellant's family relied on the

48

law, and the law let them down. And, eventually, both medicine and the law let down Officer Scott, and his family. And appellant was vilified as if he had deliberately chosen this life path and this outcome. Honestly, what sane person would?

Somehow, all those accusatory, bitter police statements at sentencing seem really out of place when you see that neither law nor medicine came to the aid of appellant or Officer Scott. Nor did law or medicine protect society. Did appellant chose to be mentally is? No. Should Dr. Zetin have listened and made a sounder diagnosis? Yes. Would a 5150 hold have helped on April 7, 2005? Well, discharging him certainly wasn't the right answer.

Appellant acknowledges that reducing a sentence under Dillon "is a solemn power to be exercised sparingly only when, as a matter of law, the Constitution forbids what the sentencing law compels." (People v. Mora, supra, 39 Cal.App.4th at p. 616.) The reduction of a sentence because it is cruel or unusual "'must be viewed as representing an exception rather than a general rule.'" (People v. Smith (1986) 187

49

Cal.App.3d 666, 683, disapproved on other grounds in
People v. Bacigalupo (1991) 1 Cal.4th 103, 126-127, fn.
4.)

Appellant respectfully submits that his LWOP
sentence is disproportionate to his culpability, given
the severity of his illness, his lack of substantial
criminal history, the inadequate medical and legal
protocols that failed to recognize his need for
hospitalization and treatment, and the jury's finding
that he lacked the intent to kill.  Had appellant had a
choice not to be mentally ill, had appellant been
himself as he once was, he would not have been standing
in Judge Ito's courtroom on January 15, 2010. And
Officer Scott would not have come to harm at his hands.
LWOP in this case, particularly where the jury found no
intent to kill, violates article I, section 17 of the
California Constitution.

CONCLUSION

For the foregoing reasons, appellant respectfully requests that his convictions be set aside and his petition be granted.

Respectfully submitted,

Dated: _Jan 20, 2011_        _Deborah L Hawkins_
                             Deborah L. Hawkins
                             Attorney for Appellant
                             William Sadowski

51

## CERTIFICATE OF WORD COUNT

California Rules of Court, rule 8.504 (d)(1) provides that a petition for review produced on a computer shall not exceed 8,400 words. Word Perfect states that the foregoing Petition for Review contains 8,395 words.

I declare under penalty of perjury and the laws of the state of California that the foregoing is true and correct.

Executed this _____ June 20 _____, 2011 at Poway, California.

_Deborah L. Hawkins_
Deborah L. Hawkins

*EXHIBIT A*

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B221859 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA054153) |
| v. | COURT OF APPEAL - SECOND DIST. |
| WILLIAM SADOWSKI, | F I L E D |
| Defendant and Appellant. | MAY 3 1 2011 |
| | JOSEPH A. LANE    Clerk |
| | Deputy Clerk |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lance A. Ito, Judge. Affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan Sullivan Pithey and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted William Sadowski of murdering a police officer, with findings that the murder was committed during a carjacking and that he had used a deadly weapon – the officer's patrol car – to commit the murder. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17), 12022 subd. (b)(1).)[1]  The jury found the murder had not been premeditated.[2]  The jury further convicted Sadowski of two counts of carjacking and one count of attempted carjacking.  (§§ 215, subd. (a), 664/215, subd. (a).)  In a bifurcated proceeding, the jury found that Sadowski had been sane at the time he committed the crimes.  The trial court sentenced Sadowski to a term of life without the possibility of parole, plus a determinate aggregate concurrent term of 15 years.  We affirm.

FACTS

### The Crimes

On April 29, 2005, Los Angeles Airport Police Officer Tommy Scott stopped his marked patrol car on Lincoln Boulevard to contact Sadowski.  While the two men were talking, Sadowski suddenly pushed Officer Scott aside, ran to his patrol car, jumped in the driver's seat, and started driving away.  As Officer Scott tried to gain control of the vehicle by way of the driver's door, Sadowski accelerated up to 50 miles per hour, and began swerving across all lanes.  Officer Scott hung on to the vehicle.  To an eyewitness, it looked like Sadowski was trying to "shake the policeman off" the patrol car.  Sadowski continued for a quarter-mile then crashed into a concrete wall at 45 to 55 miles per hour.  Inside the patrol car, airbags saved Sadowski from significant injury.  The driver's side door hit a fire hydrant, and Officer Scott was decapitated.

