1  FAY ARFA, A LAW CORPORATION
2  Fay Arfa, Attorney at Law
   State Bar No. 100143
3  10100 Santa Monica Blvd., #300
4  Los Angeles, CA  90067
   Tel.: (310) 841-6805
5  Fax: (310) 841-0817
6
   Attorney for Petitioner
7  WILLIAM SADOWSKI
8

FILED
CLERK, U.S. DISTRICT COURT

DEC 2 1 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

9              IN THE UNITED STATES DISTRICT COURT
10
11         FOR THE EASTERN DISTRICT OF CALIFORNIA
12                      CV12-10623 PSG(RZ)
13                                    ) Case No.
   WILLIAM SADOWSKI,                  )
14                                    )
                 Petitioner,          ) PETITION FOR WRIT OF
15                                    ) HABEAS CORPUS BY A
        v.                            ) PERSON IN STATE
16                                    ) CUSTODY (28 U.S.C. §
   RANDY GROUNDS, Warden,             ) 2254); MEMORANDUM
17                                    ) OF POINTS AND
                 Respondent.          ) AUTHORITIES
18                                    )
19 _____ )
20
21
22
23
24
25
26
27
28

1

# TOPICAL INDEX

2

3

**Page**

4  **VERIFICATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

5  **STATEMENT OF THE FACTS** . . . . . . . . . . . . . . . . . . . .  7

6

7       **Overview** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

8  **THE GUILT PHASE** . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

9       **A.**    **Introduction** . . . . . . . . . . . . . . . . . . . . . . .  7

10

11       *April 19, 2005* . . . . . . . . . . . . . . . . . . . . . . . . . .  8

12       *April 28, 2005* . . . . . . . . . . . . . . . . . . . . . . . . . .  8

13       *April 29, 2005* . . . . . . . . . . . . . . . . . . . . . . . . . .  8

14

15       *Sadowski's Statements* . . . . . . . . . . . . . . . . . . . . .  12

16  **THE SANITY PHASE** . . . . . . . . . . . . . . . . . . . . . . . . . .  15

17       **A.**    **Sadowski's Decline into Mental Illness** . . . . . . . . . . .  15

18

19       **B.**    **Psychiatric Evidence** . . . . . . . . . . . . . . . . . . . . . .  17

20       **Prosecution Case** . . . . . . . . . . . . . . . . . . . . . . .  20

21  **ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

22

23  I.    **SADOWSKI'S TRIAL FOR KILLING A POLICE OFFICER IN THE OVERWHELMING PRESENCE OF UNIFORMED OFFICERS VIOLATED SADOWSKI'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL (U.S. Const. amends. V, VI, XIV)** . . . . . . . . . . . . . .  22

24

25

26

27

28

A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

B.    Standard of Review
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

C.    The Right to a Fair Trial under the Federal Due Process
      Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

D.    An Essential State Policy or Interstate Must Justify
      Inherently Prejudicial State Practices . . . . . . . . . . . . . . .    23

E.    The Overwhelming Presence of Uniformed Officers
      Deprived Sadowski of Due Process and a Fair Trial . . .    26

II.   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY
      FAILING TO PREPARE AND PRESENT AN ADEQUATE DEFENSE
      FOR SADOWSKI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

      B.    The Constitution Guarantees a Criminal Defendant the
            Right to an Attorney who will Investigate the Case and
            Present a Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

      C.    Trial Counsel Rendered Ineffective Assistance by Failing to
            Present Dr. Zetin as a Witness . . . . . . . . . . . . . . . . . . . .    33

      D.    Trial Counsel Rendered Ineffective Assistance by Failing to
            Present the Disability Insurance Records Showing That
            Sadowski's Policy Had a Maximum 24 Month Security
            Benefit Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

III.  THE PROSECUTOR COMMITTED PREJUDICIAL MISCONDUCT
      DURING THE GUILT AND SANITY PHASES; TRIAL AND
      APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

B.  **Federal and State Standards of Review** . . . . . . . . . . . . . 44

C.  **The Prosecutor Committed Prejudicial Misconduct During the Guilt Phase** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1.  *Improper Appeals for Sympathy* . . . . . . . . . . . . . . . . . 45

2.  *Violating the "Golden Rule"* . . . . . . . . . . . . . . . . . . 45

D.  **The Prosecutor Committed Prejudicial Misconduct During the Sanity Phase** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

1.  *Misstating the Law* . . . . . . . . . . . . . . . . . . . . . . . . 48

2.  *Disparaging Defense Counsel* . . . . . . . . . . . . . . . . . . 48

3.  *Misstating and Arguing Facts Outside the Record; Improper Vouching* . . . . . . . . . . . . . . . . . . . . . . . . . 49

4.  *Improper Vouching* . . . . . . . . . . . . . . . . . . . . . . . . 57

IV.  **THE TRIAL COURT DENIED SADOWSKI DUE PROCESS AND A FAIR TRIAL BY FAILING TO ISSUE COMPLETE INSTRUCTIONS AT THE SANITY PHASE; TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE** . . . . . . . . . . . . . . . . 64

A.  **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.  **Due Process Requires a Trial Court to Correctly Instruct the Jury on Every Essential Element of the Offense and the Burden of Proof** . . . . . . . . . . . . . . . . . . . . . . . . 65

C.  **The Trial Court Deprived Sadowski of Due Process and a Fair Trial by Failing to Issue Proper Sanity Phase Instructions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

iv

V.   THE OVERWHELMING EVIDENCE PROVED SADOWSKI'S INSANITY AT THE TIME OF THE CARJACKING (U.S. Const. amends V, VI.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

    A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

    B.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

    C.   The California Test of Legal Insanity . . . . . . . . . . . . . . .   74

    D.   Sadowski Overwhelmingly Proved His Insanity . . . . . . .   75

VI.  THE TRIAL COURT'S SENTENCE OF LWOP CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS . . . . . . . . . . . . . . . . . .   81

    A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

    B.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82

    C.   Applicable Federal and State Standards . . . . . . . . . . . . .   82

    D.   A Trial Court May Find That Punishment Is Disproportionate to the Nature of the Crime Involved. . .   83

    E.   The Punishment in this Case Is Disproportionate to the Nature of the Crime Involved. . . . . . . . . . . . . . . . . . . . . . .   85

       *The Offense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85

       *The Offender* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85

VII. THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   88

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89

v

**EXHIBITS**

A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Photograph of Police Car

B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Lab Results (4/29/2005)

C . . . . . . . . . . . . . . . Involuntary Placement Psychiatric Facility (4/7/2005)

D . . . . . . . . . . . . . . . . . . . . . . Declaration of Michele Kentros (11/19/2012)

E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Distance to (to LAX)

F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . News Articles

G . . . . . . . . . . . . . . . . . . . . . . Declaration of Mark Zetin, M.D. (12/4/2012)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Letter from Dr. Zetin (4/12/2008)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Social security check (5/5/2005)

H . . . . . . . . . . . . . . . . . . . . . Northwestern Mutual Letter (4/27/2005)
. . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Fay Arfa (12/5/2012)

I . . . . . . . . . . . . . . . . . . . . . . . . Prosecution Closing Argument (Guilt Phase)

J . . . . . . . . . . . . . . . . . . . . Prosecution Closing Argument (Sanity Phase)

K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Jury Instructions (Sanity Phase)

L . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Jury Instructions (Guilt Phase)

M . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Picture of Overturned Car
. . . . . . . . . . . . . . . . . . . . . . . . . Sadowski's Booking Photo (4/30/2005)

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bell v. True,*
413 F. Supp. 2d 657 (W.D. Va. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Berger v. United States,*
295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45, 57, 58

*Brecht v. Abrahamson,*
507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 88

*California v. Trombetta,*
467 U.S. 479 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Carella v. California,*
491 U.S. 263 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Cary v. Musladin,*
549 U.S. 70 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Chambers v. Mississippi,*
410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Coffin v. United States,*
156 U.S. 432 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cupp v. Naughten,*
414 U.S. 141 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Darden v. Wainwright,*
477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Davis v. Alaska,*
415 U.S. 308 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Donnelly v. DeChristoforo,*

416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Drope v. Missouri*,
420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Duncan v. Louisiana*,
391 U.S. 145 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Enmund v. Florida*,
458 U.S. 782 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Estelle v. McGuire*,
502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Estelle v. Williams*,
425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 30

*Gilmore v. Taylor*,
508 U.S. 333 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Gregg v. Georgia*,
428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Harmelin v. Michigan*,
501 U.S. 957 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Hart v. Gomez*,
174 F.3d 1067 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Holbrook v. Flynn*,
475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22- 24, 26, 30

*In re Winship*,
397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 73, 80

*Jackson v. Virginia*,
443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Lawn v. United States*,

355 U.S. 339 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Leland v. Oregon,
343 U.S. 790 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 80

Lord v. Wood,
184 F.3d 1083 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Miller v. Fenton,
474 U.S. 104 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Moore v. Dempsey,
261 U.S. 86 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Osborne v. Ohio,
495 U.S. 103 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Robinson v. California,
370 U.S. 660 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Solem v. Helm,
463 U.S. 277 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Strickland v. Washington,
466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Bess,
593 F.2d 749 (6th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Carroll,
26 F.3d 1380 (6th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Gaudin,
515 U.S. 506 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

United States v. Hayward,
420 F.2d 142 (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Krebs,*
788 F.2d 1166 (6th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Lamerson,*
457 F.2d 371 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Moore,*
109 F.3d 1456 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 72

*United States v. Morris,*
568 F.2d 396 (5th Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Roard,*
924 F.2d 1426 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Washington v. Glucksberg,*
521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Woods v. Dugger,*
923 F.2d 1454 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-26, 30

## STATE CASES

*Howard v. Corning,*
72 Cal. App. 4th 621 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*In re Dennis,*
51 Cal. 2d 666 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*In re Lynch,*
8 Cal. 3d 410 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 83-84

*People v. Anderson,*
6 Cal. 3d 628 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*People v. Bassett,*
69 Cal. 2d 122 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*People v. Berryman,*
6 Cal. 3d 337 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*People v. Breverman,*
19 Cal.4th 142 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*People v. Coogler,*
71 Cal. 2d 153 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*People v. Cromer,*
24 Cal. 4th 889 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v. Cunningham,*
25 Cal. 4th 926 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*People v. Dean,*
158 Cal. App. 2d 572 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 76

*People v. Dillon,*
34 Cal. 3d 44 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 83-84, 86

*People v. Espinoza,*
3 Cal. 4th 806 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*People v. Fields,*
35 Cal. 3d 329 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*People v. Flannel,*
25 Cal. 3d 668 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*People v. Gionis,*
9 Cal. 4th 1196 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 62

*People v. Goldstein,*
139 Cal. App. 2d 146 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*People v. Hill,*
17 Cal. 4th 823-824 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 62-63

*People v. Love,*
56 Cal. 3d 720 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

*People v. Mora,*
39 Cal. App. 4th 605 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82

*People v. Perry,*
7 Cal. 3d 756 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   63

*People v. Prince,*
203 Cal. App. 3d 848 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

*People v. Redd,*
48 Cal. 4th 691 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49, 55

*People v. Samuel,*
29 Cal. 3d 489 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

*People v. Sedeno,*
10 Cal. 3d 703 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66, 72

*People v. Simington,*
19 Cal.App.4th 1374 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61

*People v. Skinner,*
39 Cal. 3d 765 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . .   73, 74, 80

*People v. Talle,*
111 Cal. App. 2d 650 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

*People v. Vance,*
188 Cal. App. 4th 1182 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*People v. Weddle,*
1 Cal. App. 4th 1190 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84

*People v. Willard,*
150 Cal. 543 (1907) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

*People v. Williams*,
151 Cal. App. 2d 173 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   75

*People v. Woods*,
75 Cal. App. 2d 246 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

*People v. Woodward*,
4 Cal. 4th 376 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*People v. Young*,
11 Cal. App. 4th 1299 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84

## STATE AND FEDERAL CONSTITUTIONS

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Cal. Const. art. I § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Cal. Const. art. I, § 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Cal. Const. art. I, § 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 81, 83

## STATE STATUTES

Cal. Evid. Code § 312 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

Cal. Penal Code § 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67

Cal. Penal Code § 25.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67

Cal. Penal Code § 190.2 ................................... 3, 81

Cal. Penal Code 215 ...................................... 2

Cal. Penal Code § 1026 ................................... 76

Cal. Penal Code § 1127b ................................. 76

Cal. Penal Code § 1368 ................................... 2

Cal. Penal Code § 12022 ................................. 2

## CALIFORNIA CRIMINAL JURY INSTRUCTIONS

CALCRIM No. 222 ........................................ 67

CALCRIM No. 224 ........................................ 70

CALCRIM No. 225 ........................................ 70

CALCRIM No. 226 ........................................ 67

CALCRIM No. 3450 ................................... 67, 70

CALCRIM No. 3550 ...................................... 67

CALJIC No. 1.02 ......................................... 70

CALJIC No. 1.03 ......................................... 70

CALJIC No. 2.01 ......................................... 70

CALJIC No. 2.20 ......................................... 69

CALJIC No. 2.21 ......................................... 69

CALJIC No. 2.27 ......................................... 69

CALJIC No. 2.80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CALJIC No. 2.81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CALJIC No. 2.82 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CALJIC No. 2.83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CALJIC No. 3.32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

CALJIC No. 8.73.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CALJIC No. 8.83.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

CALJIC No. 17.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

CALJIC No. 17.40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

CALJIC No. 17.41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

CALJIC No. 17.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

CALJIC No. 17.47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

## OTHER SOURCES

Hinshaw, Stephen P., *The Mark of Shame: Stigma of Mental Illness and Agenda for Change* (2007) at 73-93 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

FAY ARFA, A LAW CORPORATION
Fay Arfa, Attorney at Law
State Bar No. 100143
10100 Santa Monica Blvd., #300
Los Angeles, CA  90067
Tel.: (310) 841-6805
Fax: (310) 841-0817

Attorney for Petitioner
WILLIAM SADOWSKI

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WILLIAM SADOWSKI,** | ) Case No. |
| | ) |
| **Petitioner,** | ) **SUPPORT OF PETITION** |
| | ) **FOR WRIT OF HABEAS** |
| v. | ) **CORPUS (28 U.S.C. §** |
| | ) **2254); MEMORANDUM** |
| **RANDY GROUNDS, Warden,** | ) **OF POINTS AND** |
| | ) **AUTHORITIES** |
| **Respondent.** | ) |
| | ) |

Petitioner alleges:

1.   Petitioner WILLIAM SADOWSKI is unlawfully restrained of his liberty and imprisoned by Warden Grounds at Salinas Valley State Prison (SVSP), Soledad, CA.

2.    Warden Grounds purports to imprison Sadowski by authority of and pursuant to a commitment rendered in the Los Angeles County Superior Court on January 15, 2010. (Case No. SA041780)

3.   An Information filed September 5, 2006, charged Sadowski with the

first degree murder of Officer Tommy Scott on April 29, 2005. (Ct.
1)(1 CT 82.) The Information alleged a deadly weapon use allegation
and two special circumstances: (1) officer in the performance of his
duties and (2) engaged in carjacking. Cal. Penal Code § 12022 (b)
(1); § 190.2, (a) (7), § 190.2 (a) (17).) (1 CT 83.)

4.   The prosecution also alleged that, on April 29, 2005, Sadowski
committed the crime of carjacking against Officer Scott and Craig
Lazar and attempted carjacking against Christina Koesler. Cal. Penal
Code § 215(a). (1 CT 84-85.)

5.   On September 5, 2006, Sadowski pled not guilty to the charges. (1
CT 90.)

6.   On May 7, 2008, criminal the trial court suspended criminal
proceedings based on Sadowski's incompetency. Cal. Penal Code §
1368. (1 CT 112.) On June 16, 2008, after a finding of competency,
criminal proceedings resumed. (1 CT 114-115.)

7.   On December 5, 2008, the prosecution declined to seek the death
penalty. (1 CT  120.)

8.   On March 11, 2009, Sadowski entered a plea of not guilty by reason
of insanity to all charges. (1 CT 124.)

9.   On October 26, 2009, the guilt phase of Sadowski's trial began (1 CT
159.) On November 16, 2009, the jury found Sadowski guilty of the
felony murder of Officer Scott during a carjacking. (2 CT 441.) The

2

1    jury found that Sadowski used a deadly weapon and that the murder

2    was committed during a carjacking. Cal. Penal Code § 190.2 (a) (17)

3    (2 CT 441 - 442.)
4

5    10.  The jury found the murder was not willful, deliberate, or premeditated.

6    The jury also found the special circumstance [peace officer

7    intentionally killed in the performance of his duties] to be not true.

8    Cal. Penal Code, § 190.2 (7). (2 CT 441-442.)
9
10   11.  The jury found Sadowski guilty on the remaining carjacking and

11   attempted carjacking charges. (2 CT 443-445.)

12   12.  On November 16, 2009, the sanity phase began.  (2 CT 452.) On

13   November 25, 2009, the jury found that Sadowski was sane when he

14   committed the crimes. (2 CT 524)

15   13.  On January 15, 2010, the trial court sentenced Sadowski to life in
16
17   prison  without the possibility of parole. (14 RT 2559-2562.)