After the crash, Sadowki stumbled from the wreckage, and walked up to a car that had stopped near the accident.  Sadowski tried unsuccessfully to drag Christina Koesler from the car through the locked driver's door.  Sadowski then walked to a Ford Explorer stopped behind Koesler, and took it from its driver, Craig Lazar.  Sadowski sped off for

---

[1]     All further references are to the Penal Code unless otherwise indicated.

[2]     The information alleged that Sadowski knew or should have known that the victim was a peace office engaged in the performance of his duties within the meaning of section 190.2, subdivision (a)(7).  The jury found this allegation not true.

2

about 900 feet. He lost control of the Explorer, crashed into a fence, and flipped the Explorer upside down. Police took Sadowski into custody at the scene.

As he was being pulled from the Explorer, Sadowski stated, "I'm sorry. I know I did wrong. I did not try to hurt the guy. I know I fucked up. I fucked up real bad. I just want to kill myself." While being transported to UCLA Medical Center by ambulance, Sadowski kept repeating statements to the effect, "I want to die. Let me die. I deserve to die. I'm sorry, sorry for what I did." At one point he said something to the effect, "Please don't tell my mom what I did." While being transported from the hospital to police headquarters, Sadowski made statements to the effect that he needed a lawyer "to save [his] life," and to help him avoid "the electric chair or . . . the gas chamber."

*The Criminal Case*

In September 2006, the People filed an information charging Sadowski with the murder of Officer Scott (§ 187, subd. (a)), two counts of carjacking (§ 215, subd. (a)), and one count of attempted carjacking (§§ 664/215, subd.(a)). The murder count included ancillary allegations that Sadowski committed the offense in the course of a carjacking (§ 190.2(a)(17)), and that he used a deadly weapon, a motor vehicle (§ 12022, subd. (b)(1)) , and that he knowingly killed a police officer engaged in the performance of his duties (§ 190.2 (a)(7)). The charges were tried to a jury during the fall of 2009. The prosecution evidence established the facts summarized above.

Sadowski presented evidence showing that he had a history of mental illness, and that he had been acting unusual both in the days leading up to the events on April 29, 2005, and after being taken into custody. A psychiatrist at the Twin Towers jail facility testified that he diagnosed Sadowski as suffering from bipolar disorder. Sadowski's defense counsel's argument to the jury implored the jurors to find that Sadowski was not guilty because he did not have the required intent for the charged crimes as he was mentally ill. On November 16, 2009, the jury returned verdicts finding Sadowski guilty of the murder of Officer Scott, with findings that the murder was committed while Sadowski was engaged in the commission of a carjacking, and that Sadowski used a deadly weapon to commit the murder. (§§ 187, subd. (a), 190.2, subd. (a)(17), 12022

subd. (b)(1).) The jury found that the murder was not premeditated. The jury also convicted Sadowski of the two carjacking counts and the one attempted carjacking count. (§§ 215, subd. (a), 664/215, subd. (a).)

On November 25, 2009, at the conclusion of a bifurcated proceeding, the jury returned a verdict finding that Sadowski had been sane at the time he committed the crimes. On January 15, 2010, the trial court sentenced Sadowski as noted at the outset of this opinion.

## DISCUSSION

I.   **Uniformed Police Officers as Trial Spectators**

Sadowski filed a motion for new trial based on several claims, one of which was that his trial had been unfair because uniformed police officers were permitted to sit in the courtroom audience during the trial. The trial court denied Sadowski's claim. On appeal, Sadowski contends the trial court abused its discretion in denying his motion for new trial. We disagree.

A fair trial is a fundamental due process right guaranteed under the Fourteenth Amendment. (*Holbrook v. Flynn* (1986) 475 U.S. 560, 570 (*Holbrook*).) Whether the presence of uniformed police officers in a courtroom is so inherently prejudicial as to render a trial unfair is largely a matter of degree. The test is whether the police officers' presence creates an " 'unacceptable risk . . . of impermissible factors coming into play.' " (*Ibid.*) In *Holbrook*, the United States Supreme Court ruled that four uniformed state troopers sitting in a spectators' row immediately behind the defendant to supplement the court's ordinary security personnel did not create such an inherent risk of prejudice that it denied the defendant a fair trial. (*Holbrook, supra*, 475 U.S. at p. 570.) At the same time, the court cautioned that "a roomful of uniformed and armed policemen might pose [a risk] to a defendant's chances of receiving a fair trial." (*Id.* at pp. 570-571.)