18   14.  Sadowski appealed his conviction and, on May 31, 2011. the Court of

19   Appeal, Second Appellate District, Division Eight, affirmed his

20   conviction.  (Case No.  B221859.)  Sadowski raised the following

21   issues on appeal:

22
     a.   Trial for the Death of a Police Officer in a Courtroom Filled with
23        Uniformed Officers as a Substantial Spectator Presence
24        Violated Appellant's State and Federal Due Process Right to a
          Fair Trial (U.S. Const. Amend. V and Amend. XIV; Cal. Const.
25        Art. I §§ 7, 15)
26

27

28                                        3

b.   Appellant Should Be Granted a New Trial Based on
     Prosecutorial Misconduct (U.S. Const. Amends. V, VI, and
     Amend. XIV)

c.   The Evidence Is Insufficient to Prove Beyond a Reasonable
     Doubt That Appellant Was Sane at the Time of the Carjacking
     (U.S. Const. Amend V. and Amend. VI)

d.   Appellant's LWOP Sentence is Cruel and Unusual Punishment
     under the California Constitution (Cal. Const. Art. I § 17)

15.  Raising the same issues that he raised on appeal, Sadowski

     petitioned for review and, on September 14, 2011, the California

     Supreme Court denied review.  (Case No.  S194212 )

16.  On December 7, 2012, Sadowski filed a petition for writ of habeas

     corpus in the Los Angeles Superior Court.  The petition stands

     pending before the superior court.  Sadowski raised the following

     issues in his petition for writ of habeas corpus:

     a.   Sadowski's Trial for Killing a Police Officer in the Overwhelming
          Presence of Uniformed Officers Violated Sadowski's Rights to
          Due Process and a Fair Trial

     b.   Trial Counsel Rendered Ineffective Assistance by Failing to
          Prepare and Present an Adequate Defense for Sadowski

     c.   The Prosecutor Committed Prejudicial Misconduct by Violating
          the "Golden Rule" and Improperly Vouching; Trial and Appellate
          Counsel Rendered Ineffective Assistance

     d.   The Trial Court Denied Sadowski Due Process and a Fair Trial
          by Failing to Issue Complete Instructions at the Sanity Phase;
          Trial and Appellate Counsel Rendered Ineffective Assistance

4

e.  The Trial Court's Sentence of LWOP Constituted Cruel and Unusual Punishment in Violation of the Federal and State Constitutions

Sadowski has no other plain, speedy, or adequate remedy at law, and is without remedy except on application for writ of habeas corpus to effect the immediate release and discharge to which he is constitutionally entitled.  Attached are facts and arguments in support of this Petition.

WHEREFORE, Sadowski prays judgment as follows:

1.  Issue an Order to Show Cause to Respondent to inquire into the legality of Sadowski incarceration.

2.  Grant Sadowski leave to conduct such discovery as has been and shall later be requested by Sadowski upon a showing of good cause;

3.  Hold an evidentiary hearing.

4.  Issue a writ of habeas corpus to have Sadowski brought before it so that he may be discharged from his unconstitutional confinement and restraint and to reverse his conviction; and

5.  Grant such other appropriate relief as law and justice require.

DATED: December 10, 2012

Respectfully submitted,
FAY ARFA, A LAW CORPORATION

**/s Fay Arfa**

_____
Fay Arfa, Attorney for Petitioner

5

**VERIFICATION**

STATE OF CALIFORNIA     )
                           )   ss.
COUNTY OF LOS ANGELES  )

    I, Fay Arfa, am the attorney for the Petitioner. I have read the petition and know the contents. The same is true of my knowledge, except as to those matters which are alleged on information and belief, and, as to those matters, I believe it to be true.

    I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on December 10, 2012 at Los Angeles, California.


/s Fay Arfa

_____

Fay Arfa, Attorney at Law

6

# STATEMENT OF THE FACTS

### Overview

Sadowski, a 46 year old former aerospace engineer, had a long and substantial history of bipolar mental illness. On April 29, 2005, at 10:43 a.m., LAX Officer Tommy Scott stopped to speak to Sadowski as he [Sadowski] walked toward LAX. (1 CT 276; 8 RT 1220) Sadowski jumped into the patrol car and started to drive away. Scott was killed as he tried to regain control of his car.

# THE GUILT PHASE[1]

## A.   Introduction

Sadowski had worked as an aerospace engineer, earning $200,000 a year.  He had a wife, two children and lived in a $700,000 house. (4 RT 361-363.)  Sadowski suffered from bipolar disorder, and,  from June 2003 until April 29, 2005, he could no longer work. He received private disability payments of $4000 a month. (3 RT 212)

By April 29, 2005, Sadowski lived in his truck. (4 RT350; 2 CT 289-308.)

People described Sadowski as "not normal" and "odd." (3 RT 283-284, 288.)  Sadowski would talk to himself or imaginary people. (4 RT 367-368.) He would mumble incoherently, speak loudly and pace back and

---

[1]   Counsel for petitioner Sadowski has consolidated the defense and prosecution case facts for smoother reading.

forth. (4 RT 372, 375, 378.)

Sadowski hung out daily at the Flight Centre, where he bought airline tickets and, Global Gossip, an internet café adjacent to the Flight Centre. (3 RT 258, 269, 347; 4 RT 375.)

Sadowski "loved" two Russian women, namely, eighteen-year-old Zhanna and seventeen year old Olga. Between 2004 and early 2005, Sadowski traveled several times to Russia to visit the women. (3 RT 257-260, 274-275, 348-349.)

*April 19, 2005*

On April 19, 2005, Sadowski bought an airline ticket to Russia. He planned to depart on May 4, 2005. (3 RT 267, 271; 5 RT 555 -557.) A few days later, an agitated Sadowski returned to the Flight Centre to change his flight to an earlier date, but could not afford the $200 change fee. Sadowski became angry and more agitated. (3 RT 273, 285,290-291.)

*April 28, 2005*

On April 28, 2005, the police found Sadowski naked on the beach. Sadowski said he felt good being naked, that he should not have to wear clothes and wanted people to love and be free. (8 RT 1163 - 1167. )

*April 29, 2005.*

On April 29, 2005, at 7:57 a.m., Sadowski's truck, which had been blocking a parking lane, had been towed. (7 RT 978-981) Sadowski, who seemed incoherent, began ranting and raving in the street. Sadowski,

8

1  believing that a conspiracy targeted him, yelled, "They're all against me.

2  They're out to get me."  (3 RT 351.)

3
4      At about 10:00 a.m., Sadowski was walking "in an abrupt and

5  confused way" near the highway's center divider. He walked back and forth

6  and in circles, gestured, cursed toward the sky and shook his head.

7  Sadowski also pounded violently on the center divider. (8 RT 1192-1196,

8  1207, 1214.) A passing motorist, who worked as a physician, described

9  Sadowski as "having a psychotic episode." (8 RT 1200.)

10
11      At about 10:30 a.m., Sadowski began walking on the walkway

12  leading to LAX. He did not walk straight; he walked with this head "up and

13  down" and seemed "off."  Suddenly, without looking, he darted into the

14  street, turned and ran back to the sidewalk. (8 RT 1131-1134.) The police

15  were notified. (8 RT 1148.)

16
17      At about 10:45 a.m., LAX Officer Tommy Scott stopped his patrol car

18  and started to talk to Sadowski. (4 RT 386-388, 392, 442, 471-473.)

19  Suddenly, Sadowski pushed past Scott and got into his [Scott's] patrol car.

20  Scott moved toward the car and tried to pull Sadowski out of the car.

21  Sadowski began to drive and Scott held onto the car. Scott reached

22
23  through the car window and tried to regain control of the car. Sadowski

24  continued to drive, dragging Scott alongside. (3 RT 306-308, 327; 4 RT

25  391-394, 406, 429, 483-485, 491- 494; 5 RT 521-523.)

26      While driving at 40-50 miles an hour, Sadowski drove the car 200 feet

27

28                                    9

and suddenly swerved. The car jumped the curb. The car door then

clipped a fire hydrant and decapitated Scott. Scott's body spun a few feet

off the ground and hit a fence. The car crashed, water gushed from the fire

hydrant and Sadowski stumbled out.[2] (3 RT 308, 335; 4 RT 409, 425, 454-

458, 469, 488-489, 511.) (Tr. Exh. 64.) (Exh. A)

Meanwhile, motorist Cristina Koesler saw the incident and stopped.

Sadowski approached and tried, unsuccessfully, to open Koesler's car

door. Sadowski then walked over to Greg Lazar's car and Lazar let

Sadowski take his car. Before driving off, Sadowski put on a seatbelt and

adjusted the mirror. (3 RT 310-311, 332-333; 4 RT 505, 508, 511-516.)

Sadowski sped away in Lazar's car for about a fourth of a mile. The

car crashed and overturned.[3] (4 RT 498; 5 RT 617-619, 625, 632.)

Sadowski, who had cut his own neck and wrists with a piece of glass,

asked the responding officers to "Shoot me," or "Let me die." (5 RT 635,

636, 688.) Sadowski told the paramedics, "Yes, I just want to die, "I'm

sorry. I know I did wrong. I did not try to hurt the guy," and "I fucked up. I

fucked up real bad. I just want to kill myself." (5 RT 639-640. )  In the

---

[2]    The prosecution's accident reconstructionist opined that the driver
intentionally hit the fire hydrant and steered into the concrete retaining wall.
(6 RT 744,762-763, 776, 801.)

[3]    The prosecution's accident reconstructionist opined that the driver
lost control of the car and crashed. No brakes were applied. (6 RT 753,
818, 833.)

1   ambulance, Sadowski repeated, "I deserve to die or I want to die. Just kill

2   me now" and "I am sorry for what I did." (5 RT 655-656, 669.)

3
4        Sadowski underwent surgery and, as he came out of the anesthesia,

5   claimed to be Jesus Christ.[4] (5 RT 685.) The medical staff stabilized

6   Sadowski with anti psychotic medication and put him in four-point

7   restraints. (7 RT 946, 953.) The police then transported Sadowski to jail in

8   a "safety chair."  (7 RT 948; 8 RT 1054.)  Sadowski arrived at  the jail

9   disoriented, confused and cried out, "I want my Mommy." (8 RT 1114-
10
11   1119.) At about 8:30 p.m., Sadowski showed symptoms of psychosis and

12   bipolar disorder. A jail doctor placed Sadowski in four point restraints

13   because Sadowski cried, could not concentrate, and cut his own wrist and

14   neck. (8 RT 1062, 1064, 1078, 1094.)

15
16        Dr. Ebrahim, a jail psychiatrist, saw and spoke to Sadowski on April

17   29, 2005, at 10:30 p.m. Sadowski cried as Dr. Ebrahim spoke to him;

18   Sadowski  said he missed his sons and that he saw their faces. Sadowski

19   was  "non-informative," hostile, and uncooperative. He had a difficult time

20   staying on one subject matter. (8RT 1059-1062, 1070-1071.)

21        Dr. Ebrahim diagnosed Sadowski with bipolar disorder with psychotic
22
23   episodes.  Dr. Ebrahim did not see any signs of malingering. (8RT 1064,

24   1068, 1078-1079.)

25

26   ---
     [4]    Sadowski had no drugs or alcohol in his system. (6 RT 704.)  (Tr.
27   Exh. K) (Exh. B)

28                                 11

*Sadowski's Statements*

As the jail staff diapered and restrained him, Sadowski said he "did bad things, " "ignored his brother," and, "I hurt so many people." (1 CT 278.) Later, he said, "The police got the wrong person. I didn't do anything. They tied me down for my safety, but I am not suicidal." (8 RT 1044. )

On April 29, 2005, the police interviewed Sadowski. (5 RT 684-678.) Sadowski rambled and talked nonsense. (1 CT 236-273.) He said he belonged to the "union of souls," that he tried to kill himself for "love" and that he loved people so much, he wanted to die for them. Sadowski thought he would be trapped in prison if he did not jump the fence, become a little child and try to kill himself. Sadowski said, "I did a bad thing. I killed somebody - great pain" and "I was killing everybody." (1 CT 245-248.)

Sadowski said he planned to jump over a fence to escape his troubles when Scott stopped him. Scott angered Sadowski when he approached him; Sadowski pushed Scott and took his car so that he could ram the car and kill himself. (1 CT 246-250.)

According to Sadowski, Scott hung onto the car for dear life and "was willing to risk his life for my life." (1 CT 251.) Sadowski said, "I kept going and going, and he was in great pain" and "I was dragging him . . . " (1 CT 251-252.) Sadowski said he wanted to die. He said he did not know what happened to Scott, but he assumed Scott would be hurt. Sadowski said Scott dropped off the car because he [Sadowski] let go of him. Sadowski

said that Scott hung onto him, but "I pushed away, my own brother. I pushed on my brother." (1 CT 251-254.)

Later, Sadowski said he wanted to be free of Scott, so he drove faster. Sadowski said, "I turned the wheel, but he was free [of me]." (1CT 255.) Sadowski said he drove faster to get the officer off the car. He said, "I just tore him away." (1 CT 271.) After hitting the fire hydrant, Sadowski "just walked away, was taking my problem, my confusion. I didn't try and help him. I just thought about myself. I was selfish." (1 CT 256.) Sadowski rambled on, "I just ignored it and just kept thinking about my problem. What do I do about going home? Or whether or not to kill myself, about my wife. I always get ideas about what I must do next." (1 CT 256.)

Sadowski said he stayed with the police car "the whole time," "to the end. To . . . like my attempted death. I was willing to die, die for love." (1 CT 257.) Sadowski said "I didn't want to get away. I just wanted to be dead. I wanted it all to end." (1 CT 259.) Sadowski planned to end it all by "having a friend blow up the car" or "ram a plane into it." (1 CT 259.) Sadowski said, "I was very evil. These ideas of this other person." (1 CT 259.) Sadowski said, "I thought I was God. I could not die. And so, if it was up to her [the person in his head that he talked to], I thought she was Satan - " (1 CT 259.)

Sadowski took the second car because he was "trying to get to love" and go to hell. He thought, "If I do good, if I do evil things for love, I use

evil against evil for love." (1 CT 261, 266.)

When told Scott had been killed, Sadowski said, "That kind of violence, I don't need to know it," "No one could survive that," and "Only God could survive that." (1 CT 268.)

After the police repeatedly said, "You knew that what you were doing was wrong, didn't you?" Sadowski said, "It was wrong."[5] (1 CT 268-269.)

On May 2, 2005, Sadowski wore a suicidal gown and stayed in a private, monitored room, with a bolted bed. (8 RT 1045-l046.)

On May 2, 2005, during a second interview, Sadowski said that, on April 29, 2005, he thought he was God and Satan spoke to him. He went to the airport to kill himself to go to hell and make Satan his wife. He said, "Evil against evil to do good Satan would be, like, Olga and become my wife." Sadowski "wanted to [and had to] die for love and was "dying for Satan." He had to die to bring Olga out of hell to earth "where it's good." (2 CT 315-316, 336.)

Sadowski said he took the patrol car so he could crash and die and be with Satan. He said he had to die for love and thought only about himself and "what . . . [he] I had to do for . . . [his] woman [Olga]." (2 CT 358-360, 365)

---

[5]    The detective repeatedly asked Sadowski during the interview, "You knew that what you were doing was wrong, didn't you?" (6 RT 712.) When Sadowski wanted to talk about the voices in his head and Satan, the detective steered the conversation back to the accident. (6 RT 712.)

14

After Sadowski crashed the police car, he thought Satan told him to push a button to blow up the car. He could not remember how he got to the second car after he crashed the patrol car. (2CT 372)

## THE SANITY PHASE

### A. Sadowski's Decline into Mental Illness

Sadowski tried to commit suicide several times. In 1986, Sadowski tried to kill himself by ingesting pills. Afterwards, his sister and brother-in-law, Michelle and Jim Kentros, hospitalized him. In 1989, Sadowski tried to kill himself using carbon monoxide from a car's exhaust pipe. In the late 1980's, Sadowski again tried to kill himself. (10 RT 1553-1554, 1589, 1592.)

By the 1990's, Sadowski had a promising career, friends, a wife and two daughters. (10 RT 1572, 1574.) Sadowski had earned a masters' degree in mathematics and worked as a computer scientist. After an extended background check, Sadowski received a top secret security clearance and worked at Hughes until 1998. (12 RT 1841, 1889.)

After leaving Hughes, Sadowski deteriorated mentally. Between 2000 and 2001, Sadowski looked "wild," "disheveled," and "bug-eyed." (12 RT 1890.) In August 2003, Sadowski destroyed his chances of working in the defense industry by stealing a computer. (10 RT 1565.)