In *People v. Cummings* (1993) 4 Cal.4th 1233 (*Cummings*), our Supreme Court addressed the issue of police officer spectators at trial using this language: "Defendants argue . . . that the [trial] court abused its discretion in permitting any uniformed officers to attend the trial as spectators. We find no abuse of discretion on the part of the trial

4

court. The right to a public trial is not that of the defendant alone. [Citations.] . . . Only if restriction is necessary to preserve a defendant's right to a fair trial may the court restrict attendance by members of the public. Because a First Amendment right of access to judicial proceedings is also recognized, they may not be closed 'unless specific, on the record findings are made demonstrating that "closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " [Citations.]

"In this case there was no effort to close the proceedings . . . [but Defendant] sought to exclude a segment of the public. As members of the public, the police officers had both common law and constitutionally based rights to attend the trial. Exclusion of any group on the basis of the members' status would be impermissible. The trial court sought to balance the rights of those officers whose duty assignments precluded attendance in civilian clothes against the possibility that seeing large numbers of uniformed officers among the spectators would somehow influence the jury. The concerns expressed by [Defendant] were not sufficient to establish that excluding all uniformed officers was essential to a fair trial, and the record does not support his claim of actual prejudice." (*Cummings, supra,* 4 Cal.4th at pp. 1298-1299.)

In his opening brief on appeal, Sadowski cites to five instances during trial he believes demonstrate uniformed officers were improperly in the courtroom during trial. They include:

(1)  The denial of a request by defense counsel that police officer spectators be required to wear civilian clothes, rather than uniforms. Even though the court denied this request, we note that the prosecutor nevertheless advised the court that she had been asked by an airport police department's liaison "about who could come [to the trial]," and that she had given this "guidance" on the subject: "I said, . . . if [an officer] is on their way to work or in their uniform for some reason, they won't have to take their uniform off to come in [court]. But neither do they . . . have to put it on if they're on a day off and they're coming down because they're supportive or a friend or they want to see [and] that it's perfectly fine to wear a suit, civilian clothes, that nobody is asking them to put on

uniforms to come down here. [¶] . . . But I also wasn't comfortable in saying . . . you
can't wear your uniform if you want to wear your uniform."

(2) Before voir dire, the court indicated that it was willing to further consider the
issue of uniformed police officers in the courtroom and that counsel was free to question
prospective jurors on the issue of whether their presence might influence them in some
way.

(3) Sadowski posits that the prosecutor expressed sympathy for Scott during
closing argument at the guilt phase, and "turned to the family who were surrounded by
numerous uniformed . . . officers." However, the citation to the record he set forth, page
530 of the clerk's transcript, is a page from his motion for new trial.

(4) At one point during the guilt phase, defense counsel advised the trial court that
a uniformed police officer had held the door open for jurors. Counsel said, "I don't see a
problem with that [but] he touched the juror that walks with a cane, like gently escorting
her, and I have a problem with that type of contact." Counsel asked the court to instruct
the officer "not to have that type of contact with the jurors." The court agreed with
defense counsel's position, stating the gesture was probably "just a matter of manners,
but not appropriate." The investigating detective accompanying the prosecutor promised
the court that he would "have a talk" with the officer.

(5) During the motion for new trial, the trial court stated: "[O]ne of the items that
is not clearly explained in the court record is the attendance of the Los Angeles World
Airport police officers . . . during the course of the trial in uniform. . . . [¶] Although, at
the beginning and end of the case, . . . during the arguments and opening statements, we
did have a number of police officers here present in the courtroom. We also had sheriffs
as well, who wear a different uniform, but there clearly was a presence of law
enforcement in the courtroom."

We reject Sadowski's claim that the presence of uniformed officers in the
courtroom audience rendered his trial unfair. It is undisputed that police officers sat in
the courtroom audience, at least at some parts of trial. At the same time, the record does
not support any conclusions concerning the number of officers present at any given point.

6

In addressing Sadowski's motion for new trial based on the uniformed police officers
factor, the trial court expressly noted that officers had been present, but then stated:
"However, I don't believe [the officers'] presence was in any way oppressive or in any
way intimidating, and I also believe that police officers have a right to attend court
proceedings in uniform if they're on duty."