By 2004, Sadowski's marriage ended and he lived in his car. Sadowski called his brother-in-law and sister, Jim and Michele Kentros,

1  and sounded "manic" because he screamed or talked very, very quickly
2  and incessantly. On March 16, 2004, after Sadowski telephoned the
3  Kentros', Jim Kentros tried to get Sadowski hospitalized. He notified
4
5  Sadowski's psychiatrist, Dr. Zetin, and the police department. Although Dr.
6  Zetin believed Sadowski was psychotic, he refused to hospitalize him. The
7  police also refused to involuntarily hospitalize Sadowski. (10 RT 1551-
8  1552, 1557-1560, 1563, 1579.)
9
   During 2003 and 2004, Sadowski telephoned his friends and family
10
11  and spoke about the devil, God and religion. He sent out weird e-mails
12  rambling about good, evil, and religion. Sadowski considered himself
13  Jesus, spoke about the gospel, love, Satan and saving the world. (12 RT
14  1561, 1845, 1862, 1872-1873, 1891-1892, 1898, 1903, 1908.) (Tr. Exh.
15  144)
16
17   Sadowski talked loudly and obsessed about two teenage Russian
18  women, Olga and Zhanna, whom he considered "angels." He planned to fly
19  to Russia on May 4, 2005; Sadowski did not have a ticket to travel on April
20  29, 2005. (12 RT 1843, 1844, 1851, 1854, 1972, 1974, 1976, 1979-1980.)
21   Sadowski sometimes seemed "almost like a normal person." (10 RT
22  1587.)
23
24   On April 7, 2005, in the midst of a psychotic break, Sadowski stood
25  naked in the middle of the street in front of a church. (2 CT 481-480.)
26  Sadowski was taken to the emergency room of a nearby hospital.
27
28                                    16

1 Sadowski believed he was the new savior and wanted to get into God's
2 house by walking naked in the streets. (12 RT 1911-1914.)
3
4 Sadowski appeared to be bipolar and experiencing a psychotic break.
5 He was involuntarily held and transferred to the county psychiatric hospital.
6 (12 RT 1918-1919, 1932.)
7 **B. Psychiatric Evidence**
8 Drs. Plotkin and Rothberg, both psychiatrists, testified for Sadowski.
9 They opined that Sadowski suffered from paranoia, depression and bipolar
10 mental illness. According to Dr. Plotkin, when bipolar patients become
11 manic, their insights erode and they exhibit psychotic symptoms, such as
12 delusions and hallucinations. They also suffer from hyper sexuality,
13
14 including promiscuity or sexual delusions. (11 RT 1632-1633, 1650, 1668.)
15 Between the bipolar episodes, the patient can be symptom free and
16 look and function normally. Bipolar patients often fail to take their
17 medications because of the side effects and because the medications
18
19 eliminate their euphoric states. By not taking the medications, longer and
20 more severe bipolar episodes result. (11 RT 1637-1638, 1646-1649)
21 According to Dr. Plotkin, during the three weeks before and after April
22
23 29, 2005, Sadowski showed manic symptoms. On April 7, 2005, while in a
24 manic episode, the delusional and paranoid Sadowski stood naked in front
25 of a church. (Tr. Exh. 146) (Exh. C) On April 8, 2005, after Sadowski left
26 the psychiatric hospital, Sadowski acted suspicious, paranoid, and did not
27
28 17

1  take his medicine. (11 RT 1641-1644, 1654, 1749, 1753, 1822, 1827.)

2  
3  Dr. Plotkin opined that, on April 29, 2005, Sadowski did not
4  consciously decide to carjack Scott's car. Sadowski's mental illness,
5  including his irrational, delusional, psychotic behavior, precipitated his
6  actions. (11 RT 1654.) Dr. Plotkin opined that Sadowski experienced a
7  manic episode when he took the cars and, at the time, overwhelming
8  delusions prevented him from distinguishing between right and wrong. (11
9  RT 1676-1677-1680.)
10  

11  Dr. Plotkin formed his opinion based on Sadowski's medical records
12  and Sadowski's hospitalization history. He also based his opinion on
13  Sadowski's actions including being naked in front of the church, speaking
14  erratically, and experiencing delusions. (11RT 1654, 1764)

15  
16  Sadowski's statements also reflected his mania. Sadowski said he
17  was God, he made statements about good and evil, he spoke about dying
18  for love, joining Olga by killing himself, Olga being Satan and that he had to
19  die to go to hell to rescue and merge with her. (11 RT 1660- 1661, 1670.)

20  Dr. Plotkin opined that, after the manic phase ended, when Sadowski
21  spoke to the police, he could not understand what happened. Furthermore,
22  
23  Sadowski took mood stabilizing drugs that improved his mental state. (11
24  RT 1672, 1676, 1823.)

25  According to Dr. Rothberg, on April 29, 2005, consistent with a
26  severe psychotic break, Sadowski lost contact with reality and suffered
27  
28  18

1  delusions. As a result, Sadowski became insane. Sadowski's insanity
2  compelled him to drive the police car, commit suicide, go to hell, and join
3
4  with Satan, who was incarnated in Olga. (13 RT 2011-2012, 2015, 2044,
5  2056. )

6      When Sadowski took the police car, he was insane and his mental
7  disease prevented him from appreciating the wrongfulness of his actions.
8  Although Sadowski could appreciate that taking the car and driving with the
9
10 officer hanging on was legally wrong, he could not appreciate that it was
11 morally wrong because he was focused on dying and uniting with Satan.
12 (13 RT 2014-2015.)

13      Dr. Jack Rothberg found no evidence that Sadowski malingered. Dr.
14 Rothberg agreed that Sadowski suffered a psychotic break during the April
15
16 29, 2005 incident. Dr. Rothberg testified that people who suffer from
17 psychotic episodes may block out the memories of those episodes. Also,
18 Dr. Rothberg believed that during the various interviews, the interviewers
19 suggested factual scenarios that interfered with Sadowski's ability to
20 distinguish the actual events from the events suggested by the
21 interviewers. (13 RT 2000, 2007, 2008.)
22
23      Dr. Rothberg opined that Dr. Hirsch examined a different person
24 because bipolar symptoms fluctuate dramatically over time. (13 RT 2017,
25 2057.) Also, Dr. Hirsch ignored Sadowski's disturbed, irrational and
26 psychotic behavior immediately preceding the incident. (13 RT 2019.)
27
28                          19

1

## Prosecution Case

2 Barry Hirsch, a psychologist, who had never treated anyone with
3
4 bipolar disorder, agreed that Sadowski suffered from bipolar disorder. But,
5 Hirsch believed that Sadowski malingered. (13 RT 2071, 2073.)

6 Despite multiple suicide attempts, Hirsch found Sadowski's
7 depression "really [not] that severe." (13 RT 2078.) Dr. Hirsch found
8 Sadowski "quite functional" based on his "excessive traveling" and his
9
10 refusal to medicate. Hirsch opined that Sadowski got naked on the beach
11 to keep his disability payments. (13 RT 2081-2083, 2102, 2107-2108.)

12 Dr. Hirsch opined that Sadowski had an "aggressive personality,
13 exceeding boundaries." (13 RT 2090.) He claimed Sadowski had been
14 aggressive with law enforcement officers. He also claimed that Sadowski
15
16 got aggressive with a married female fitness instructor, who got a
17 restraining order against Sadowski. (13 RT 2122-2133.)

18 Dr. Hirsch also cited an incident where Sadowski accused guards at
19 a television studio of beating him, despite a security video tape which
20 showed that Sadowski threw himself down. (13 RT 2095.)

21 Despite no evidence that Sadowski's hearing had been tested, Hirsch
22
23 opined that Sadowski spoke loudly because he could not hear well. (13 RT
24 2092, 2095.)

25 On April 7, 2005, after Sadowski had been found walking naked in
26 the street, the medical staff, finding him "gravely disabled," put him on a 72
27

28 20

hour hold. (Tr. Exh. 146) (Exh. C) Sadowski denied substance abuse. (Tr. Exh. 147) The medical tests taken on April 29, 2005 found no evidence of any drugs in Sadowski's system. Sadowski tested negative for nine drugs, including cannabinoids and ethanol. (Tr. Exh. K) (Exh. B) Despite the documented lack of evidence, Hirsch believed that, on April 7, 2005, Sadowski got naked because he abused alcohol and marijuana. (13 RT 2104, 2352.)

According to Hirsch, Sadowski never intended to kill himself on April 29, 2005 and Sadowski's statements to the paramedics showed that he knew what he did was illegal and wrong. (13 RT 2160-2161, 2169) Hirsch opined that Sadowski's writings about religion "reflect[ed] an overall sexualized orientation " and Hirsch labeled Sadowski a deviant hebephile. (13 RT 2173-2174. )

21

## ARGUMENT

I. **SADOWSKI'S TRIAL FOR KILLING A POLICE OFFICER IN THE OVERWHELMING PRESENCE OF UNIFORMED OFFICERS VIOLATED SADOWSKI'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL (U.S. Const. amends. V, VI, XIV)**

### A. Introduction

Defense counsel objected to the presence of uniformed police officers at trial. The trial court refused to exclude the uniformed officers, finding no case law that allowed him to "bar peace officers from appearing in uniform." (2 CT 530; 2 RT 63-64, 149.)

The trial court erred because the overwhelming presence of uniformed police officers at Sadowski's trial for killing an officer violated Sadowski's federal and state due process rights to a fair trial. U.S. Const. amends. V, VI, XIV; *Estelle v. McGuire*, 502 U.S. 62, 73 (1991); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974); *Holbrook v. Flynn*, 475 U.S. 560, 570-572 (1986); Cal. Const. art. I, §§ 7, 15.

### B. Standard of Review

Constitutional questions are reviewed de novo. *People v. Cromer,* 24 Cal.4th 889, 896 (2001); see also, *Miller v. Fenton*, 474 U.S. 104, 114 (1985) (Independent review is necessary to clarify and unify guiding constitutional principles.)

Trial courts have broad power to control their courtrooms and maintain order and security. *People v. Woodward*, 4 Cal.4th 376, 385

22

(1992). Denial of a motion is reviewed for an abuse of discretion. *People v. Cunningham,* 25 Cal. 4th 926, 984 (2001).

## C.    The Right to a Fair Trial under the Federal Due Process Clause

The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. *Drope v. Missouri,* 420 U.S. 162, 172 (1975). The Fourteenth Amendment is binding upon the states through the Due Process Clause. *Duncan v. Louisiana,* 391 U.S. 145, 148-150, 155-156 (1968) The presumption of innocence is a basic component of a fair trial. *Coffin v. United States,* 156 U.S. 432, 453 (1895).

To give full effect to the presumption, courts must guard against factors that may undermine the fairness of the fact-finding process. *Estelle v. Williams,* 425 U.S. 501, 503-504 (1976). "[A] court must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Id.,* citing *In re Winship,* 397 U.S. 358, 364 (1970).

## D.    An Essential State Policy or Interstate Must Justify Inherently Prejudicial State Practices

The United States Supreme Court has held that an essential state policy or interest must justify trial practices that prejudice an accused's due process right to a fair trial. *Estelle v. Williams,* 425 U.S. at 505 (prohibiting jail clothing); *Holbrook v. Flynn,* 475 U.S. at 568-569. (Due process not denied by presence of uniformed security guards); *Cary v. Musladin,* 549

23

1  U.S. 70, 76 (2006) (addressing civilian conduct such as wearing buttons in

2  the courtroom.)

3

4  In *Estelle v. Williams*, 425 U.S. at 503-504, the Court held that

5  compelling an accused to stand trial in identifiable prison clothes denies an

6  accused due process and a fair trial. *Estelle* found that [u]nlike physical

7  restraints, compelling an accused to wear jail clothing furthers no essential

8  state policy." *Id.* at 505.

9

10  In *Holbrook v. Flynn*, 475 U.S. at 571-572, the Supreme Court held

11  that four uniformed state troopers sitting in the spectator row directly

12  behind the defendant throughout his trial for security purposes did not

13  create such inherent prejudice that it denied the defendant a fair trial. The

14  Court stated that the test must be "whether an unacceptable risk is

15  presented of impermissible factors coming into play." *Id.* at 570.  The Court

16

17  did ". . . not minimize the threat that a roomful of uniformed and armed

18  policemen might pose to a defendant's chances of receiving a fair trial." *Id.*

19  at 570-571. The Court also stated that guards who are not readily

20  identifiable by the jury would have been the better practice. *Id.* at  572.

21  In *Woods v. Dugger,* 923 F.2d 1454, 1459 (11th Cir. 1991), the

22

23  Eleventh Circuit found that a large number of non witness, off-duty,

24  uniformed prison guards sitting as spectators at the defendant's high profile

25  trial for the death of a prison guard resulted in unjustifiable prejudice. The

26  highly publicized trial was held in a geographic area where the prison

27

28                                                   24

1  employed most of the residents and supported the local economy. There

2  was extensive pre-trial publicity about the death of the guard.  In addition,

3
4  off-duty uniformed prison guards filled half of the 40 seat courtroom gallery.

5  *Id.* at 1455, 1458.

6      The Eleventh Circuit found the presence of the uniformed spectator

7  guards and the pretrial publicity to be presumptively prejudicial. *Id.* at

8  1459. "The prejudice arises from the presence of the uniformed corrections
9
   officers in the context of a trial being held in the midst of an angry
10
11 community." *Id.* The Court of Appeal noted that the guards were present

12 during voir dire, closing argument, and throughout sentencing. *Id.*  "The

13 officers were there for one reason: they hoped to show solidarity with the

14 killed correctional officer. In part, it appears they wanted to communicate a
15
   message to the jury. The message of the officers is clear in light of the
16
17 extensive pretrial publicity. The officers wanted a conviction followed by

18 imposition of the death penalty." *Id.* at 1459-1460.

19      *Dugger* found that the state failed to show that the officers' presence

20 furthered an essential state interest and failed to justify the presence of

21 uniformed officers as spectators. *Id. Dugger* then held the presence of the
22
23 uniformed guards in substantial numbers extremely prejudiced Dugger. *Id.*;

24 see also, *Bell v. True,* 413 F.Supp.2d 657, 719-721 (W.D. Va. 2006)  (The

25 presence of too many uniformed off-duty officers might create "oppressive"

26 atmosphere. Trial court had duty to control the overt presence of law

27

28                                     25

1    enforcement to avoid inherent prejudice to defendant's right to a fair trial.)

2    **E.    The Overwhelming Presence of Uniformed Officers**
3    **Deprived Sadowski of Due Process and a Fair Trial**

4    The trial judge erroneously believed he could not stop the uniformed
5
6    police officers from attending trial. (2 RT 63-64.) However, the trial court
7    overlooked that it could stop uniformed police officers from attending the
8    trial if their presence threatened Sadowski's right to a fair trial. See,
9    *Holbrook v. Flynn,* 475 U.S. at 570-571; *Woods v. Dugger,* 923 F.2d at
10   1459.
11
12   The overwhelming presence of uniformed police officers gave "an
13   aura of, there's a legal enforcement that really wants a particular verdict,
14   and I think that may have swayed the proceedings in this case." (14 RT
15   2520.) The trial court acknowledged the presence of law enforcement,
16   including deputy sheriffs, in the courtroom, particularly during the
17
18   arguments and opening statements. The trial court found that law
19   enforcement's presence did not intimidate the jury and that uniformed, on-
20   duty police officers could attend court proceedings. (14 RT 2526.)

21   The prosecution failed to justify the "on duty" uniformed officers'
22   substantial presence at Sadowski's trial. As in *Dugger,* the officers
23   attended as spectators, not as witnesses or court functionaries. (*Id.*; 14 RT
24
25   2526.) Further, as in Dugger, the officers were "there for one reason: they
26   hoped to show solidarity with the killed . . . officer. In part, it appears that

27

28                                    26

they wanted to communicate a message to the jury . . . " *Id.* at 1459-1460.

The uniformed police officers made themselves highly visible spectators and created an oppressive presence in the courtroom. (2 RT 63-64.) The police found Sadowski guilty from the outset and marked his case for special treatment. Dr. Ebrahim testified that Sadowski's jail records designated him [Sadowski] as having "done serious crime" because it involved the death of the police officer. (8 RT 1068.)

Here, the uniformed officers saturated not only the courtroom, but also the courtroom corridors. Numerous uniformed officers stood in the hallway outside the courtroom at the beginning of each day and before re-entering the courtroom after lunch. Several times, at least ten officers stood and talked within the earshot of the jurors. (Exh. D at 12-13)

Here, not only did the uniformed police officers strategically position themselves inside the courtroom, they tried to bond with and evoke sympathy from the jury. During trial, a uniformed officer held the door open for the jurors and seemed to "escort" the juror who walked with a cane. The court found the gesture inappropriate under the circumstances.[6] (8 RT

---

[6]    Defense counsel informed the trial court:

DEFENSE COUNSEL: When I was bringing in one of my witnesses, I know -- I think it's an LAX police officer, the tall gentleman, African American, who sits by the Scott family, he was holding the door for the jurors. I don't see a problem with that. Then he touched the juror that walks with the cane, like gently escorting her, and I have a problem with that type of

1185.)