The record does not establish that "a roomful of uniformed and armed policemen"
had been present throughout Sadowski's trial or at any part of the trial (*Holbrook, supra,*
475 U.S. at pp. 570-571), nor does the record establish that there had been "large
numbers of uniformed officers among the spectators" at any particular time during
Sadowski's trial (*Cummings, supra,* 4 Cal.4th at pp. 1298-1299). We do not see that the
trial court abused its discretion. The record does support a conclusion that the trial court
acted unreasonably in declining to find that Sadowski's trial had been unfair. We reach
this conclusion after considering the issue in the light of either an "unacceptable risk" of
possible prejudice (*Holbrook, supra,* 475 U.S. at pp. 570-571), or "actual prejudice"
(*Cummings, supra,* 4 Cal.4th at pp. 1298-1299). The record simply does not persuade us
that there was any taint arising from the presence of police officers.

Finally, Sadowksi takes issue with the trial court's statement that police officers
had "a right to attend court proceedings in uniform if they're on duty." We acknowledge
that the record does not show whether they officers who were present in uniform were
actually on duty. But, the bottom line is this -- the record does not show that the presence
of uniformed officers resulted in a denial of a fair trial. The record does not suggest that
an "air of authority" from the presence of uniformed police officers overshadowed
Sadowski's trial, nor does it suggest a possibility that the outcome of Sadowski's trial
may have been affected by uniformed officers.

## II.    The Prosecutorial Misconduct Issue

Another claim presented in Sadowski's motion for new trial was that prosecutorial
misconduct rendered his trial unfair. The trial court denied the motion on this ground
also. On appeal, Sadowski contends the trial court abused its discretion in denying his
motion for new trial based on his claim of prosecutorial misconduct. We find otherwise.

Prosecutorial misconduct occurs when a prosecutor employs either a reprehensible or deceptive method to persuade a jury. The defendant need not show bad faith on the part of the prosecutor to establish misconduct because a defendant is injured by an improper trial tactic, regardless of whether it occurred inadvertently or through an intentional design. (*People v. Hill* (1998) 17 Cal.4th 800, 822-823.) Where a reviewing court finds that misconduct infected a trial with such unfairness as to make the defendant's resulting conviction a denial of due process, the misconduct is an error of constitutional magnitude compelling reversal of the defendant's conviction. (*People v. Morales* (2001) 25 Cal.4th 34, 44.) Where a reviewing court finds that misconduct merely exposed jurors to some form of improper evidentiary matter, the error is reviewed under the harmless error test articulated in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Frye* (1998) 18 Cal.4th 894, 976, disapproved on another ground on *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

## 1. Forfeiture

Sadowski alleges four categories of misconduct: (1) appealing for sympathy for the victim's family; (2) misstating the law; (3) disparaging defense counsel; and (4) misstating facts. Before examining any of Sadowski's misconduct claims, we must address the People's argument that Sadowski forfeited certain of his misconduct claims because he did raise a timely objection, and request an admonition to the jury at the time of the alleged misconduct. (See. e.g., *People v. Brown* (2003) 31 Cal.4th 518, 553.)

We agree with the People that Sadowski forfeited his claim that the prosecutor disparaged defense counsel in the course of her closing argument during the sanity phase of trial. The prosecutor's argument encompasses 51 pages of the reporter's transcript; Sadowski claims the prosecutor committed misconduct by belittling defense counsel in this one passage from the prosecutor's closing argument: "Please use your critical thinking skills when something is said to you by Ms. Nunez [defense counsel] and not supported by the record. Just say to yourself, she is desperate, she really has nothing to work with, she is desperate. She has to stand here and say something, so she picks and chooses and takes things out of context. She never talks to you about [Sadowski's

8

rational acts]. She says he is crazy, he is crazy, you have to find him insane because he is crazy." There was no objection. As a result, we find the claim of misconduct must be considered forfeited.

We disagree with Sadowski's argument that we should veer from the general requirement for an objection as the record does not persuade us that an objection would have been futile. The trial court sustained defense counsel's objections to other statements made by the prosecutor, and admonished the jury. We have no reason to believe the trial court would have disregarded an objection to other portions of the prosecutor's arguments.

Neither do we find ineffective assistance based on a failure to object. In *Strickland v. Washington* (1984) 466 U.S. 668, the Supreme Court established that "[t]he claim of ineffective assistance of counsel involves two components, a showing the counsel's performance was deficient and proof of actual prejudice. *(Strickland v. Washington[, supra,]* 466 U.S. 668 . . . ; *People v. Ledesma* (1987) 43 Cal.3d 171 . . .)" *(People v. Garrison* (1989) 47 Cal.3d 746, 786.) On a direct appeal, a conviction will be reversed for ineffective assistance of counsel only where the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission. *(People v. Lucas* (1995) 12 Cal.4th 415, 442; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1058 [" 'If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," [citation], the contention [that counsel provided ineffective assistance] must be rejected.' "].)