The uniformed officers aligned themselves with the prosecution and,
two uniformed officers always sat on each side of the decedent's parents.
Several uniformed officers attended trial each day, but on some days, the
uniformed officers occupied the back row on the entire right side of the
courtroom. (Exh. D at 12)

The uniformed officers held the door open for the jurors to go in and
out, they would stare at the jury and, whenever the jury entered or left the
courtroom, the uniformed officers would stand up as the jury walked right in
front of their seats. (Exh. D at 12)

During trial, Michele Kentros sat on the left side, two or three rows
from the front of the courtroom.  A Hispanic officer, about six feet tall and in
his mid-thirties, at the end of the row of officers, kept glaring at her. The
officer's threatening looks caused her to physically shake in fear.  (Exh.  D
at 13)

Furthermore, the trial was held in close proximity to the Los Angeles
Airport (LAX) where the incident occurred.  The distance between LAX and
the Airport Courthouse, where the trial was held, was only two miles or six
minutes away. (Exh.  E)   The local press highly publicized Sadowski's

---

contact. So if he could be told not to have that type of contact
with the jurors.
    THE COURT: That would be preferable. I'm sure it's just
a matter of good manners, but not appropriate.  (8 RT 1185)

28

1  case. In 2005, when the incident happened, the Daily Breeze published
2  nine articles about the incident. (Exh. F) During the year of the trial, from
3
4  March 2009 until November 2009, the local newspaper published about 20
5  articles dealing with the trial, Sadowski, and Officer Scott. (Exh. F)

6  At sentencing, the police made heavily biased, contemptuous, hateful
7  and bitter statements. The statements showed no sympathy for Sadowski,
8  who suffered from a long term serious mental illness. The officers denied
9
10 Sadowski's history of delusions and suicide and assumed that Sadowski
11 chose to become seriously mentally ill. One police officer called Sadowski
12 a "criminal minded individual." (14 RT 2536.) Another stated that Sadowski
13 was not entitled to be called "Mr. "[7] (14 RT 2540.)

14 Captain Fitchpatrick, despite overwhelming evidence of Sadowski's
15
16 decades-long mental health history and despite that the jury found no intent
17 to kill, said, "Instead of letting him help Mr. Sadowski, he chose to kill him."
18 (14 RT 2543; 2 CT 441-442.) Fitchpatrick said, "Although in this court,
19 we've said that he's had some mental problems and things of that nature,
20 no. There was no proof of that, because he wouldn't have tried to escape.
21

22 [7]  The officer stated:
23
24     [BY THE OFFICER] Mr. Sadowski - well, *I shouldn't even
25     say Mr.* That's something I wouldn't give you respect for. I know
        that you'll be sleeping where you will be sleeping, where you're
26     going to eat for the rest of your life, that I look forward to that.
       That's my only solace." (14 RT 2540.) (Italics added.)
27

28                                    29

1  He wouldn't have tried to get to carjack, one, two, to get away."(14 RT

2  2543.) Fitchpatrick overlooked that the jury never found that Sadowski tried

3
4  to escape.  Besides, escape had nothing to do with Sadowski's sanity. (14

5  RT 2543.)

6      The police officers who lost one of their own in horrific circumstances,

7  could not be objective and fair. As a result, the uniformed officers should

8  have been excluded from the trial so as not to  intimidate the jury. As in

9
10 Dugger, the police officers' obvious bias and bitterness justified excluding

11 uniformed police officers where the defendant faces trial for the death of a

12 fellow officer.

13      Here, the police officers tried to intimidate the jury in violation of the

14 most elementary principles of a fair trial. *Moore v. Dempsey,* 261 U.S. 86,

15
16 (1923) (Holmes, J.); *Woods v. Dugger*, 923 F.2d at 1456-60.

17      Therefore, the trial court erroneously allowed the substantial,

18 pervasive presence of uniformed officers at Sadowski's trial. The pervasive

19 presence of uniformed law enforcement officers undermined Sadowski's

20 due process right to a fair trial. U.S. Const. amends. V, VI, XIV; *Estelle v.*

21 *McGuire*, 502 U.S. at 73;  *Donnelly v. DeChristoforo*, 416 U.S. at 643;

22
23 *Estelle v. Williams,* 425 U.S. at 505; *Holbrook v. Flynn*, 475 U.S. at  570-

24 572.

25
26
27
28                      30

1
2
3

## II. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO PREPARE AND PRESENT AN ADEQUATE DEFENSE FOR SADOWSKI

4

### A. Introduction

5
6
7
8
9
10
11
12

Sadowski pleaded not guilty by reason of insanity and, on November 16, 2009, the sanity phase began. (2 CT 452.) On November 25, 2009, the jury found that Sadowski was sane when he committed the crimes. (2 CT 524) During the sanity phase, the prosecution's sole witness, Barry Hirsch, Ph.D., testified that, on April 29, 2005, Sadowski never intended to kill himself and that Sadowski knew that he committed an illegal and wrong act. (13 RT 2160-2161, 2169)

13
14
15
16
17
18
19
20
21
22
23
24

Defense counsel failed to present Dr. Zetin to testify that Sadowski suffered a psychotic break that rendered him legally sane on April 29, 2005. (Exh. G at 49-50) However, Dr. Zetin, Sadowski's treating psychiatrist, would have *emphatically* testified that, during the April 29, 2005 incident, Sadowski suffered from a mental disease or defect, and he was incapable of knowing or understanding the nature and quality of his act or of distinguishing right from wrong. (Exh. G at 50) Since Hirsch's testimony constituted the prosecution's entire sanity case, by impeaching Hirsch, the jury would have found Sadowski insane during the April 29, 2005 incident.

25
26
27

During the sanity phase, Hirsch's opined that Sadowski feigned mental illness and manipulated the system to get disability payments. (13

28

31

1   RT 2081-2083, 2102, 2107-2108.) However, even if Dr. Zetin disputed

2   whether Sadowski qualified for disability, Sadowski's disability insurance

3
    had a 24 month maximum benefit period and Sadowski knew that he would
4

5   continue to receive disability benefits through October 26, 2005. (Exh.  H)

6   Defense counsel failed to present the evidence even though it would have

7   impeached Hirsch's testimony during the sanity phase.  (Exh.  H at 61)

8
        By failing to present Dr. Zetin as a witness and by failing to present
9
    evidence that Sadowski had a maximum two year disability period, defense
10

11  counsel rendered ineffective assistance and Sadowski was denied due

12  process and a fair trial. U.S. Const. amends. V, VI, XIV;  *Brecht v.*

13  *Abrahamson,* 507  U.S. 619, 623 (1993); *Strickland v. Washington*, 466

14  U.S. 668, 694 (1984).

15
        **B.    The Constitution Guarantees a Criminal Defendant the**
16  **Right to an Attorney who will Investigate the Case and**
    **Present a Defense**
17

18  The United States Supreme Court has held that a defendant may

19  present evidence in support of a relevant defense. *California v. Trombetta*

20
    467 U.S. 479, 485 (1984); *Chambers v. Mississippi*, 410 U.S. 284, 302
21

22  (1973). Criminal defendants also have the right to counsel. U.S. Const.

23  amend. VI. See also, *Strickland,* 466 U.S. at 694.

24      A "lawyer who fails adequately to investigate, and to introduce into

25  evidence, [evidence] that demonstrates his client's factual innocence, or

26
    that raises sufficient doubt as to that question  to undermine confidence in
27

28                                      32

1  the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d

2  1067, 1070 (9th Cir. 1999) (defense counsel ineffective for failing to review

3
4  or introduce at trial documents corroborating defense witness's testimony);

5  see also *Lord v. Wood*, 184 F.3d 1083, 1096 (9th Cir. 1999) (defense

6  counsel ineffective for failing to contact or call witnesses who told police

7  and investigators that they saw the victim alive after defendant allegedly

8  killed her.)

9
10  ## C. Trial Counsel Rendered Ineffective Assistance by Failing to Present Dr. Zetin as a Witness

11  Dr. Zetin had treated Sadowski for several years, from 2001 until

12
13  2005. Dr. Zetin would have emphatically testified that during the April 29,

14  2005 incident, Sadowski suffered from a mental disease or defect, and he

15  was incapable of knowing or understanding the nature and quality of his act

16  or of distinguishing right from wrong. (Exh. G) Defense counsel needed,

17  but inexplicably failed, to present Dr. Zetin as a defense witness at the

18
19  sanity phase. Instead, defense counsel relied on the prosecutor's

20  representation that she [the prosecutor] planned to call Dr. Zetin. When

21  the prosecutor failed to call Dr. Zetin as a witness, defense counsel "did not

22  have the opportunity to arrange for Dr. Zetin to come to court." (SCT 1)

23  Dr. Zetin would have testified that, after reviewing the witness

24
25  reports, the police officers' interrogations and, based on his knowledge of

26  bipolar affective disorder, Sadowski suffered from a bipolar mixed episode

27  at the time of the April 29, 2005 incident. In fact, after the police arrested

28  33

1   Sadowski, Zetin even told defense counsel that he believed that Sadowski

2   suffered a psychotic break during the April 29, 2005 incident. (Exh. G at

3
    49- 50)
4

5       On April 12, 2008, Dr. Zetin prepared a letter, at defense counsel's

6   request. In the letter, Dr. Zetin told defense counsel that he believed that

7   at the time of the incident, Sadowski suffered a bipolar mixed episode.(Exh.

8   G at 51) During the sanity phase, defense counsel introduced Dr. Zetin's

9
    April 12, 2008 letter and, during closing argument, Nunez mentioned letter
10

11  and relied on it to prove Sadowski's mental state.[8] However, she

12  inexplicably failed to present Dr. Zetin himself as a witness. (Tr. Exh. OO)

13  (Exh. G at 51)

14      Instead, defense counsel argued during closing: "The other thing is

15
    that *we unfortunately did not get to hear from Mr. Zetin*, but we did hear
16

17  about his theories and even though Dr. Hirsch disagreed with them, other

18  experts testified that the manic phase can come out of the blue, that these

19  episodes can be autonomous, coming on spontaneously out of the blue. "

20

21  ───────────────
    [8]     DEFENSE COUNSEL: Now, I know she [the prosecutor]
22          focused a lot about Dr. Zetin and she also mentioned in her
23          opening statement she was going to call Dr. Zetin, but she
            chose not to do that. And in her closing argument, she also
24          chose not to discuss his letter of April 12, 2008.
25          And in that letter, he had written, quote, I believe that he
            was extremely psychotic and that he was in the middle of a
26          mixed episode with clearly stated intention to kill himself at the
27          time of the incident. . . .(14RT 2345)

28                                      34

1    (14RT 2434) (Italics added.)

2    During the sanity phase, Dr. Hirsch testified that Dr. Zetin wrote the
3
4    April 12, 2008 letter to cover himself against a lawsuit. (14RT 2346, 2358)
5    Dr. Hirsch testified that Dr. Zetin violated Sadowski's confidentiality and
6    "opened [Dr. Zetin] to a " huge civil suit.  Whether that played a part in his
7    [Dr. Zetin's] reconsidering formulation or not, I have no way of knowing, but
8    it's a serious concern of mine that somebody in a murder case writes what
9
10   may be a solicited or unsolicited -- I have no way of knowing whether Miss
11   Nunez asked him to write this or an investigator for Miss Nunez or this is
12   simply an unsolicited letter that came in. If this is unsolicited he's got a civil
13   case possibly pending and that causes me to have grave concern about
14   what he's written."  (14RT 2359)
15
16   The prosecutor theorized that Sadowski contrived his mental illness
17   to get disability benefits.  In her sanity phase opening, the prosecutor
18   argued that Dr. Zetin, "who has monitored him for years" wrote to
19   Sadowski's disability insurance company saying, "It's an outrage that this
20   man continues to collect disability. He's traveling the world. He can work if
21
22   he wants to. He's unmotivated to work. He's totally able to work. He doesn't
23   want to work on the same kind of job he used to have that required a lot of
24   concentration, but that's a matter of choice for him. He can work, and it's an
25   outrage that he's not working.'" (10RT 1546.)
26   The prosecutor also argued, in her opening statement, that Dr. Zetin
27

28                                      35

1  wrote in December 2004 that Sadowski was in "remission" and told

2  Sadowski that "'you have to go back to work. It's an outrage. You're

3
4  traveling the world. You're making extended trips. You tell me you're fine.

5  You're not compliant with your medications. You need to go back to work . .

6  .'" (10RT 1547)

7       During her sanity phase closing, the prosecutor highlighted the fact

8  that the defense failed to call Dr. Zetin. She argued that:

9       THE PROSECUTOR:  I  want you to remember and I want you

10  to think about the  fact that the defense is asking you for a verdict of
   not guilty by reason of insanity, but yet did not produce for you, Dr.

11  Zetin. *They chose not to call the treating psychiatrist of the defendant
   who treated him for 4 years. They chose not to put him on the*

12  *witness stand and that has to be suspect. And not only is it suspect,*
13  *when you read the notes, you know exactly why the defense did not*
14  *put him on the witness stand.* And that is because of how excellent
   the treatment was, how you could see actually the course of the

15  illness and exactly that on April 5th Dr. Zetin wrote he is in remission.
16  It doesn't mean he is cured.  Remission.  It means he has no signs
   and symptoms.  And April 5th and the documents fully state that he

17  said that.  (14RT 2452) (Italics added.)  (Exh. I at 69)

18
19       Using Dr. Zetin's notes, the prosecution theorized that Sadowski was

20  sane during the April 29, 2005 incident. However, Dr. Zetin would have

21  testified that Sadowski was insane at the time of the April 29, 2005

22
23  incident.  Because defense counsel never called Dr. Zetin as a witness, the

24  prosecutor attacked defense counsel and argued that Dr. Zetin would have

25  been a hostile witness.   Dr. Zetin would have been the most crucial

26  defense the defense could have presented during the insanity phase. Dr.

27

28                                    36

1   Zetin would have emphatically testified that during the April 29, 2005

2   incident, Sadowski suffered from a mental disease or defect, and he was

3

4   incapable of knowing or understanding the nature and quality of his act or

5   of distinguishing right from wrong.  (Tr. Exh. OO) (Exh. G)  By failing to

6   present Dr. Zetin, defense counsel rendered ineffective assistance

7        **D.    Trial Counsel Rendered Ineffective Assistance by Failing to
8             Present the Disability Insurance Records Showing That
             Sadowski's Policy Had a Maximum 24 Month Security
9             Benefit Period**

10   Beginning in June 2003, until April 29, 2005, Sadowski collected

11   $4,000 a month in private disability payments due to his bipolar disorder.
12
13   Dr. Zetin treated him for his disability. (Tr. Exh.  98)  The prosecution

14   theorized that Sadowski faked mental illness to extend his disability

15   payments. The prosecution asserted that Sadowski staged the April 7,

16   2005 public nakedness episode to keep his monthly disability payments.

17   However, the defense had evidence that Sadowski's policy contained a 24
18
19   month maximum benefit period.  (Exh. H.)

20   Sadowski's disability insurance payments would have continued until

21   October 26, 2005, regardless of how Dr. Zetin diagnosed Sadowski's

22   mental condition on April 5, 2005.[9]  (Exh.  H) Furthermore, Sadowski's
23
_____

24   [9]     When arguing about Sadowski's calendar, the prosecutor argued,
25   and then you get to October 26, where it says, "Northwestern Mutual,
     WMW, final day benefit is  payable." so apparently his $4,000 a month in
26   disability was going to end on that particular day.  (9RT 1406)  However,
27   the disability was going to end that day regardless of what Dr. Zetin said

28                                      37

social security insurance paid Sadowski $27,718 on May 5, 2005. (Exh. H)
However, defense counsel failed to present evidence showing that
Sadowski's disability insurance payments would have ended and that
Sadowski did not need to feign any mental illness to keep them.

The prosecutor spent a great deal of trial time using Sadowski's
$4000 monthly disability payments to show Sadowski's motive to fake his
mental illness. During opening, the prosecutor relied heavily on the
termination of Sadowski's disability payments as the motive for Sadowski's
April 2005 actions. The prosecutor argued:

> You will learn that about the time he went out on his
> disability for the bipolar disorder, and that was a private
> insurance policy that he had purchased, and he was collecting
> $4,000 a month benefits, and that at that time, he was what he
> would call in transition sort of some people might say in
> between jobs transition. (2RT 211)

During her case in chief, she introduced all of Sadowski's disability
payments. (Tr. Exhs. 105 - 134) During the sanity phase, the prosecutor
extensively questioned the defense witnesses about Sadowski's disability.
(11RT 1690, 1694, 1704, 1707, 1709, 1713, 1715, 1720, 1722, 1726, 1729,
1733, 1736, 1737, 1738, 1740, 1741, 1742, 1746, 1747, 1760 [Dr. Plotkin].)
The prosecutor also presented Barry Hirsch, Ph.D. to testify that Sadowski
faked the April 7, 2005 public nakedness episode.

---

about Sadowski's mental illness or even if his mental illness continued.

38

1    Hirsch testified:

2        Q [BY THE PROSECUTOR]; Assuming that was on April
3    5th of 2005  let me ask you, have you also reviewed then an
4    incident where he was found naked trying to get into a church
     that occurred just two days later?
5

6        A [BY DR. HIRSCH]: Yes.

7        Q: And can you tell us what information you garnered
8    regarding that?

9        A: Well, when I interviewed Mr. Sadowski, we certainly
10   spoke about that, and he gave me his best recollections in
     2009 of the incident that occurred. I also reviewed some of the
11   hospital records related to that.