Here, the record does not demonstrate that there could have been no justifiable, tactical reason to forego an objection. Further, the record does not demonstrate that if an objection had been made, that it might have resulted in a different outcome of the sanity phase of the trial. Although it may have been better for the prosecutor to say that that the defense's *position* was desperate, rather than saying that defense *counsel* was desperate, we see no harm in the decision to forego an objection. The respective lines in Sadowski's case were drawn cleanly for the jurors. Assuming without deciding that the

9

prosecutor employed improperly focused language, she exposed the jurors to little more than a colloquially-phrased comment that the defense position in the case should be viewed as weak. We will not abandon the forfeiture rule to avoid an ineffective assistance claim that does not withstand scrutiny.

We next agree with the People's argument that Sadowski forfeited his claim that the prosecutor misstated facts. Sadowski's opening brief on appeal cites us to 19 points in the prosecutor's closing argument at the sanity phase, during which, claims Sadowski, the prosecutor misstated facts. We have examined the reporter's transcript at all 19 points cited, and find that no objection was interposed.[3] Because no objection was made at any point, all of Sadowski's claims of prosecutorial misconduct based on allegedly misstated facts are forfeited.

We again reject Sadowski's argument that we should apply an exception to the requirement for an objection. We are not persuaded that an objection would have been futile. More importantly, the record suggests that Sadowski's trial counsel had a reasonable tactical reason for not objecting to the prosecutor's misstatements of facts. On reviewing the argument by Sadowski's trial counsel, we find that the very first words by defense counsel presented a theme to this effect: let me tell you all the things that the prosecutor said that "were not right." In short, the record supports a conclusion that the reason no objections were interposed to the prosecutor's allegedly improper statements is that a tactical decision was made to let the prosecutor build a case based upon misstatements, and then to attack those misstatements in rebuttal. In other words, the record shows that defense counsel believed it would be better to highlight that the prosecution needed to make misstatements to buttress its case, rather than make serial objections to every misstatement as it arose. We will not apply an exception to the forfeiture rules for misconduct given the record before us.

---

[3]    Two passages that Sadowski claims are objectionable came closely connected, near the outset of the prosecutor's argument. Sadowski's defense counsel requested a sidebar, but there was no express objection, and no request for an admonishment. The sidebar is not reported; the prosecutor's argument continued after the sidebar without any comment from the trial court.

10

We now turn to the claims of prosecutorial misconduct preserved by objection.

### 2. Sympathy for the Victim

Sadowski argues the prosecutor improperly invoked sympathy for Officer Scott in an effort to persuade the jury. The citation to the record offered by Sadowski shows this exchange during the prosecutor's argument to the jury at the penalty phase of the trial: "[The Prosecutor]: In the opening statement, [defense counsel] said [Sadowski] has lost everything. No, he didn't lose everything. And I thought to myself, Officer Scott lost everything because he lost his life. . . . He didn't lose it. He was robbed of his life. It was violently taken from him. . . . [¶] Don't let this defendant rob Officer Scott of the sympathy that each and every one of you would have for him.

[Defense Counsel]: Objection. Your Honor.

[The Court]: Sustained. [The Prosecutor], sympathy is not an issue in this case."

[The Prosecutor]: Did the defendant lose everything? . . ."

We find no abuse of discretion in the trial court's decision not to grant a new trial based on the prosecutor's passing reference to sympathy for Officer Scott. It is true that the prosecutor should not have invoked sympathy for Officer Scott in an effort to persuade the jury that Sadowski was guilty (*People v. Fields* (1983) 35 Cal.3d 329, 362 [appeals to sympathy or the passions of the jurors are improper at the guilt phase of a criminal trial]). However, only misconduct that prejudices a defendant's right to a fair trial requires reversal. (*Id.* at pp. 363-364.) We see no reasonable probability that the jury's verdicts at the guilt phase of trial may have been more favorable to Sadowski without the prosecutor's lone, passing utterance of the word "sympathy." The trial court sustained defense counsel's objection with a statement that sympathy was not an issue. Beyond this, the court instructed the jurors that they were to decide the case on the facts alone, and were not to allow bias, sympathy, prejudice, or public opinion influence their decision. (CALCRIM No. 200.) In the absence of something in the record to indicate otherwise, we presume that the jurors treated the trial court's instructions as a statement of law from a judicial authority, and treated the prosecutor's comments as the words of an

11

advocate who was attempting to persuade. (*People v. Mayfield* (1993) 5 Cal.4th 142, 179.) We see no possibility of prejudice.