12
         Q: And tell us what your conclusions were regarding that.
13

14       A: *My impression was that this was a decision on this man's
         part to try to subvert authority and continue his $4,000 a month*
15       *disability paycheck, and that this was a conscious decision that*
16       *perhaps was Influenced by some manic kinds or hypomanic kinds of*
         *thinking that propelled him in the direction of public exposure . . .*
17       (13RT 2082)   (Italics added.)

18

19   The prosecution seized on Hirsch's opinion that Sadowski faked the

20   April 7, 2005 naked in the street incident.  Throughout the sanity phase, the

21
     prosecutor questioned Hirsch to elicit testimony that Sadowski faked his
22
23   mental illness on April 7, 2005 to keep his disability payments. Hirsch

24   testified in relevant part:

25       A: [BY DR. HIRSCH]: *It's also highly possible that he was*
26       *looking at losing $4, 000 a month and decided to act out [by*
         *being naked in public] in a way that would be in accord with the*
27

28                                39

1  *way at least I see his personality*. No way of knowing.  (13RT
2  2105) (Italics added.)

3      Q [BY THE PROSECUTOR]: And I think you indicated
4  before but you had -- *you were suspicious about the sincerity or*
5  *the genuineness -- I'm not even sure of the right language of*
   *the April 7th incident; correct?*

6
7      A [BY DR. HIRSCH]: Correct. (14 RT 2378-2379) (Italics
   added.)
8                          * * *

9      Q [BY THE PROSECUTOR]. You indicated that the
10 entries that Dr. Zetin had made on April 5th were one of the
11 reasons why you thought that the event that happened on *April*
   *7th at Queen of Angels you had some suspicion regarding that;*
12 *correct?*  (14RT 2385)

13     A [BY DR. HIRSCH]. Correct (14RT 2386) (Italics added.)
14

15 During the guilt phase closing, the prosecutor focused on Sadowski's

16 disability payments as follows:

17     THE PROSECUTOR: For the last year-and-a-half, two
18 years, three years, he's been collecting disability, *a disability*
   *check for about $4,000 a month. A disability check for about*
19 *$4,000 a month* . . .  (9RT 1385) (Exh.  J at 123) (Italics added.)

20
                           * * *
21

22     THE PROSECUTOR: . . . *And he's stretching his $4,000*
   *to use it for the things he wants to use it for.* . . . He's got all the
23 time in the world. He can fly on any schedule. He's not confined
24 by a work schedule. He wants to travel. He wants to have
25 relationships with very young girls. The man was 46 years old.
   Olga was 17 years old . . .  *And this time in his life was about*
26 *adventure, freedom and living off $4,000 tax-free income. And*
   *that's the baseline where he starts here.*  (9RT 1386) (Italics
27

28                          40

1   added.)
2
                                              * * *

3        THE PROSECUTOR: . . . Then you get to the April 7th
4   incident that *Dr. Hirsch found very suspect. And I will suggest to
5   you Dr. Zetin would have found it extremely suspect also* . . .
    It's very odd that you could be in the middle of a psychotic
6   episode totally out of touch with reality standing in the street
7   naked . . .   It sounds manipulative . . . *It sounds like he did
    that conduct to make a record so if he later needed to pull the
8   records from that hospital, he could pull them and say look how
9   crazy I was on that date.* (14RT 2467) (Italics added.)

10   During the sanity phase, the prosecution presented only psychologist
11   Barry Hirsch, Ph. D.  Hirsch opined, and the prosecution heavily relied on
12   Hirsch's opinion, that Sadowski got naked on the beach to keep his
13
14   disability payments. (13 RT 2081-2083, 2102, 2107-2108.)  According to
15   Hirsch, Sadowski never intended to kill himself on April 29, 2005 and
16   Sadowski's statements to the paramedics showed that he knew what he
17   did was illegal and wrong. (13 RT 2160-2161, 2169)

18       Defense counsel could have proved that Sadowski qualified for two
19   years of disability.  Sadowski's disability insurance had an expiration date
20   of October 26, 2005 and he would continue to receive benefits through
21   October 26, 2005. (Exh. H) Defense counsel failed to present any
22
23   evidence to show that the disability payments had nothing to do with the
24   April 7, 2005 incident.  The disability evidence would have proved that,
25   regardless of what Dr. Zetin or Sadowski believed, Sadowski's disability
26   payments would have terminated after two years, on October 26, 2005.
27

28                                    41

1    Furthermore, the evidence would have proved to the jury that on April

2  7, 2005, just days before the April 29, 2005 incident, Sadowski suffered a

3
4  psychotic break and never faked the April 7, 2005 incident.  The evidence

5  would also have proved to the jury that Sadowski was legally insane at the

6  time of the April 29, 2005 incident and had no motivation to either carjack

7  or kill Officer Scott for any criminal reason.  Therefore, trial counsel

8  rendered ineffective assistance by failing to present the disability insurance

9
10  payment information.  *Strickland,* 466 U.S. at 694.

42

1
2
3
4
5

### III. THE PROSECUTOR COMMITTED PREJUDICIAL MISCONDUCT DURING THE GUILT AND SANITY PHASES; TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE

### A. Introduction

6    The prosecutor committed misconduct throughout the guilt and sanity
7 phase closing arguments.  During the guilt phase closing, the prosecutor
8 asked the jury to sympathize with Officer Scott's family and improperly
9
10 urged the jury to consider how the victim felt during the carjacking. (2 CT
11 530; 9 RT 1414, 1418, 1458, 1460)

12    During the sanity phase closing, the prosecutor misstated the
13 applicable law and attacked defense counsel's  integrity. The prosecutor
14 mischaracterized the evidence, referred to facts not in evidence, and
15
16 improperly vouched. (2 CT 530; 14 RT 2471, 2447-2477, 2492)  The
17 prosecutor injected her personal feelings and opinions into the case. (14RT
18 2475, 2478, 2480, 2490, 2495) As a result, Sadowski was denied due
19 process and his right to a fair jury trial. U.S. Const. amends. V, VI, XIV.

20    Trial counsel moved for a new trial based on prosecutorial
21
22 misconduct. (2 CT 530.)  Finding no misconduct, the trial court denied the
23 motion. (14 RT 2526-2537.) The trial court overlooked that prosecutorial
24 misconduct undermined Sadowski's state and federal due process right to
25 a fundamentally fair trial. U.S. Const. amends. V, XIV; *Estelle v. McGuire*,
26 502 U.S. at 73; *Donnelly v. DeChristoforo,* 416 U.S. at 643; Cal. Const.
27

28                                          43

1 art. I, §§ 7, 15.

2 Trial counsel inexplicably failed to object to the misconduct.

3
4 Appellate counsel raised the issue of prosecutorial misconduct on appeal,

5 but overlooked several instances of prosecutorial misconduct. Therefore,

6 both trial and appellate counsel rendered ineffective assistance. *Strickland,*

7 466 U.S. at 694.

8 **B. Federal and State Standards of Review**

9
10 "A prosecutor's intemperate behavior violates the Federal

11 Constitution when it comprises a pattern of conduct so egregious that it

12 infects the trial with such unfairness as to make the conviction a denial of

13 due process." *People v. Gionis,* 9 Cal.4th 1196, 1214 (1995); *Donnelly v.*

14 *DeChristoforo,* 416 U.S. at 642-643; *Darden v. Wainwright,* 477 U.S. 168,

15 181 (1986).

16
17 A prosecutor is held to a higher standard than that imposed on other

18 attorneys because of the unique function he or she performs in

19 representing the state. "The United States Attorney is the representative

20 not of an ordinary party to a controversy but of 'a sovereignty whose

21 obligation to govern impartially is as compelling as its obligation to govern

22
23 at all; and whose interest, therefore, in a criminal prosecution is not that it

24 shall win a case, but that justice shall be done." *Berger v. United States,*

25 295 U.S. 78, 88 (1935).

26 A prosecutor "may prosecute with earnestness and vigor . . . [b]ut

27

28 44

while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States,* 295 U.S. at 88.

Misconduct during closing argument is of particular concern. "The argument of the district attorney particularly his closing argument, comes from an official representative of the People. As such, it does and it should, carry great weight. It must, therefore be reasonably objective." *People v. Talle,* 111 Cal.App.2d 650, 677 (1952).

## C. The Prosecutor Committed Prejudicial Misconduct During the Guilt Phase

### 1. *Improper Appeals for Sympathy*

During closing argument in the guilt phase, the prosecutor appealed to the passions of the jury by asking for sympathy for Officer Scott's family as she turned to the family who were surrounded by many LAX uniformed police officers. The prosecutor said, "Don't let this defendant rob Officer Scott of the sympathy that each and everyone of you would have for him." (2CT 530; 9 RT 1418.) After defense counsel's objection, which the trial court sustained, the prosecutor said, "Sympathy is not an issue in this case." (9 RT 1418.)

### 2. *Violating the "Golden Rule"*

Prosecutorial misconduct includes appealing to the sympathy or

45

1   passions of the jury. *People v. Vance,* 188 Cal.App.4th 1182, 1192 (2010).

2
3   For example, inviting the jury to put itself in the victim's position and

4   imagine what the victim experienced "is a blatant appeal to the jury's

5   natural sympathy for the victim." *Id.* at 1188. Likewise, urging the jury to
6
7   consider the impact of the crime on the victim's family is prosecutorial

8   misconduct. *Id.* at 1193.  See also *People v. Fields,* 35 Cal.3d 329, 362

9   (1998)  (Inviting the jury to view the case through their fears and emotions
10
11   encourages jurors "to depart from their duty to view the evidence

12   objectively.")

13
14         In *Vance,* a first degree murder case, the court found it to be

15   prejudicial misconduct for the prosecutor to urge the jurors to "walk in [the

16   victim's] shoes" and to "relive in your mind's eye" what the victim

17   experienced. *Id.* at 1194. It also found to be misconduct the prosecutor's
18
19   statement, " 'Defense is objecting because the defense believes that I'm

20   painting too graphic a picture.' " *Id.* at 1200-1201.

21
22         Here, the prosecutor improperly asked the jury to view the evidence

23   through the victim's eyes as well as their own eyes.  The prosecutor

24   violated the "Golden Rule" when she argued:
25
26         THE PROSECUTOR:   Because it was a gamble. Officer
           Scott almost caught him. Officer Scott almost stopped him. The
27

28                                      46

defendant actually had to kill Officer Scott to be successful, but only because officer Scott fought so hard. Officer Scott fought and fought and fought, and he never quit. And the defendant wasn't able to get away from Officer Scott until he killed Officer Scott.

*Officer Scott held on. He held on for dear life. He held on, second after second after second, for a quarter mile, 45, 50 miles an hour. I have racked my brains on how I could make you feel that, and I can't do it. There is nothing I can think of to compare it to. What is it like as your fingers are slipping and slipping, and it's going faster and faster? You can think about holding onto a car with your fingers, imagine how bad that would be. But you've got to add the element of speed and you've got to add the element of swerving. And how do you do that? How do you really ever know?* All you can think of is Indiana Jones. And that's so misleading because you see it, but everybody is always okay. Because it's not real . . . (9RT 1414) (Italics added.)

* * *

[BY THE PROSECUTOR]: You know, and what comes to mind is, you know, you're holding on for dear life. Let's say you are on a cliff, and you see and you hear that somebody is approaching, and then you look up, and that person reaches down, and you're like, *"Thank goodness, somebody's going to help me," and instead, they peel your hands off. They peel them off."* (9RT 1458) (Italics added.)

The prosecutor also improperly argued that they, or their loved ones, could have been victims:

[BY THE PROSECUTOR]: *You know,  even if you're not a police officer,  you could get carjacked. Your baby might be in the car, your child,  and you might do everything in  your power to try to stop that person from taking your car.* We talked about it before. Even if you fell down and you got run over accidentally by the carjacking and he killed you, it's carjacking .

47

. . (9RT 1460) (Italics added.)

**D. The Prosecutor Committed Prejudicial Misconduct During the Sanity Phase**

**1. *Misstating the Law***

The prosecutor misstated the applicable law during closing argument in the sanity phase. (2 CT 530; 14 RT 2492.) The trial court sustained defense counsel's objections when the prosecutor argued as follows:

> THE PROSECUTOR:  So,  let's look at what his analysis of what [evil against evil for good] is and what that means to him . . . This is the document. What does that mean? Does that really mean you should do evil against evil? It's still saying I have to do evil, I have to do something evil. And he did not something evil. And for good? It is to save the world?
> *Even taking him at his word, it's for him to be with Olga. Again the instruction says a reasonable person with reasonable moral standards.* (14 RT 2492.)  (Italics added.)

The trial court also sustained defense counsel's objection when the prosecutor argued the following:

> THE PROSECUTOR: *And, in fact, you will remember there was a jury instruction from before that says if there is two reasonable interpretations from the evidence, you must adopt the one against the person who has the burden, if that is a tie, maybe he is, maybe he isn't.* (14 RT 2496.)  (Italics added.)

**2. *Disparaging Defense Counsel***

During her closing in the sanity phase, the prosecutor disparaged defense counsel. (2 CT 530; 14 RT 2471.) The prosecutor improperly

48

argued as follows:

> THE PROSECUTOR: *Please use your critical thinking skills when something is said to you by Ms. Nunez and not supported by the record. Just say to yourself, she is desperate, she really has nothing to work with, she is desperate. She has to stand here and say something, so she picks and chooses and takes things out of context.* She never talks to you about buying tickets and all that stuff. She says he is crazy, he is crazy, you have to find him insane because he is crazy. He is angry. That is what he is."(14 RT 2471.) (Italics added.)

### 3. *Misstating and Arguing Facts Outside the Record; Improper Vouching*

The prosecutor misstated facts about the nature and duration of Sadowski's mental illness, argued facts not in evidence, and vouched for the Sadowski's saneness. (14 RT 2447-2478.) *People v. Love,* 56 Cal.3d 720, 731 (1961) (misconduct to use arguments calculated to mislead a jury); *People v. Hill,* 17 Cal.4th 823-824, 827-828 (1998); *People v. Redd,* 48 Cal.4th 691, 740-741 (2010).

The prosecutor improperly argued as follows:

> THE PROSECUTOR: He [Sadowski] has been under the care of a psychiatrist from at least 2001 and has never been hospitalized either for depression or mania. (14RT 2449.)

Long before 2001, Sadowski had been under psychiatric care and hospitalized. (10 RT1552-1554, 1589, 1592.) On April 7, 2005, Sadowski was hospitalized after he was found naked in the street. (2CT  481-480; 12

49

RT 1911-1932.) Immediately after the April 29, 2005 naked on the beach incident, he was transported to the hospital where, he medicated with antipsychotic drugs and placed in four-point restraints. (7 RT 946.)

The prosecutor also improperly argued:

> THE PROSECUTOR: But this man has never had such a severe case of bipolar that he has ever been hospitalized for it. (14 RT 2449.)

Sadowski had been hospitalized twice between1985 and 1987. (10RT 1553-1554, 11 RT1632, 1686.) He was hospitalized on April 7, 2005. (12RT 1911-1932.) In jail, he was suicidal and placed in restraints and a bolted bed and was placed on the floor reserved for the sickest patients. (8 RT 1067, 1077; 13 RT 2006.)

The prosecutor improperly implied that Dr. Zetin's April 5, 2005 opinion that Sadowski was in remission, was his final word on the subject. (14RT 2451-2452.) The prosecutor incorrectly implied that defense counsel did not call Dr. Zetin as a witness because his testimony would have favored the state. (14RT 2495.)

Actually, after April 29, 2005, Dr. Zetin admitted he erred about his April 5, 2005 opinion. (14 RT 2345-2346.) The prosecutor planned to call Dr. Zetin, but changed her mind. (14 RT 2522-2523.) The prosecutor

1  unfairly gave the jury the false impression that Dr. Zetin's testimony would
2  have hurt Sadowski.
3

4      The prosecutor argued that Dr. Zetin's psychiatric skills caused
5  Sadowski's bipolar disorder to go into remission on April 5, 2005. (14 RT
6  2452.) No prosecution or defense expert testified that a psychiatrist could
7
8  cure bipolar disorder or cause it to go into remission. Nothing in the record
9  showed that Dr. Zetin's care influenced Sadowski's condition.
10

11     The evidence showed that Dr. Zetin misjudged Sadowski's mania and
12  psychosis. In March 2004,he refused the Kentros' request to hospitalize
13  Sadowski. (10 RT 1579.) Dr. Zetin's failure to correctly diagnose and treat
14
15  Sadowski's mental illness on April 5 and April 7, 2005 resulted in April 29,
16  2005 death. (14 RT 2345-2346.)
17

18     The prosecutor misrepresented the nature of Dr. Zetin's 2003-2004
19  notes, implying that he had found Sadowski "nonconformist," not bipolar.
20  She argued about Zetin's notes, "What part of this is bipolar?" (13RT 2454-
21  2455. ) However, Dr. Zetin extensively documented Sadowski's bipolar
22
23  symptoms. Besides, bipolar disorder makes sufferers "nonconformists"
24  because they exhibit symptoms that do not conform to social norms. (11
25
26  RT 1630, 1650, 1634, 1646, 1647, 1651-1652.)
27

28                                    51

The prosecutor argued, "He is getting the best care that you can get

in the country for his bipolar disorder." (14 RT 2457.) But the prosecution

failed to present any evidence about the level of care that Sadowski

received. In fact, Dr. Zetin's failure to correctly diagnose Sadowski's

condition in March 2004 and April 2005 led to Scott's death. (10 RT 1579;

14 RT 2345-2346.) The prosecutor argued, "He is bipolar, which is a

scammer " (14 RT 2458.) No evidence supported the inference that bipolar

suffers are dishonest or "scammers."