### 3. Misstatement of Law

Sadowski next contends the prosecutor improperly misstated the law in an attempt to persuade the jury during the sanity phase of the trial. We disagree.

During the sanity phase of the trial, the prosecutor tried to emphasize that the burden was on Sadowski to prove that he was not sane, and tried to explain that, if the evidence was "a tie," then Sadowski had not met his burden. Sadowski points to the following reference in the trial record to establish that the prosecutor engaged in misconduct by misstating the law:

"[The Prosecutor]: So given the fact that it is [defendant's] burden, let's say, you say maybe he is [insane], maybe he was [insane]. That is not enough, not maybe. [¶] Well, it's possible [he was insane]. . . . That is not enough. Those things are not enough. [¶] And . . . you will remember there was a jury instruction from before that says if there [are two] reasonable interpretations from the evidence, you must adopt the one against the person who has the burden. . . .

[Defense Counsel]: That isn't the law.

[The Court]: I'm sorry counsel, that instruction doesn't apply to this portion of the case.

[The Prosecutor]: Strike that. [¶] If you say to yourself, well, one side says this, one side says that, it's a tie. That then means he is not legally sane, [he] has not carried [his] burden. And you must find that he is sane. . . ."

Even if the prosecutor misstated the law, we find no abuse of discretion in the trial court's decision that the prosecutor's misconduct did not compel a new trial. Again, we discern no reasonable probability of prejudice arising from the misconduct. The prosecutor was not deceptively or reprehensibly persuasive. Further, Sadowski's counsel immediately objected, and the trial court stated that the instruction to which the prosecutor had alluded did not apply to the sanity phase of the trial. The prosecutor promptly backed off the point by saying "strike that," and moved on to her point

12

regarding the burden of proof, and a "tie" in the evidence. We see no possibility that the prosecutor's words regarding "two reasonable interpretations" of the evidence had any effect on the outcome of the sanity phase of Sadowski's trial.

## III.    The Jury's Sanity Finding

Sadowski contends the jury's finding that he was sane at the time he committed his crimes is not supported by substantial evidence. We disagree.

Our criminal law presumes a defendant was sane at the time he or she committed a crime. (§ 1026, subd. (a).) A defendant may plead not guilty to an offense, and deny any special allegations, and join that plea with a plea of not guilty by reason of insanity. (§ 1016, subd. (2) & (6).) When such pleas are entered, the court conducts a bifurcated trial, and the issues of guilt and sanity are separately tried. (*People v. Hernandez* (2000) 22 Cal.4th 512, 520.) The sanity phase of trial is part of the same criminal proceeding as the guilt phase, but differs procedurally from the guilt phase of trial in that the issue is confined to sanity and the burden is on the defendant to prove by a preponderance of the evidence that he was not sane at the time he or she committed an offense. (*Id.* at p. 521.) In addressing the issue of whether the defendant was sane at the time of a criminal offense, a trier of fact determines whether the defendant proved by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the crime. (§ 25, subd. (b).)

A jury's finding on the issue of sanity is reviewed under the substantial evidence test. (*People v. Hernandez, supra,* 22 Cal.4th at p. 527.) This means a reviewing court must consider the whole record, examining the evidence in the light most favorable to the finding, presuming every fact the jury could reasonably deduce from the evidence, and deferring to the jury's assessment of the weight and credibility of the evidence. (*People v. Padilla* (2002) 98 Cal.App.4th 127, 134-135.) In other words, before we may overturn the jury's finding that Sadowski was sane, we must find as a matter of law that the finder of fact could not reasonably have rejected the evidence of insanity. (*People v. Skinner* (1986) 185 Cal.App.3d 1050, 1059.)

13

The sanity phase of Sadowski's trial boiled down to the jury's election between the testimony of opposing mental health experts. The defense and the prosecution presented their respective experts' conclusions about what was or was not established by the evidence of Sadowski's behavior and his mental health treatment, both past and present. The jury accepted the prosecution's presentation, and we cannot find as a matter of law that its decision was unreasonable.