The prosecutor argued, "No matter how many times Ms. Nunez tries

to tell you that his religious themes were crazy themes, nobody said

that."(14 RT 2460.) Contrary to the prosecutor's argument, Steve Gates

testified that Sadowski twisted Christ's words about love into a crazy

version. Gates testified that Sadowski's statements differed completely

from standard Christian doctrine. Sadowski told Gates that he [Sadowski]

wanted to save the world. (12RT 1891-1892.)

Similarly, Frank Wutts testified that Sadowski said that Satan spoke

through Wutts. Wutts testified that, after Sadowski visited in March 2005,

Wutts thought Sadowski should be psychiatrically evaluated. (12 RT1864,

1872.) Mahamdi said Sadowski regarded himself as"the savior of the

52

1 world." (12 RT 1972.) Sadowski also talked about delusional religious

2
3 themes involving God and love. (11RT 1764; 14 RT 2384.)

4 The prosecutor unfairly argued, "Listening to Ms. Nunez, it almost

5 sounds delusional to believe in God, to read the teachings of Jesus Christ."

6
7 (14 RT 2461. ) Contrary to the prosecutor's statement, defense counsel

8 presented many witnesses who testified that Sadowski spoke about

9 religion in crazy ways.

10

11 The prosecutor improperly argued, "Then you get to the April 7

12 incident that Dr. Hirsch found very suspect. And I will suggest to you Dr.

13
14 Zetin would have found it extremely suspect, also." (14 RT 2466.) Actually,

15 Dr. Zetin acknowledged that he incorrectly diagnosed Sadowski on April 5,

16 2005. (14 RT 2345-2346.)

17
18 The prosecutor incorrectly argued, "Apparently nobody has consulted

19 with Dr. Zetin." (14 RT 2466.) In fact, the prosecutor knew that defense

20 counsel had consulted with Dr. Zetin. (14 RT 2345)

21

22 The prosecutor erroneously argued, "But I think you would feel bad if

23 I never had given you the evidence that on April 5 his treating psychiatrist

24 who has seen him for three years found him to be completely in remission."

25
26 (14 RT 2467.) Actually, after the April 29, 2005, incident, the prosecutor

27

28 53

1  knew that Dr. Zetin changed his April 5, 2005 opinion. (14 RT 2345-2346.)

2
3  No evidence was presented that a bipolar patient could be

4  "completely in remission." Dr. Zetin never said Sadowski was "completely

5  in remission." He checked the box "recovered April 5" on the insurance

6
7  disability form which according to Dr. Plotkin, failed to meet the American

8  Psychiatric Association minimum recordkeeping requirements. (11 RT

9  1749.)

10

11  The prosecutor argued that witness Karen Courtney testified that, on

12  April 29, 2005, Sadowski because furious because his car had been

13  towed. (14 RT 2470.) Actually, Courtney testified she saw Sadowski ranting
14

15  in the middle of the street. (3 RT 351.) Courtney testified that, although she

16  screamed at him to get out of the street, Sadowski seemed incoherent, as

17  if he wore blinders and could not see her. (4 RT 370.)
18

19  The prosecutor argued about Sadowski's foot journey to LAX:

20  THE PROSECUTOR: He [Sadowski] is angry and he is
21  trying to get to Russia. He was trying to get there earlier than
     on May 4th. So he walks up the hill. He walks and I heard her
22  tell you it would only be a crazy man that would walk, you have
23  to be insane to walk. *Well, I am insane. I walk an hour and a
     half every day and I am insane I guess.* Is it that true People
24  that to walk up a hill from Marina del Rey to the airport, you
25  have to be insane . . . What is crazy about walking? It's
     healthy, trying to stay in shape for those young girls. Trying to
26  look good." (14 RT 2471.) (Italics added.)

27

28  54

1

2      The prosecutor improperly injected her own personal experiences

3   into closing argument. *Redd,* 48 Cal.4th at 740-741. No one testified that

4
5   Sadowski walked to LAX to exercise. The evidence showed that

6   pedestrians rarely walked in the area. (9RT 1192-1196, 1206, 1209; 8 RT

7   1131-1134.)

8

9      The prosecutor argued, "Does it matter if the reason he was killing

10  himself to go to hell to fight the devil to be with Olga? It's garbage. It's hard

11  for me to say it with a straight face because it's garbage. You can look at
12
13  all these records. He never talked like that to Dr. Zetin. He never talked like

14  that to anybody at any time."(14 RT 2473.)

15      Actually, Dr. Plotkin, relying on Dr. Zetin's notes testified, "There are
16
17  probably a hundred different records that diagnose and document his

18  manic symptoms, his delusions, his lack of sleep, his pressured thoughts,
19
20  his pressured speech. Those are well documented, we see that going

21  back to the early 80's on this individual." (11 RT1762. )

22      Dr. Plotkin, using Dr. Zetin's notes, testified that on March 5, [2005],
23
24  Sadowski talked about the delusional religious themes involving God and

25  love. He talked about the joy to children website, had grandiose ideas, and

26  believed the world was breaking down. Sadowski also wore two watches
27

28                          55

1   to their last appointment. (11 RT 1764.)

2
3       Dr. Plotkin,  using Dr. Zetin's notes, testified, "There were reported
4   behaviors by the wife . . .  that he was influenced by the devil and Satan.
5   That seemed to be the common theme he saw." (11 RT 1764.) Dr. Plotkin
6
7   using Dr. Zetin's notes, testified, "[C]oworkers had him  . . .  being hyper
8   religious and writing hyper religious rants in e-mails." (11 RT 1764. ) Dr.
9   Plotkin testified, [re evil for evil for good]: "I don't remember if that exact
10
11  quote is in there, but there are plenty of notations of very similar
12  delusions."(11 RT 1765.)

13
14      The prosecutor argued, "Everybody came to court and said he knew
15  what he was doing when he was doing it." (11 RT 2474-2475.) Actually,
16  only Dr. Hirsch testified to Sadowski's sanity.

17
18      The prosecutor argued, "He doesn't pull up the name Olga until three
19  days later when he is talking with Detective Ito."(14 RT 2480.) In fact, many
20  witnesses testified about Sadowski's pre-April 29, 2005 involvement and
21
22  preoccupation with Olga and Zhanna. Selma Mahamdi testified that
23  Sadowski stalked about them as angels, and the embodiment of purity. (11
24  RT 2480; 12 RT 1972.) She said his trip to Russia seemed to be a form of
25
26  salvation for him. (11RT 2480.)

27

28                                  56

1
2
3
4

The prosecutor argued, "Some of you may have believed he had an intent to kill." (14 RT2483.) Actually, the jury did not find Sadowski had the intent to kill. (2 CT 441.)

5
6
7
8
9
10

The prosecutor argued that Sadowski had some sort of highly sophisticated airline reservation expertise reserving and cancelling airline tickets to increase chances of flying standby ticketless, passportless, and luggageless on April 29, 2005. (14 RT 2469-2470.)

11
12
13
14
15
16

The record fails to support the prosecutor's argument. Sadowski had no ticket to fly on April 29, 2005. (12 RT 1979-1980.) Nor did the prosecutor present any evidence that Sadowski had the same airline reservation expertise as, for example, the Lufthansa manager presented by the prosecution. (5 RT 568.)

17
18

### 4. *Improper Vouching*

19
20
21
22
23
24
25
26
27

The prosecutor has a special obligation to avoid "improper suggestions, insinuations, and especially assertions of personal knowledge." *Berger v. United States,* 295 U.S. at 88. A prosecutor must not vouch for the credibility of a government witness. Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness; or may indicate that information not presented to the

28

jury supports the witness's testimony. *Lawn v. United States,* 355 U.S. 339, 359-60 n. 15 (1958); *United States v. Lamerson*, 457 F.2d 371 (5th Cir. 1972); see also *Berger v. United States*, 295 U.S. at 88.

A prosecutor need not actually use the words "I believe," or any similar phrase, for a statement to constitute improper comment on the credibility of witnesses. See, e.g., *United States v. Bess,* 593 F.2d 749, 757 n. 10 (6th Cir.1979) (quoting with approval *United States v. Morris*, 568 F.2d 396, 402 (5th Cir.1978) (Attorney "may not state, 'The prosecution's witnesses are telling the truth,' or 'I believe the prosecution's witnesses are telling the truth' ").

Even the use of the words "I want to suggest" would not be sufficient to prevent a statement from constituting improper comment on witness credibility when that statement is coupled with a statement that the witness in question "is basically telling the truth . . . because she had no reason to lie." *United States v. Krebs,* 788 F.2d 1166, 1176-77 (6th Cir.1986); *see also United States v. Carroll,* 26 F.3d 1380, 1387, 1389 (6th Cir.1994).

Here, the prosecutor improperly vouched for her witnesses and injected her personal opinions into her argument and made improper disparaging comments about defense counsel:

58

1
2
3
4
5
6

THE PROSECUTOR: Everybody came to court and said he knew what he was doing when he was doing it. *I was shocked what Dr. Rothberg wrote in his report.* He said psychotic. Psychotic. The man couldn't know what he is doing. It seemed obvious that he knew what he was doing. He knew it was a police officer and he knew he was stealing his car and he knew what he was doing. (14RT 2475) (italics added.) (Exh. I at 92)

7

\* \* \*

8
9
10
11
12
13
14

THE PROSECUTOR: Before I forget, there were a couple things I wanted to mention in Ms. Nunez' opening statement to you. *One of the things that has troubled me,* there has been this sort of attack or inference if you will, that somehow the police are at fault in this place because the brother-in-law, you know, in March of I think 2004, testified that he had called LAPD and she showed you the phone numbers that he called, and said that there has been like an occasion if the police had responded appropriately back in 2004 and done something (14RT 2478) (Italics added.) (Exh. I at 95)

15
16

\* \* \*

17
18
19
20
21
22
23
24
25

THE PROSECUTOR: I want to talk to you about the burden of proof. You know, I didn't have to prove anything here. It's not my job, not my burden, not my responsibility. *You wouldn't have any of Dr. Zetin's information if it wasn't for me. I didn't call him as a witness to come testify, but I brought to you and put into evidence all his progress notes, all his evaluations, and all the forms he filled out for the disability insurance company.*
*It's important to look at why that wasn't brought to you by the defense. Because it contradicted the defense they have chosen of legal insanity here. And you wouldn't have that information if I hadn't have brought it here.* (14RT 2495) (Italics added.) (Exh. I at 112)

26
27

\* \* \*

28

59

1

2  THE PROSECUTOR: *And every time Ms. Nunez stood
here and told you he was mumbling and incomprehensible, I
3  said to myself am I in a different trial? I remember the witness
4  saying he was very angry about his car being towed, not that
he was incoherent and didn't know what he was saying.* (14RT
5  2470) (Italics added.) (Exh. I at 87)

6

7  * * *

8  THE PROSECUTOR: Remember from the earlier jury
9  instructions you are not to speculate. *That is totally improper.
It's totally improper to say there is evidence of something of
10  which there is no evidence at all in this case. But the thing that
11  surprised me the most and I am going to spend sometime
talking about it was when Ms. Nunez said to you that the
12  defendant didn't know what was right or wrong because he was
13  -- he had a belief that Olga was in hell and he had to rescue
Olga from hell and there was an imperative to rescue
14  somebody who is in hell, in danger, and that in evidence to do
15  that, he had to push out Officer Scott. I have never heard that in
his tape recorded statements, and I know you haven't either.
16  Maybe that is what she wishes he would have said in his tape
17  recorded statements, but it was not what he said.* It was not
anywhere in that . . .  (14RT 2480) (Italics added.) (Exh. I at 97)

18

19  * * *

20  THE PROSECUTOR: *Do I apologize for giving Dr. Hirsch
21  the money for evaluating the evidence in this case? When you
have an expert to take the time to review all the documents that
22  you give them to take the time to help a lay person try to
23  understand psychiatric records, the history of this defendant so
that I can bring that evidence in here into court for you to
24  evaluate, I don't think I need to apologize for that.*
25  We expect competent, thorough work, and those are the
people we are going to hire, just to go down the list and say this
26  person is a psychiatrist, psychiatrist, psychiatrist, you know
27

28  60

1  *what, I am going to go by the person who just says psychiatrist*
2  *by his name. Is there some legitimacy to that argument that I*
3  *could have hired a psychiatrist? I think all of you saw that Dr.*
   *Rothberg was ill-prepared. I think all of you heard that the*
4  *opinions expressed were not on any solid basis.* What Dr.
5  Plotkin said was this was driven by the bipolar illness. You are
   not going to see that word anywhere in your jury instructions.
6  Driven. You are not going to see this was driven by his bipolar.
7  . . . (14RT 2490) (Exh. I at 107)

8  The prosecutor committed misconduct because she improperly

9
10  appealed to the jury's passions and prejudice, she misstated the law and

11  she disparaged defense counsel. *People v. Simington*, 19 Cal.App.4th

12  1374, 1378 (1993).

13
14  **D.  The Prosecutor's Pervasive and Prejudicial Misconduct**
       **During Closing Deprived Sadowski of Due Process and a**
15     **Fair Trial; Trial and Appellate Counsel Rendered Ineffective**
       **Assistance**
16

17  The long, complex and emotionally charged case, involving the

18  horrific death of a highly regarded police officer, required an objective jury.

19
20  Throughout argument, the prosecutor improperly misstated the facts,

21  misstated the applicable law, impugned defense counsel's integrity, asked

22  the jury to sympathize with the family, improperly injected her personal

23
24  feelings, and violated the "Golden Rule."

25  "The sheer number of the instances of prosecutorial misconduct ...

26  is profoundly troubling." Considered together, the pervasive instances of
27

28                              61

1   prosecutorial misconduct ". . . created a negative synergistic effect,

2
3   rendering the degree of overall unfairness to defendant more than that

4   flowing from the sum of the individual errors." *People v. Hill*, 17 Cal.4th at

5   847.

6
7       Granted, the trial court sustained several of defense counsel's

8   objections.  Unfortunately, the court's efforts to correct the legal

9   misstatements failed to "unring" the bell sounded by the prosecutor's
10
11  repeated misconduct.  See, *United States v. Roard*, 924 F.2d 1426, 1434

12  (8th Cir. 1991) ["[A] bell once rung is difficult to unring . . . .")

13      The prosecutorial misconduct "infect[ed] the trial with such unfairness
14
15  as to make the conviction a denial of due process. " *Gionis,* 9 Cal. 4th at

16  1214.) The prosecutor's conduct involved the "use of deception or

17
    reprehensible methods to attempt to persuade  . . .  the jury." *People v.*
18
19  *Espinoza,* 3 Cal.4th 806, 820. The cumulative effect of the prosecutor's

20  misconduct deprived Sadowski of a fair trial and due process.  U.S. Const.

21
22  amends. V, VI, XIV; *Estelle v. McGuire,* 502 U.S. at  73; *Donnelly v.*

23  *DeChristoforo,* 416 U.S. at  643.

24      **E.    Counsel Failed to Properly Object, she Rendered**
25          **Ineffective Assistance**

26      Defense counsel objected to some, but not all of the prosecutor's
27

28                                  62

1  misconduct. Defense counsel did not need to object because grave doubt

2  existed about Sadowski's guilt and the prosecutor's misconduct contributed

3

4  materially to the verdict. *People v. Perry,* 7 Cal.3d 756, 790  (1972),

5  quoting *People v. Berryman,* 6 Cal.3d 337 (1936).  Second, no objection

6
   was required because no instruction or retraction could have cured the
7

8  misconduct. *Id.* Third, no objection was required because the prosecutorial

9  misconduct pervaded her closing and any objections would be futile.

10
    *People v. Hill,* 17 Cal.4th at 821-822.
11

12      Alternatively, where defense counsel waived the issue by failing to

13  object, Sadowski received ineffective assistance. U.S. Const. amend. VI;

14
    *Strickland,* 466 U.S. at 687-688.
15

16      Furthermore, appellate counsel raised the issue on appeal. However,

17  appellate counsel failed to adequately raise the issue because she failed to

18
19  raise issues about violation of the "Golden Rule" and additional issues

20  about improper vouching and disparagement of defense counsel. As a

21
    result, appellate counsel rendered ineffective assistance. U.S. Const.
22

23  amend. VI; *Strickland,* 466 U.S. at 694.