The prosecution's primary witness, Barry Hirsch, Ph.D., a forensic psychologist, testified that the evidence showed Sadowski had been sane at the time of the events on April 29, 2005. Dr. Hirsch discounted the significance of an event in early April 2005, when Sadowski was "found naked trying to get into a church." Dr. Hirsch interviewed Sadowski about the incident in 2009, and had reviewed some hospital records related to the incident. He opined: "My impression was that this was a decision on this man's part to try to subvert authority and continue his $4,000 a month disability paycheck, and that this was a conscious decision that perhaps was influenced by some manic kinds or hypomanic kinds of thinking that propelled him in the direction of public exposure." Dr. Hirsch noted that Sadowski's "disrobing" came during a period of time related to a conclusion by a "Dr. Zetin" that Sadowski's "disability check should stop."

Dr. Hirsch also noted evidence that Sadowski was defiant with authority figures, and that he had made a false claim for financial benefit. Sadowski accused CBS Studio security guards of assaulting him as they escorted him out of the studio. He filed a police report, and claimed he suffered from anxiety as a result of the assault. Dr. Hirsch talked to the security guards and watched the event on videotape. He concluded that Sadowski's representations were false and designed to work up medical claims for the purpose of a lawsuit.

Dr. Hirsch further observed that Sadowski's life activities around the time of his crimes also showed that he was functioning normally despite any mental illness. He had traveled overseas, which belied a showing of mental disorganization or mania. Sadowski had little difficulty navigating through foreign countries and was able to make logical

14

decisions during travels with extensive itineraries. Sadowski was able to understand and follow the tourism visa rules for extending his European visits.

Dr. Hirch interviewed Sadowski a number of times and found his memories of his crimes were selective and self-serving. When addressing his crimes, Sadowski recalled only memories that aided the claim that he was delusional and suicidal, whereas he had little problem recalling information unrelated to the crimes. As Dr. Hirsch explained, Sadowski had a good memory about the facts involved in his legal matters, but had memory lapses when discussing the instant crimes. Dr. Hirsch concluded "[i]t was a case of malingering through denial of knowledge, denial of memory."

Apart from his after-the-fact memory problems regarding his crimes, Dr. Hirsch also believed that Sadowski's behavior during the crimes showed he knew right from wrong at the time of the crimes. As Dr. Hirsch put it, Sadowski's behavior showed "he knew what he was doing. It was purposeful. It followed [a] specific direction in terms of the means that contributed to it." Sadowski's statements to paramedics and police after the crimes also showed he knew his actions were legally and morally wrong, and his statements about being executed for what he had done was also of legal significance in that it showed Sadowski was aware of his legal dilemma. Sadowski's show of regret for what he had done was of significance; his statement that he deserved to die showed he understood the moral wrong he had committed. To the extent that Sadowskis's motivations may have been irrational (e.g. to reunite with Satan), those motivations did not negate that Sadowski knew what he was doing, and knew that it was wrong from a societal perspective to do what he was doing.

Finally, Dr. Hirsch also reviewed progress and treatment notes prepared by Dr. Zetin for his treatment of Sadowski from December 2001 to April 2005. Dr. Zetin's notes from the period around early April 2005 indicated that Sadowski was "recovered," and that his prognosis was for "no restrictions," and that he was "very ready for vocational rehab." The notes "reflect[ed] more communication" between Dr. Zetin and Sadowski, and showed that Sadowski as discussing "his job, the insurance, the Social Security, and that he was sending internet job applications out." Dr. Zetin recorded that

Sadowski did not appear "pressured or grandiose," indicating that his speech or physical motions were not overly rapid, and that Sadowski was not "thinking that [he was] the best, . . . the greatest . . . ." Dr. Zetin's notes further indicated that Sadowski's "mood [was] pretty stable overall."

The evidence in the form of Dr. Hirsch's testimony is substantial evidence that Sadowski was sane at the time of his crimes, and the evidence showing the contrary does not mean that the jury's sanity finding cannot be sustained. While Dr. Zetin's assessment of Sadowski may have been overly optimistic in April 2005, it cannot be ignored that Sadowski's own treating therapist generally considered him to be functional during the time frame closely approaching the murder of Officer Scott. The remaining evidence in Sadowski's favor does not defeat that substantial evidence supports the jury's verdict.

## IV.    The Sentencing Issue

Sadowski contends his sentence of life without the possibility of parole amounts to cruel or unusual punishment under the California Constitution. We disagree.

A sentence is cruel or unusual within the meaning of article I, section 17, of our state Constitution when it is so disproportionate to the crime for which it is imposed that " 'it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478.)