24
25
26
27
28                             63

1    **IV.    THE TRIAL COURT DENIED SADOWSKI DUE PROCESS
2            AND A FAIR TRIAL BY FAILING TO ISSUE COMPLETE
3            INSTRUCTIONS AT THE SANITY PHASE;  TRIAL AND
             APPELLATE COUNSEL RENDERED INEFFECTIVE
4            ASSISTANCE**

5    **A.    Introduction**

6        The trial court failed to issue complete instructions at the sanity
7
8    phase.  At the sanity phase, the trial court issued a total of seven

9    instructions, namely, CALJIC Nos. 4.00 (The Defense of Insanity"), 2.50.2

10   ("Definition of Preponderance of the Evidence"), 4.01 ("Effect of Verdict of
11
12   Not Guilty by Reason of Insanity"), 4.03("Temporary Insanity"), 4.04

13   ("Insanity - Lucid Intervals"), 4.05 ("Insanity –'Irresistible Impulse'"), 17.50
14
15   ("Concluding Instructions").  (Exh.  K)  None of the sanity phase

16   instructions included critical instructions about the judging witnesses'

17   credibility, judging expert witnesses and evidence.
18
19       Granted, the trial court instructed the jury at the sanity phase of the

20   trial to apply the instructions given at the guilt phase of the trial to the

21   extent those instructions were "not inconsistent" with the sanity phase
22
23   instructions.  (2CT 515)  (Exh.  K) However, the passing reference to the

24   guilt phase instructions failed to fulfill the trial court's obligation to provide
25
26   adequate instructions to the jury.

27       Nor did the trial court instruct the jury to overlook erroneous and

28                                    64

1  inapplicable instructions.  Furthermore, the trial court never gave the jury

2
3  the guilt phase instructions to compare for inconsistencies or omissions or

4  applicability. (Exh.  L) Since the trial court failed to correctly instruct the jury

5  with proper instructions, the jury could not render a fair and reliable verdict

6
7  on Sadowski's sanity.  Therefore,  the trial court deprived Sadowski of due

8  process and a fair trial.  U.S. Const. amends. V, VI, XIV. Trial counsel

9  failed to object and appellate counsel rendered ineffective assistance by

10
11  failing to raise the issue. *Strickland,* 466 U.S. at 694.

12  **B.  Due Process Requires a Trial Court to Correctly Instruct**
           **the Jury on  Every Essential Element of the Offense and**
13          **the Burden of Proof**

14
15  "Implicit in the right to trial by jury afforded criminal defendants under

16  the Sixth Amendment to the Constitution of the United States is the right to

17  have that jury decide all relevant issues of fact and to weigh the credibility
18
19  of witnesses." *United States v. Hayward,* 420 F.2d 142, 144 (D.C. Cir.

20  1969); see also *United States v. Gaudin,* 515 U.S. 506, 511 (1995); *Davis*

21  *v. Alaska*, 415 US 308, 318 (1974).
22
23  Due process demands that the jury be  instructed correctly as to

24  every essential element of the offense and the burden of proof. See *United*

25  *States v. Gaudin*, 515 U.S. at 522-23; *Osborne v. Ohio*, 495 U.S. 103, 122-
26
27  24 (1990);  *Carella v. California*, 491 U.S. 263, 267-68 (1989) (Scalia, J.,

28

1   concurring).

2   Under California law "[A] defendant has a constitutional right to have
3
4   the jury determine every material issue presented by the evidence . . . "
5   *People v. Sedeno,* 10 Cal.3d 703, 720 (1974) overruled on other points in
6
7   *People v. Flannel,* 25 Cal.3d 668, 684, fn. 12 (1979), and in *People v.*
8   *Breverman,* 19 Cal.4th 142, 176 (1998).

9   A jury instruction error violates due process where "the ailing
10
11  instruction by itself so infected the entire trial that the resulting conviction
12  violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147 (1973).

13  In reviewing jury instructions, the question is whether the instructions
14
15  as a whole were misleading or inadequate to aid the jury's deliberations.
16  See *Estelle v. McGuire,* 502 U.S. at 72; see also *Gilmore v. Taylor,* 508
17  U.S. 333, 343-44 (1993); see *United States v. Moore*, 109 F.3d 1456, 1465
18
19  (9th Cir.), cert. denied, 118 S. Ct. 108 (1997). If the jury instructions "as a
20  whole [are] ambiguous, the question is whether there is a 'reasonable
21  likelihood that the jury has applied the challenged instruction in a way that
22
23  violates the Constitution.'" *Id.* (internal quotation marks omitted) (quoting
24  *Estelle v. McGuire*, 502 U.S. at 67.)

25

26

27

28                                          66

**C.    The Trial Court Deprived Sadowski of Due Process and a
Fair Trial by Failing to Issue Proper Sanity Phase
Instructions**

At the sanity phase, the trial court failed to issue any pre-deliberation

instructions or instructions dealing with evidence, witnesses or experts.

The trial court issued a total of seven instructions, namely, CALJIC Nos.

4.00, 2.50.2, 4.01, 4.03, 4.04, 4.05, 17.50.  (2 CT. 515-516) (Exh.  K)

Granted, the trial court instructed the jury to consider all of the evidence

received in the guilt phase as well as the instructions "not inconsistent with

the [sanity phase] instructions now being given to you." (2CT 515) (Exh. K)

However, the trial court failed to refer the jury to the instructions the "jury

had been given which [were] not inconsistent with the [sanity phase]

instructions . . ."[10]

The trial court should have re-instructed the jury with proper

instructions because the jury heard the instructions as to the guilt phase

---

[10]    The use note to CALCRIM No. 3450 ("Insanity: Determination, Effect
of Verdict (Cal. Penal Code §§ 25, 25.5"), provides: "If the court conducts a
bifurcated trial on the insanity plea, the court **must** also give the
appropriate post-trial instructions such as CALCRIM No. 3550, *Pre-
Deliberation Instructions*, CALCRIM No. 222, *Evidence*, and CALCRIM No.
226, *Witnesses. See In re Ramon M.,* 22 Cal.3d 419, 427, fn. 10 (1978).
These instructions may need to be modified."  Judicial Counsel of
California Criminal Jury Instructions CALCRIM (Fall 2012 ed.) (Original
italics.)

several days earlier.  On November 16, 2009, the trial court instructed the jury with about 60 guilt phase instructions  (2CT 410)  (Exh.  L) The trial court instructed the jury on the sanity phase on November 25, 2009, about ten days later.  (2CT 512) (Exh.  K) Nothing in the record shows that the jury would even have remembered the trial court's guilt phase instructions.  The trial court never gave the jury hard copies of the guilt phase instructions to compare for inconsistencies.

At the guilt phase, the trial court gave the jury instructions to the jury

> THE COURT: All right.
> It's my personal policy to make sure that you each have your own personal set of instructions. The foreperson of your jury, the person you select to be the foreperson, will have the master set of instructions. However, it is an identical photocopy of what you are about to receive. . . . [J]ury instructions are a very, very critical part of the trial. And as you know, here in the United States, we pride ourselves on our open courtroom proceedings.  (9RT 1324)

At the sanity phase, the trial court passed out only the seven instructions.  The trial court stated, "All right. The record will reflect each of the members of our jury panel, including the alternates, have received a copy of these [seven] instructions."  (14RT 2417, 2505 ["ladies and gentlemen if you would take up your instruction package and join me at the bottom of page 2].)

During the sanity phase, the defense presented several lay witnesses

68

1   and several expert witnesses, including Robert Wheeler,  Frank Wutts,

2   Steve Gates,  James Kentros, Selima Mahamdi, Dr. Plotkin, and Dr.

3

4   Rothberg. (10 RT 1553- 1554; 11 RT 1630; 12 RT 1972; 13 RT 1840,

5   2000.) The prosecution presented only Barry Hirsch, Ph.D. (13 RT 2071.)

6
        The trial court should have instructed the jury on how to evaluate the
7

8   sanity phase evidence, including the testimony from the competing experts.

9   At the very least, the jury needed to know that it could not arbitrarily reject

10
    an expert's opinion that a defendant was legally insane at the time of the
11

12   commission of a crime. *Howard v. Corning,* 72 Cal.App.4th 621, 632

13   (1999); *People v. Prince,* 203 Cal. App. 3d 848, 859 (1988) (jury may

14
    consider the credibility of expert witnesses, the reasons for their opinions,
15

16   and the facts upon which their opinions are based, to determine weight to

17   give opinion.)

18
        During the sanity phase, the trial court should have re-instructed the
19

20   jury with several more instructions including instructions about the

21
    credibility of witnesses (CALJIC No. 2.20), discrepancies in testimony
22

23   (CALJIC No. 2.21.1), expert testimony - qualifications of expert  (CALJIC

24   No. 2.80), hypothetical questions  (CALJIC No. 2.82), resolution of

25
    conflicting expert testimony  (CALJIC No. 2.83), opinion testimony of lay
26

27   witness (CALJIC No. 2.81), sufficiency of testimony of one witness

28                                        69

1  (CALJIC No. 2.27). (Exh. L at 200-202 )

2  The trial court should have also issued appropriate post trial

3
4  instructions and pre deliberation instructions such as, jury not to take cue

5  from judge  (CALJIC No. 17.30), statements of counsel (CALJIC No. 1.02),

6
7  no independent investigation (CALJIC No. 1.03), individual opinion required

8  (CALJIC No. 17.40), how jurors should approach their task (CALJIC No.

9  17.41), jury deliberations (CALJIC No. 17.43), admonition against

10
11  disclosure of jury balloting. (CALJIC No.17.47). (Exh. L at 203-204)

12  Otherwise, the trial court failed to adequately instruct the jury.

13  Even assuming the trial court told the jury at the close of the sanity

14
15  phase of the trial to apply the "not inconsistent" instructions given at the

16  guilt phase, the trial court never told the jury to overlook erroneous and

17  inapplicable instructions.[11] For example, the trial court failed to tell the jury

18
19  to disregard nonapplicable instructions such as the following:

20  "However, a finding of guilt as to any crime may not be based

21

22  [11]  The use note to CALCRIM No. 3450 ("Insanity: Determination, Effect
23  of Verdict (Cal. Penal Code §§ 25, 25.5"), provides "Do **not** give CALCRIM
No. 224, *Circumstantial Evidence: Sufficiency of Evidence*, or CALCRIM
24  No. 225, *Circumstantial Evidence: Intent or Mental state.* These
25  instructions have no application when the standard of proof is
preponderance of the evidence. *People v. Johnwell,* 121 Cal.App.4th 1267,
26  1274 (2004)." Judicial Counsel of California Criminal Jury Instructions
27  CALCRIM (Fall 2012 ed.) (Original italics.)

28  70

1    on circumstantial evidence unless the proved circumstances are not
2    only (1) consistent with the theory that the defendant is guilty of the
     crime, but (2) cannot be reconciled with any other rational conclusion
3    . . . Also, if the circumstantial evidence as to any particular count
4    permits two reasonable interpretations, one of which points to the
     defendant's guilt and the other to his innocence, you must adopt that
5    interpretation that points to the defendant's innocence, and reject that
6    interpretation that points to his guilt. If, on the other hand, one
     interpretation of this evidence appears to you to be reasonable and
7    the other interpretation to be unreasonable, you must accept the
8    reasonable interpretation and reject the unreasonable. (CALJIC No.
     2.01) (Exh. L at 200)
9

10                                  * * *

11        You have received evidence regarding a mental disease
12   or mental disorder of the defendant at the time of the
     commission of the crimes charged in Counts 1, 2, 3 & 4. You
13   should consider this evidence solely for the purpose of
14   determining whether the defendant actually formed the required
     specific intent, premeditated, deliberated or harbored malice
15   aforethought which are elements of the crimes charged in
16   Counts 1, 2, 3 & 4.  (CALJIC No. 3.32) (Exh. L at 199)

17                                  * * *

18        A hallucination is a perception that has no objective
19   reality. If the evidence establishes that the perpetrator of an
     unlawful killing suffered from a hallucination which contributed
20   as a cause of the homicide, you should consider that evidence
21   solely on the issue of whether the perpetrator killed with or
     without deliberation and premeditation. (CALJIC No. 8.73.1)
22   (Exh. L at 194)

23                                  * * *

24

25        Specific intent or mental state. The specific intent or
     mental state with which an act is done may be shown by the
26   circumstances surrounding its commission. But you may not
27   find a special circumstance alleged in this case to be true

28                                   71

1
2
3

unless the proved surrounding circumstances are not only, (1) consistent with the theory that the defendant had the required specific intent or mental state, but (2) cannot be reconciled with any other rational conclusion.

4
5
6
7
8
9
10
11

Also, if the evidence as to any specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to the absence of the specific intent or mental state, you must adopt that interpretation which points to the absence of the specific intent or mental state. If, on the other hand, one interpretation of the evidence as to the specific intent or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable. (CALJIC No. 8.83.1) (Exh. L at 198)

12   The jury had to make critical factual findings about Sadowski's mental

13   state at the time of the incident. Unless the trial court properly instructed

14
15   the jury, the jury could not have determined every material issue presented

16   by the evidence. *See, People v. Sedeno,* 10 Cal.3d at 720. Since the trial

17
18   court issued only a few instructions, none of which dealt with crucial

19   credibility issues, the instructions could not have adequately aided the

20   jury's deliberations. See *Moore,* 109 F.3d at 1465 cert. denied, 118 S. Ct.

21
22   108 (1997). As a result, Sadowski was deprived of due process and a fair

23   trial. U.S. Const. amends. V, VI, XIV. Both trial and appellate counsel

24   rendered ineffective assistance by failing to raise the issue. *Strickland,* 466

25   U.S. at 694.

26
27
28

## V. THE OVERWHELMING EVIDENCE PROVED SADOWSKI'S INSANITY AT THE TIME OF THE CARJACKING (U.S. Const. amends V, VI.)

### A. Introduction

The jury found that Sadowski was sane during the carjacking. (2 CT 522) Because the jury's verdict lacked substantial evidentiary support, the verdict violated Sadowski's state and federal due process rights. U.S. Const. amends. V, XIV; *In re Winship,* 397 U.S. at 364; *Leland v. Oregon*, 343 U.S. 790, 801 (1952); *People v. Skinner,* 39 Cal.3d 765, 744 (1985) (Punishment by death or imprisonment of one whose mental illness results in the inability to appreciate an act is wrongful raises serious questions of constitutional dimension under the due process and cruel and unusual punishment provisions of the Constitution.)

### B. Standard of Review

"On the trial of the issue raised by the plea of not guilty by reason of insanity there is a rebuttable presumption that the accused was sane at the time the crime was committed. [Citations.] The accused has the burden of proving his insanity by a preponderance of the evidence. [Citations.] The evidence of insanity presented by the accused must outweigh the prosecution's evidence (including the presumption of sanity) not in number of witnesses or quantity of evidence, but in its effect on the jury. [Citations.]

The finding of the trier of fact upon the issue of insanity cannot be disturbed on appeal if there is any substantial and credible evidence in the record to support such finding. [Citation.]" *People v. Dean,* 158 Cal.App.2d 572, 577, (1958); see also Cal. Pen. Code §25 (b); Jackson v. Virginia, 443 U.S. 307, 318 (1979); *People v. Samuel,* 29 Cal.3d 489, 505 (1981) [competency]; *People v. Bassett,* 69 Cal.2d 122, 137 (1968) [insanity]; *People v. Skinner,* 185 Cal.App.3d at 1059 (to overturn finding of sanity, reviewing court must find as a matter of law the fact finder could not reasonably reject evidence of insanity.)

## C. The California Test of Legal Insanity

A defendant is legally insane if at the time of the commission of the crime he or she suffered from a mental disease or defect which made him or her incapable of knowing the nature and quality of the act or incapable of knowing the act is wrong. The test includes a temporal element, because "it must appear that the defendant, when the act was committed, was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed." *People v. Willard,* 150 Cal. 543, 554 (1907).

The jury is the sole judge of the fact of a defendant's sanity at the time of the charged crime. Cal. Evid. Code § 312; *People v. Woods,* 75 Cal.App.2d 246, 248 (1946) (trier of the facts is not required to accept the

74

testimony of a witness as true though it stands uncontradicted where the

trier of the facts determines that such testimony is false.) Similarly, the jury

acts within its role in rejecting uncontradicted expert testimony because it is

the exclusive province of the jury to weigh the evidence and, in the context

of an expert's testimony, to determine whether the information which

formed the basis of the opinion is worthy of belief. An expert's opinion is

only as good as its foundation. *People v. Williams*, 151 Cal.App.2d 173,

187 (1957) (expert's conclusions are to be weighed in the light of the

reasons assigned therefor and the other facts in evidence); *People v.*

*Goldstein,* 139 Cal. App. 2d 146, 153-154 (1956) (expert opinion is not

direct evidence, but only circumstantial evidence.)

"Although unanimity of expert opinion carries persuasive value

[Citation], a jury, under certain circumstances, can properly reject such

opinions. . . [Citation] "'The chief value of an expert's testimony in this field,

as in all other fields, rests upon the material from which his opinion is

fashioned and the reasoning by which he progresses from his material to

his conclusion ....'" [Citation] " *People v. Coogler,* 71 Cal.2d 153, 166

(1969).