We reject Sadowski's argument that his sentence must be considered shocking to the conscience and offensive to fundamental human dignity. Sadowski murdered a police officer who was performing his duty. The murder was committed during the course of a carjacking, and was followed by an attempted carjacking and a carjacking in an effort to escape. The events were horrifically violent, even for a case of murder. We have little doubt, as Sadowski's trial counsel ably argued, and as his appellate counsel has ably argued, that a mental health factor was involved in Sadowski's actions. Still, we cannot accept his argument that his sentence must be found disproportionate under constitutional precepts because he suffered from mental health problems. A jury found that Sadowski was sane when he committed his crimes, and we do not agree that his sentence must be lessened in order to reach a constitutionally permissible period of incarceration. The

16

alleged failures of the mental health profession and mental health support system noted
by Sadowski may posit important questions insofar as public policies and expenditures
are concerned, but they do not persuade us that Sadowski's sentence of life without the
possibility of parole for murdering a police officer during the commission of a violent
felony violates our state's Constitution.  The punishment fits the crimes.

### DISPOSITION

The judgment is affirmed.


BIGELOW, P. J.

We concur:


RUBIN, J.



GRIMES, J.


17

Case Name: People v. Sadowski            No.  B221859

### DECLARATION OF SERVICE

I, the undersigned, say: I am over 18 years of age, employed in the County of San Diego, California, and not a party to the subject cause.  My business address is 13446 Poway Road, PMB 225, Poway, California 92064.

On June 21, 2011, I served the attached

### APPELLANT'S PETITION FOR REVIEW

of which a true and correct copy of the document filed in the cause is affixed by placing a copy thereof in a separate envelope for each addressee named hereafter, addressed to each such addressee respectively as follows:

Frederick K. Ohlrich, Clerk
California Supreme Court
Room 1295
350 McAllister Street
San Francisco, California  94102 (original and 13)

Joseph A. Lane, Clerk
Court of Appeal, Second Appellate District
300 South Spring Street
Second Floor, North Tower
Los Angeles, California  90013-1204

Office of the Attorney General
300 South Spring Street
North Tower
Los Angeles, California  90013

The Hon. Lance A. Ito
Judge of the Superior Court
Los Angeles County
210 West Temple Street
Los Angeles, California 90012

Case Name: People v. Sadowski          No. B221859


Steve Cooley, District Attorney
c/o Linda Loftfield, Deputy
210 West Temple Street
18-000 Foltz Criminal Justice Center
Los Angeles, California 90012

Michael P. Judge, Public Defender
c/o Irene Nunez, Deputy
14400 Erwin Street Mall, 10th Floor
Van Nuys, California 91401

Jonathan B. Steiner
Executive Director
California Appellate Project
520 S. Grand Avenue, Fourth Floor
Los Angeles, California  90017

William Sadowski #AC3517
Salinas Valley State Prison
P.O. Box 1050
Soledad, California  93960-060


    Each envelope was then sealed and with the postage
thereon fully prepaid deposited in the United States
mail by me at Poway, California on June 21, 2011.

    I declare under penalty of perjury that the
foregoing is true and correct, and this declaration was
executed at San Diego, California on June 21, 2011.


Deborah Hawkins                    _Deborah L Hawkins_
                                      (Signature)

## Appellate Courts Case Information

CALIFORNIA COURTS
THE JUDICIAL BRANCH OF CALIFORNIA

Supreme Court                                    Change court ▾

*Court data last updated: 12/11/2012 02:05 PM*

Docket (Register of Actions)
**PEOPLE v. SADOWSKI**
**Case Number S194212**

| Date | Description | Notes |
|------|-------------|-------|
| 06/23/2011 | Received premature petition for review | Defendant and Appellant: Sadowski, William<br>Attorney: Deborah L. Hawkins |
| 07/01/2011 | Case start: Petition for review filed | Defendant and Appellant: Sadowski, William<br>Attorney: Deborah L. Hawkins |
| 07/01/2011 | Record requested | |
| 07/06/2011 | Received Court of Appeal record | one doghouse ( volume 1 of 3 ) |
| 08/24/2011 | Time extended to grant or deny review | The time for granting or denying review in the above-entitled matter is hereby extended to and including September 29, 2011, or the date upon which review is either granted or denied. |
| 09/14/2011 | Petition for review denied | |
| 09/21/2011 | Returned record | 1 doghouse |

**Click here** to request automatic e-mail notifications about this case.

Careers | Contact Us | Accessibility | Public Access to Records | Terms of Use | Privacy    © 2012
Judicial Council of California / Administrative Office of the Courts