**D.     Sadowski Overwhelmingly Proved His Insanity**

Sadowski met his burden of proving insanity by presenting lay and

75

1  expert witnesses to prove that Sadowski suffered a psychotic break that

2
3  triggered the carjacking.  As a result, Sadowski could not distinguish moral

4  right from moral wrong and was rendered legally insane. The jury's sanity

5  finding lacked substantial evidence. See, *People v. Dean*, 158 Cal.App.2d

6
7  at 577, n. 5.

8  The prosecution's sole witness, psychologist Dr. Hirsch, failed to

9  show that Sadowski understood the nature and quality of his acts as well

10
11 as right from wrong during the carjacking. Dr. Plotkin and Dr. Rothberg's

12 testimony  overcame the rebuttable presumption of sanity. Cal. Penal Code

13 § 1026 (a); *In re Dennis,* 51 Cal.2d 666, 674 (1959)[12] (law presumes the

14
15 defendant legally sane at the time he or she committed the offenses.)

16 Sadowski overwhelming proved that, at the time of the incident, he

17 was legally insane.  No substantial evidence supported the jury's finding

18
19 that Sadowski  was legally sane during the crime. Several lay people as

20

21 [12]   The trial court failed to instruct the jurors, in keeping with Cal. Penal
Code § 1127b, that they need not accept the experts' opinions and should:
22 "consider the qualifications and believability of the witness, the facts or
   materials upon which each opinion is based, and the reasons for each
23 opinion. [P] An opinion is only as good as the facts and reasons on which it
   is based. If you find that any fact has not been proved, or has been
24 disproved, you must consider that in determining the value of the opinion.
25 Likewise, you must consider the strengths and weaknesses of the reasons
   on which it is based." CALJIC No. 2.80.
26

27

28  76

1   well as two experts testified at trial. The defense experts all agreed that

2   Sadowski was legally insane when the incident occurred. Sadowski may

3

4   have understood the nature and quality of his act in taking the patrol car.

5   However, he did not know right from wrong.

6

7   Sadowski suffered for years from increasingly severe bipolar

8   disorder. Sadowski's mental illness resulted in multiple suicide attempts

9   and several hospitalizations. (10 RT 1552-1592.) As a typical bipolar

10   sufferer, Sadowski periodically stopped taking his medicine and, between

11

12   bipolar episodes,  he looked and acted normally. (11 RT 1646, 1752.)

13   Sadowski's mental illness profoundly progressed in the 1990s. By

14

15   2001, Sadowski no longer functioned as normal family man and gainfully

16   employed engineer. His marriage ended and he lived in his trash and junk-

17   filled car. He became "wild-looking, disheveled, and bug-eyed." (12 RT

18

19   1093, 1843, 1851, 1889-1890.) He indulged in long, haranguing

20   monologues, heard Satan speaking through others, could not work and

21   went on disability. (10 RT  1561; 12 RT 1873.)

22

23   Sadowski sent strange e-mails to former colleagues and government

24   officials. (12 RT  1843, 1845, 1851, 1865.) An e-mail to Dick Cheney and

25   President Bush said, "Love is finally victorious." (10 RT 1595.) Many e-

26

27   mails talked about "dying for love."(10 RT 1595.) Sadowski twisted the

28   77

1   words of Christ in the Gospels into a crazy version of love. (12 RT 1892.)

2
3   Sadowski wrote about "dying for love" and described everyone as sinners.

4   (10 RT 1595.)  The Wheelers thought he looked and sounded criminally

5   insane. (12 RT  1844.) Sadowski believed Satan spoke through Frank

6
7   Wutts. (12 RT 1873.)

8       In 2003, Sadowski stole a laptop computer and, by so doing,

9   destroyed his defense industry career. (10 RT  1565, 1588.) In March

10
11  2004, Sadowski's brother in law and sister unsuccessfully tried to get

12  Sadowski hospitalized.[13](10 RT  1557-1563, 1596, 1577, 1579.)

13      In 2005, Sadowski spent most of his days at the Flight Center and the

14
15  Global Gossip Café. (3 RT  347; 4 RT  375; 12 RT.  1981.) At the Café,

16  Sadowski would pace the store, talk to himself or imaginary friends and

17  mumble incoherently. (4 RT 367-368, 372.)  Sadowski lived in his car, and

18
19  used his savings and disability checks to see some young Russian women

20  who stole from him. (4RT 376, 381; 12 RT 1974-1975; 14 RT 2458-2463.)

21  Sadowski heard Satan's voice in the voice of his friends, he researched the

22
23  Lost Gospels obsessively in internet cafes, called himself Jesus Christ and

24  the savior of the world. (12 RT  1872, 1972.)

25

26  [13]   Due to the episodic nature of bipolar mental illness, In August 2004,
27  Sadowski sometimes appeared normal. (10 RT 1587; 11 RT  1646-1647)

28                          78

1   Motorists who saw Sadowski minutes before the encounter with

2   Officer Scott expressed concern about Sadowski's mental state. James

3

4   Myers thought Sadowski was in the midst of a psychotic episode. (8 RT

5   1192-1196, 1200.) Kelly Lowe said Sadowski seemed "off" and "something

6   was not right with him." (8 RT 1135.)

7

8   Sadowski's suicide reflected his inability to distinguish right from

9   wrong since society considers suicide to be a grave public wrong.

10

11   Washington v. Glucksberg, 521 U.S. 702, 723 (1997).  Society regards

12   suicide as "conduct that violates generally accepted standards of moral

13   obligation." *Id.* By trying to kill himself on April 29, 2005, Sadowski engaged

14   in morally wrong conduct.

15

16   Consistent with his insanity, after the Officer Scott incident, Sadowski

17   crashed two cars, and in an attempt to kill himself, cut his neck and wrists.

18

19   (6RT 636, 688.) Sadowski made delusional statements about why he

20   wanted to die on April 29, 2005. Sadowski said he wanted to kill himself to

21   merge with Satan to bring Olga out of hell. (2 CT 316.)

22

23   Overwhelming evidence proved that Sadowski suffered mental illness

24   and delusions when he took Officer Scott's car. (11 RT 1678; 13RT 2015.)

25   Even if he knew he should have obeyed Officer Scott, Sadowski could not

26

27   appreciate the morality of his actions because he focused on committing

28   79

the morally wrong act of suicide. (11 RT 1678; 13RT 2015.)

The evidence failed to support the sanity verdict of sanity. None of the medical professional who examined Sadowski, supported Dr. Hirsch's opinion. Dr. Hirsch, a psychologist and not a psychiatrist, never even treated a bipolar patient. (13 RT 2064, 2187.) On April 7, 2005, the psychiatric personnel described Sadowski as bipolar and psychotic. (12 RT 1918.) Dr. Ebrahim, the jail psychiatrist, found no malingering and diagnosed Sadowski as suffering from bipolar disorder. (8 RT 1078.) Dr. Zetin opined that, on April 29, 2005, Sadowski had been extremely psychotic and intended to kill himself and never intended to hurt Officer Scott. (13 RT 2345-2346; 14 RT 2345.) (Tr. Exh. OO) (Exh. G at 51)

The evidence supported an insanity verdict; no evidence supported the sanity verdict. The evidence at the sanity hearing overwhelmingly showed that Sadowski intended to kill himself and that he could not realize the wrongfulness of his actions. Without substantial proof of Sadowski's sanity, the sanity violated Sadowski's federal due process and fair trial rights. U.S. Const. amends. V, XIV; *In re Winship*, 397 U.S. at 364; *Leland v. Oregon,* 343 U.S. at 801; *Skinner,* 39 Cal.3d at 744.

## VI.   THE TRIAL COURT'S SENTENCE OF LWOP CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS

### A.   Introduction

Because the jury found a special circumstance, namely, that the murder occurred during a car jacking, the law compelled the trial court to sentence Sadowski to life in prison without the possibility of parole (LWOP). Cal. Penal Code § 190.2(a) (17) (14RT 2562; 2 CT 442.) Defense counsel asked the trial court to find that the LWOP sentence violated the prohibitions against cruel and unusual punishment. U.S. Const. amend. VIII; 2 CT  532-533; 14 RT 2556-2557; Cal. Const. art. I, § 17; *In re Lynch*, 8 Cal.3d 410, 424 (1972); *People v. Dillon,* 34 Cal.3d 44 (1983).

Despite overwhelming evidence that Sadowski suffered from bipolar disorder, the trial court imposed a sentence of life without the possibility of parole.  The trial court considered the evidence of Sadowski's  "substantial and powerful" mental illness as well as "one of the most horrific crimes that's been committed." (14 RT 2558.)  The trial court also ". . . wrestled with the defendant's long, . . . well-documented history of mental illness and the dire consequences of the conduct."  However, after noting that Sadowski also tried to carjack and actually carjacked two other people, the trial court decided, ". . . not to exercise its discretion under *Dillon* and will

1   impose the mandatory sentence of life without the possibility of parole as to

2   count one." (14 RT 2561-2562.)

3

4   **B.    Standard of Review**

5   Under California law, deciding that a punishment is cruel or unusual

6   under presents a question of law subject to independent review; it is "not a

7

8   discretionary decision to which the appellate court must defer." *People v.*

9   *Mora*, 39 Cal.App.4th 605, 615 (1995).

10

11   **C.    Applicable Federal and State Standards**

12   The Eighth Amendment to the United States Constitution provides:

13   "Excessive bail shall not be required, nor excessive fines imposed, nor

14
15   cruel and unusual punishment inflicted." A punishment is excessive in

16   violation of the Eighth Amendment if it is "grossly out of proportion to the

17   severity of the crime." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

18
19   The cruel and unusual punishment clause of the Eighth Amendment

20   prohibits the imposition of a penalty that is disproportionate to the

21   defendant's "'personal responsibility and moral guilt.'" *Enmund v. Florida*,
22
23   458 U.S. 782, 801 (1982); see also *Solem v. Helm*, 463 U.S. 277 (1983)

24   (life sentence without the possibility of parole for a seventh nonviolent

25   felony unconstitutional under the Eighth Amendment.)
26
27   The Eighth Amendment's ban on cruel and unusual punishment is

28   82

1   made obligatory on the states through the Fourteenth Amendment.

2   *Robinson v. California*, 370 U.S. 660 (1962). Article I, section 17 of the

3
4   California Constitution separately and independently sets out a prohibition

5   similar to the Eighth Amendment. *People v. Dillon*, 34 Cal.3d at 478; see

6   also *In re Lynch*, 8 Cal.3d at 414. Although the Legislature is accorded "the
7
8   broadest discretion possible in enacting penal statutes and in specifying

9   punishment for crime, . . . the final judgment as to whether the punishment
10
11  it decrees exceeds constitutional limits is a judicial function." *People v.*

12  *Anderson*, 6 Cal.3d 628, 640 (1972).

13      **D.    A Trial Court May Find That Punishment Is**
14          **Disproportionate to the Nature of the Crime Involved.**

15          The United States Supreme Court has held that in non-capital cases
16
17  the disproportionality test has exceedingly rare application under the

18  federal constitution. *Harmelin v. Michigan*, 501 U.S. 957 (1991).

19          However, the power to define crimes and prescribe punishments is a
20
21  legislative function. The court may not subvert the legislative process

22  unless the statute prescribes a penalty which is so severe in relation to the

23  crime as to violate the constitutional prohibition against cruel or unusual
24
25  punishment. The  basic test "is whether the punishment is so

26  disproportionate to the crime for which it is inflicted that it shocks the

27
28                                          83

conscience and offends fundamental notions of human dignity." *People v. Dillon,* 34 Cal. 3d at 478.

"The main technique of analysis under *Dillon* is to examine the nature of the offense and the nature of the offender. *Dillon,* 34 Cal. 3d at 479. With respect to the nature of the offense, the court considers the offense not only in the abstract but also the facts of the crime in the particular case, 'including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.'" *Id.*

With respect to the nature of the particular person before the court, "the question is whether the punishment is 'grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' "*Id. People v. Young,* 11 Cal.App.4th 1299, 1308 (1992); *In re Lynch,* 8 Cal.3d at 425-428; *People v. Weddle,* 1 Cal.App.4th 1190, 1195-1200 (1991).

Although defendant Dillon was convicted of first degree felony murder and attempted robbery and was sentenced to life in prison (a parole eligible sentence), the California Supreme Court held, ". . . in the circumstances of this case the punishment of this defendant by a sentence of life imprisonment as a first degree murder violates article I, section 17, of the Constitution. . . ." *Id.* at 489.

84

**E.    The Punishment in this Case Is Disproportionate to the Nature of the Crime Involved.**

*The Offense*

The evidence shows that, on April 29, 2005, Sadowski's severe mental illness drove his actions. (14 RT 2345-2346.)  The fortuitous and unique circumstances of the incident combined with Sadowski's mental illness led to the death of Officer Scott.

As Sadowski walked toward LAX, Officer Scott stopped Sadowski.  In a matter of seconds, Sadowski took Scott's car and sped away. Unfortunately, Scott hung onto the car and Sadowski turned and Scott was instantly killed.  Similarly, without any planning or thought about where he would go, Sadowski tried to open the door of Koesler 's car and then took Lazar's car.  Sadowski crashed Lazar's car and severely injured himself. (Tr. Exhs.  G, H, I) (Exh.  M)

*The Offender*

In 1981, Sadowski worked hard as a defense industry engineer.  He lived a quiet and decent life as a married husband and father.  Over the years, Sadowski began a long, slow and involuntary descent into mental

85

illness that resulted in the death of Officer Scott.[14]  (14 RT 2345-2346,

2557.)  Sadowski's frantic travels, his spending sprees, his fixations on

teenage women and his Satanic dogma resulted from his bipolar illness.

(14 RT 2345-2346.)

On April 7, 2005, the hospital staff recognized Sadowski's psychosis,

but released him to a tow truck company. (11 RT 1643;  12 RT 1911-1914.)

Dr. Zetin refused the Kentros' pleas to hospitalize Sadowski. (10 RT 1577-

1579; 11 RT 1753.) (12 RT 1911-1914.)

Sadowski's involvement in the crime was substantially less than that

of defendant Dillon, who planned, organized the crime, and killed someone.

*Dillon,* 34 Cal.3d at 451-452, 500-501.  Sadowski suffered from a lengthy,

persistent, well-documented severe mental illness. (14 RT 2556-2557.)

Sadowski acted impulsively, spontaneously and, as the jury found,

without any premeditation or thought. On April 29, 2005, as Sadowski

walked to LAX, Sadowski never ever intended to kill anyone.  Unforseen,

fortuitous events caused Sadowski to "snap" and take Scott's car.  The

incident happened as a result of a rash and emotional impulse triggered by

---

[14]     The prosecution incorrectly theorized, based on myths and stigma,
that Sadowski used mental illness as a scam to escape criminal
responsibility. See, Hinshaw, Stephen P., *The Mark of Shame: Stigma of
Mental Illness and Agenda for Change* (2007) at 73-93.

1  the series of events that occurred on that fateful evening.

2  Sadowski's LWOP sentence should be considered disproportionate

3
4  to his culpability in light of the severity of his illness, his lack of substantial

5  criminal history, and the jury's finding that he lacked the intent to kill.

6
7  Therefore, Sadowski's LWOP sentence ". . . in the circumstances of this

8  case . . . violated the Federal constitutional prohibition against cruel or

9  unusual punishment." *Id.* at 489; U.S. Const. amend. VIII.

10
11  Furthermore, appellate counsel raised the issue on appeal. She failed

12  to adequately compare the nature of the offense to the nature of the

13  offender.  She also failed to properly raise the issue in the context of a

14
15  denial of Sadowski's federal constitutional rights to due process and a fair

16  trial. *Strickland,* 466 U.S. at 694.

17

18

19

20

21

22

23

24

25

26

27

28                                    87

1

2

## VII.    THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL

3        Defense counsel, prejudicially failed to thoroughly investigate and

4    present a defense. The prosecutor committed misconduct.  The trial court

5

6    committed several errors.  Appellate counsel failed to raise meritorious

7    issues.  Sadowski was denied several constitutional rights including his

8    right to due process, a fair trial, and to an effective trial and appellate

9

10   attorney. U.S. Const. amends. V, VI, XIV.

11       The shortcomings were prejudicial both individually and cumulatively

12   and infected the trial with such unfairness as to make the conviction a

13

14   denial of due process.  See *Donnelly v. DeChristoforo,* 416 U.S. at 642-

15   643; *Brecht v. Abrahamson,* 507  U.S. at 623 (reversal required where the

16   combined effect of the errors had a "substantial and injurious effect or

17

18   influence on the jury's verdict.")

19

20

21

22

23

24

25

26

27

28                                      88

# PRAYER FOR RELIEF

Sadowski prays that:

1.  This Court issue a writ of habeas corpus directing the Los Angeles County Superior Court to vacate the judgment of commitment entered in Case No. SA041780 and that he be released from his state prison commitment, or that an order to show cause be issued;

2.  This Court command the Warden to have Sadowski together with the authority for his commitment at any necessary proceedings;

3.  This Court order an evidentiary hearing; and

4.  This Court grant Sadowski just and proper further relief.

DATED: December 3, 2012

Respectfully submitted,
FAY ARFA, A LAW CORPORATION

/s Fay Arfa

_____
Fay Arfa, Attorney for Petitioner

89